IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SNAP-ON BUSINESS SOLUTIONS, INC., | ) | CASE NO. 5:09-CV-1547 |
| | ) | |
| | ) | JUDGE JAMES S. GWIN |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | **DEFENDANT'S MEMORANDUM IN** |
| O'NEIL & ASSOCIATES, INC., | ) | **SUPPORT OF MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| Defendant | ) | |
| | ) | |

May It Please the Court:

    The defendant, O'Neil & Associates, Inc. ("O'Neil"), moves for summary judgment because its conduct was proper and lawful. The plaintiff has failed to produce a genuine issue of fact that would establish liability, and the defendant is entitled to judgment as a matter of law.

    The case arises from O'Neil's authorized retrieval of data authored and owned by O'Neil's customer from a web site hosted by the plaintiff. The plaintiff blocked O'Neil's internet access to the web site, and subsequently filed this lawsuit. Summary judgment is warranted because O'Neil's retrieval of data for its customer was lawful. There is no genuine issue of material fact that establishes otherwise.

-1-

**STATEMENT OF FACTS**

*Parties and Players:*

The pivotal entity in this case is not a party. Mitsubishi Caterpillar Forklift ("MCF") is a customer of both the plaintiff, Snap On Business Solutions, Inc. ("Snap On"), and O'Neil.[1] MCF produces forklifts and material handling equipment. For several years O'Neil had developed and provided interactive training materials for MCF. (Heilman Depo., pp. 20-21; Herrick Depo., pp. 62-63.) MCF also used Snap On's predecessor companies to develop and maintain an electronic parts catalog for MCF and its dealers. (MCF/Snap On Contracts, Exh. A – filed under seal.) Snap On obtained the contents for the electronic parts catalog from a number of sources in the MCF related companies, MCFA, MCFE, and MCFS. (Herrick Depo., pp. 69-73; Moore Depo., pp. 49-52, 113-14.) The contents consisted of parts illustrations, and names, numbers, and products associated with the parts illustrations. Some of the contents were provided by MCF in electronic form, but much of the content was printed material, or pdf documents, which needed to be converted into a more suitable form for effective electronic interactive use.

The plaintiff, Snap On, is the corporate successor to ProQuest Business Solutions, which contracted with MCF to provide the services for an electronic parts catalog. (Exh. A.) Snap-On converts paper catalog documents into a digital format, and provides software to allow access, retrieval, indexing, and cross-referencing of that data. The services relevant to this case are described and defined in License, Support, and Web Hosting Agreements between the plaintiff and MCF, originally in September 2000 and most recently executed in June 2005.[2] (Exh. A.) As discussed in greater detail later, the agreements consistently distinguished the MCF data, information, and content – which MCF supplied, owned, and was "solely responsible for" – from the software that the plaintiff licensed to MCF.

---

[1] To be more precise, MCF is used to refer to several entities collectively. The customers of both parties actually include Mitsubishi Caterpillar Forklift America, Inc., Mitsubishi Caterpillar Forklift Europe B.V., and Mitsubishi Caterpillar Forklift Asia Pte. Ltd. If separate references are required, the MCF entities are usually referenced in the contracts, depositions, and testimony as MCFA, MCFE, and MCFS ("S" referencing "Singapore"), respectively. MCF is formed from a collaboration of Mitsubishi Heavy Industries, Ltd., and Caterpillar Industrial, Inc.

[2] For purpose of this motion, the assignment of rights and obligations under the ProQuest contracts are assumed to be valid. The terms "plaintiff" and "Snap On" will be used to reference ProQuest, its predecessor, Bell & Howell, and Snap On, unless there is a particular need to distinguish them.

The defendant, O'Neil, creates a wide variety of product support information, particular for the aerospace, commercial, industrial and military industries. O'Neil develops and creates support documentation and information solutions in digital or paper formats. To that end it provides technical illustrations, online part cataloging, technical writing, and training materials.

*Events Leading to the Suit*

MCF's satisfaction with Snap On declined for various reasons, most of which are not directly related to the legal issues here.[3] But, MCF had repeatedly requested copies of the electronic parts data from Snap On because MCF needed the information for internal projects. Snap On demanded additional payment for the data, which MCF considered improper since the parts data belonged to MCF and the electronic processing and conversion had been paid for. (Heilman Depo., p. 27; Herrick Depo., pp. 40-41, 42-43, 48, 51, 53-56.) When MCF began to seek other providers for electronic data services, O'Neil was included because it was already providing e-learning services to MCF. (Heilman Depo., pp. 22-23; Herrick Depo., pp. 61-63.)

O'Neil offered more than a mere electronic parts catalog. O'Neil proposed a content management system that was more flexible, efficient, customizable, and responsive to the needs of MCF and its dealers. (Moore Depo., pp. 110-11.) A content management system could be used to author, revise and update technical documentation. Web and media based parts catalogs are just a part of the system. (Moore Depo., pp. 108-09.) MCF retained O'Neil, but Snap On had become the only centralized location for all of MCF's parts illustrations, names, and numbers in their suitable electronic form. (Cobb Depo., p. 117; Herrick Depo., pp. 68-71; Moore Depo., pp. 73-74, 149.) MCF advised O'Neil that Snap On was holding hostage the parts information and data. (Heilman Depo., p. 27; Herrick Depo., 59-60; Monzon Depo., pp. 143.)

O'Neil suggested that it could develop a tool, i.e., use a software application, which could automate the process of retrieving the illustrations, parts names and parts numbers from the Snap On hosted MCF web sites.[4] (Monzon Depo., pp. 90-94; 95-98; Cobb Depo., pp. 52-53.) The tool would emulate a user accessing the web site via an internet browser, would identify an illustration and its associated parts information, and copy the illustration and parts data onto O'Neil servers. (Stackhouse Depo., pp. 28-30; 101; Monzon Depo., pp. 55-57, 82-86.) The data

---

[3] MCF sought better efficiency at less cost, and was dissatisfied with Snap On's turnaround time, cooperation, and capabilities.

[4] The software is variously referred to in testimony as a tool, a reclamation or retrieval tool, or a scraper program.

could then be enriched, standardized, consolidated, and arranged in a manner suitable for use in the O'Neil content management system. (Moore Depo., pp. 66-67.) The tool did not run from the Snap On servers. It did not install code in Snap On software or on Snap On hardware. (Cobb Depo., pp. 85-86.) The tool performed the equivalent of a human user copying and pasting content from a web page onto the user's computer – only the process was automated for efficiency. The tool did not retrieve the program layer that Snap On uses to display the data, or the Snap On hosted web pages. (Monzon Depo., p. 86; Stackhouse Depo., 31-36.)

MCF agreed to have O'Neil develop the tool and to employ it to retrieve MCF's content from the Snap On hosted sites. (Cobb Depo., pp. 52-55.) MCF authorized O'Neil's access to the sites, and provided credentials, i.e., user names and passwords, for accessing and using the web sites. (Cobb Depo., pp. 28-29, 74-75, 78-79; Herrick Depo., 124-26, 131, 132, 149-50; Monzon Depo., pp. 37-38, 60; Moore Depo., pp. 33, 44-5, 74-5; Stackhouse Depo., pp. 23-25, 41-42, 101.) O'Neil ran the tool from its own servers during two time frames, in late April and early May 2009, and in mid-June 2009. O'Neil employees also accessed the sites in connection with the newly undertaken work to develop the MCF content management system. (Cobb Depo., p. 72.) The IP (internet protocol) addresses of the O'Neil servers used by O'Neil employees and the retrieval tool were not masked. (Cobb Depo., p. 137.) Snap On blocked O'Neil's IP addresses in May. O'Neil suspended data temporarily; when data acquisition resumed, the IP addresses were again blocked, and O'Neil ceased use of the reclamation tool. (Cobb Depo., pp. 109-10.) Data acquisition remains incomplete. (Cobb Depo., pp. 95-96; Herrick Depo., pp. 97, 99; Moore Depo., pp. 113-14.) Snap On filed suit on July 7, 2009.

*Contracts between MCF and Plaintiff:*

The key determinations in this case turn on two issues: ownership of the content to the MCF web site, and authorization to access the MCF web site. These issues are addressed in the contracts between the plaintiff and MCF. The most current contracts are the License Agreement and Web Hosting Agreement of September 2005. (Amended Complaint, ¶ 12; Exh. A.) These Agreements, and Exhibit A referenced in both Agreements, define the terms "Software" and "Data," and then consistently use the terms to establish that plaintiff owns and controls the Software, while MCF owns and controls the Data.[5] The current License Agreement provides:

---

[5] The Complaint and the Amended Complaint use the terms, "Proprietary Software" and "Proprietary Database." This writer has not been able to find those terms in the MCF

-4-

**LICENSE AGREEMENT**

> **1. Delivery and Installation.**
> (a) The Software licensed to Customer [MCF] may include ProQuests's NetCompass and/or PartsManager Pro applications. Net-Compass and PartsManager Pro (individually and collectively, the "Software") are each composed of various modules…. Each of the Net-Compass and PartsManager Pro Software operates with data (including, but not limited to, parts and service information) supplied by Customer (collectively, the "Data").
> (Exh. A – MCFA1032.)

Data under the Agreement were to be provided by MCF.

> 1.(c) Each of MCFA, MCFE and MCFS will provide to ProQuest the Data identified in Exhibit B ….
> (Exh. A – MCFA1033.)

The License Agreement contains various restrictions on the right to use, modify, copy and market the Software. However, the distinction between Software and Data is reinforced by provisions that define the Software as ProQuest's intellectual property, and Data as MCF's intellectual property.

> 13. (e) Without limiting the definition of Trade Secret, ProQuest acknowledges that the Data constitutes a Trade Secret of Customer.
> (Exh. A – MCFA1037.)

In addition to the License Agreement, the Web Hosting Agreement emphasized that the plaintiff owned the Software, but MCF solely controlled the content.

**WEB HOSTING AGREEMENT**

> 1. **Hosting Services.** ProQuest shall provide the hosting services described on Exhibit A … to store or "host" the certain software licensed by Customer from ProQuest and Customer's content located at the World Wide Web address identified … (the "Customer Web Site") for the term of this Agreement…. Customer acknowledges and agrees (i) that the primary function of the Hosting Services is to facilitate access by end users to the information provided through Customer's Web Site; (ii) that ProQuest has no proprietary, financial or other interest in any of the content or information that may be described in or made available through Customer's Web Site (except as provided by a separate License Agreement between ProQuest and Customer, if any); and (iii) that Customer is solely responsible for the content, quality and all other aspects of the information and other content contained in or provided through Customer's Web Site.
> (Exh. A – MCFA1047.)

---

Agreements, and cannot determine any factual basis for the plaintiff's claim to a Proprietary Database, except to the very limited extent to which copyright affords protection to a database against infringement.

> 14. **Customer Warranty and Indemnification.** Customer warrants that it will own or have the right to use and offer all such information or other content in the manner in which the same will be used, offered or provided in connection with Customer's Web Site.
>
> (Exh. A – MCFA1050.)

Both the Licensing Agreement and the Web Hosting Agreement establish that MCF controls and owns the content (or "Data") hosted on the web site.

There is certainly no ambiguity in the current agreements as to MCF's ownership of the Data; Snap On even disavows "proprietary, financial or other interest" in the content or information on the web site. More than that, when MCF first supplied content under the September 2000 Agreements with ProQuest's predecessor, Bell & Howell Publishing Services Co. (B&H), the contract contained an express provision governing copyright ownership:

> It is understood and agreed by the parties that the Net-Compass software is the property of B&H, but all rights to the information in the databases associated with the product, including without limitation all information about Customer's products, service manuals, operators manuals, parts manuals, and bulletins, belongs exclusively to Customer, including any and all copyrights associated with such data in the database. Nothing in this Agreement shall be construed as a restriction on Customer's ownership of or tight to use such information.
>
> (Exh. A – MCFA46684.)

Who owns what is clear under the contracts. The Web Hosting Agreement addresses who has the right to authorize access to the web site. The Web Hosting Agreement both references and incorporates Exhibit A, which explicitly vests the right to extend authorization to access the web site exclusively with MCF:

> **EXHIBIT A TO WEB HOSTING AGREEMENT**
>
> **Security Procedure:**
>
> **b. Customer.** Customer will be solely responsible for authorization security….
>
> The parties intend that authorized users will be required to enter a user name and password to access the Customer Web Site. The user name and password will be assigned and administered so as to allow access only to such modules as authorized for such user. *Customer will be solely responsible for assigning user names and passwords to authorized users*. (Emphasis added.)
> (Exh. A – MCFA1054.)

The Agreements establish undisputed facts on the two key issues – ownership and authorization – that preclude judgment in favor of the plaintiff.

## APPLICABLE LAW

Rule 56(c) of the Federal Rules of Civil Procedure permits summary judgment when all the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In assessing whether a "genuine issue" for trial exists, the court views the record and any inferences to be drawn from the underlying facts in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).   Entry of summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.  The moving party bears the initial burden of showing that no genuine issues of material fact exist. *Id.* at 321, 106 S.Ct. 2548.  The burden then shifts to the non-movant to come forward with evidence showing that there is a genuine issue of material fact.  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The non-movant may not simply rest on his pleadings, but must show, by reference to affidavits or other evidence, that a material issue of fact remains.  Fed.R.Civ.P. 56.

### I. THE COMPUTER FRAUD AND ABUSE ACT REQUIRES THAT ACCESS BE "WITHOUT AUTHORIZATION" OR IN EXCESS OF AUTHORIZED ACCESS

Every claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, ("CFAA") requires that access be "without authorization" or in excess of authorized access.  It is undisputed that MCF – the only entity allowed to assign user credentials for access to its web sites – authorized O'Neil to access the MCF websites located on the plaintiff's servers.  The CFAA can impose civil liability against

>**(a)** Whoever--
>
>**(2)** intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains--
>
>**(C)** information from any protected computer ….

Another provision can impose liability when one

>**(5)(A)** knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;
>
>**(B)** intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
>
>**(C)** intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

Although the term "authorization" is not specifically defined in the statute, "exceeds authorized access" is defined:

>**(e)** As used in this section--
>
>**(6)** the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter[.]

Whether the plaintiff's complaint is analyzed under (a)(2) or (a)(5) of the CFAA, the plaintiff must be able to establish unauthorized access or in excess of authorized access. *See, Black & Decker (US), Inc. v. Smith*, 568 F. Supp. 2d 939, 933 (W.D. Tenn. 2008). In *SecureInfo Corp. v. Telos Corp.,* 387 F. Supp. 2d 593 (E.D. Va. 2005), the CFAA did not apply to a non-party to a licensing agreement where access by that non-party was authorized by a party to the licensing agreement. That situation is present in the instant case. O'Neil, a non-party to the licensing agreement between plaintiff's predecessor and MCF, was authorized access by MCF.

The *sine qua non* of a CFAA violation is unauthorized access or exceeding authorized access. That essential element of the claim has not been and cannot be demonstrated. The most salient fact in this case is that O'Neil was authorized by MCF to access the web sites containing MCF data. Given that undisputed fact, the plaintiff cannot establish liability under the Computer Fraud and Abuse Act.

## II. THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM OF TRESPASS TO CHATTELS.

The plaintiff's claim that O'Neil's access and use of the MCF web site constituted a trespass to chattels. The claim is factually unsupported and the claim is legally preempted by copyright law.

### A. Under Ohio Law, A Trespass To Chattel Requires Invasion Against MCF's Possessory Interest To Property.

Trespass to chattel is a legal theory that simply does not fit the undisputed facts in this case. Trespass is an unauthorized invasion against the possessory interest to property. A tenant cannot trespass against duly leased property, although a title owner can certainly trespass against the tenant's possessory interest. See, *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 303 (6th Cir. 2005). Under the applicable Agreements in this case, MCF's data is hosted on the plaintiff's servers. In effect, MCF is a cyber-tenant. O'Neil's access and use of the hosted data – authorized by MCF – is not trespass. MCF's data was copied, not removed or destroyed, and the plaintiff was not dispossessed of property in any meaningful or actionable sense. Additionally, the use of software in a database is not the use of physical chattel as required by Ohio law. See, *Universal Tube & Rollform Equipment Corp. v. YouTube, Inc.,* 504 F. Supp. 2d 260, 268 (N.D. Ohio 2007). Therefore, the undisputed fact that access and use of the data was authorized by MCF warrants summary judgment for O'Neil on the trespass to chattels claim.

### B. The State Law Claim Of Trespass To Chattel Is Preempted By Federal Law Of Copyright.

The Copyright Act, 17 U.S.C. § 301(a), expressly preempts any "legal or equitable rights [under state law] that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright …."

To the extent that "computer software is a work fixed in a tangible medium of expression," the copying of the software (if factually supported) is covered by copyright law. *Pro CD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1453 (7th Cir. 1996).

> Federal copyright law preempts state laws when: (1) the work at issue is fixed in a tangible medium of expression and comes within the subject matter of the Copyright Act; and (2) the state law gives rights that are equivalent to the rights within the general scope

of copyright protections as set forth in 17 U.S.C. §106. *See,* 17 U.S.C. §301(a); *Toney v. L'Oreal USA, Inc.,* 406 F.3d 905, 909 (7th Cir. 2005). Even if the particular expression in question is not copyrighted or copyrightable, state laws that "intrude on the domain of copyright are preempted…." *Toney,* 406 F.3d at 911 (citing *Baltimore Orioles v. Major League Baseball Players Assn.,* 805 F.2d 663 (7th Cir. 1986)). Computer software is a work fixed in a tangible medium of expression. *See, Pro CD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1453 (7th Cir. 1996).

Federal copyright law provides copyright holders with five exclusive rights: (1) reproductions; (2) adaptation; (3) publication; (4) performance; and (5) display. *See,* 17 U.S.C. §106. Therefore "to avoid preemption, a state law must regulate conduct that is qualitatively distinguishable from that governed by Federal copyright law – *i.e.,* conduct other than reproduction, adaptation, publication, performance, and display." *See, Toney,* 406 F.3d at 910. *Cassetica Software, Inc. v. Computer Sciences Corp.,* 2009 U.S. Dist. LEXIS 51589, at *14, 2009 WL 1703015, 2009 Copr.L.Dec. P 29,780 (N.D. Dist. Ill. June 18, 2009).

The Sixth Circuit has emphasized that even when, as in this case, the material that is copied is not copyrightable subject matter, copyright law still preempts state causes of action. In *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446 (6th Cir. 2001), the court held that the scope of the Copyright Act's subject matter is broader than the scope of the Act's protections. Even though the appellants had expended considerable effort preparing and presenting materials, some of which were not copyrightable, the court recognized that "[o]ne function of § 301(a) is to prevent states from giving special protection to works of authorship that Congress has decided should be in the public domain, which it can accomplish only if 'subject matter of copyright' includes all works of a type covered by sections 102 and 103, even if federal law does not afford protection to them." *Wrench,* at 455 (quoting *Zeidenberg***,** 86 F.3d at 1453).

A trespass to chattel claim is preempted when it arises from a set of factual allegations that establishes copyright infringement. *See, Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey,* 497 F. Supp. 2d 627, 650 (E.D. Pa. 2007). In this case, the plaintiff's amended complaint adds a copyright infringement claim, which specifically alleges that the use of the data, information and content constitutes copyright infringement.

**III.  THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM OF UNJUST ENRICHMENT.**

The plaintiff's claim that O'Neil obtained business-related benefits at the expense of the plaintiff, warranting a constructive trust flowing from unjust enrichment, remains factually unsupported, and is also legally preempted by copyright law.

If the term, business related benefits, refers to benefits derived from copying MCF's data, information and content, then Snap On has no right or interest in the claim. If the term is referring to benefits derived from copying the plaintiff's Software, there is no evidence that copying occurred.

In either scenario, copyright law preempts the state law claim. So, for the reasons set forth is Section II.B., above, the claim of unjust enrichment, even if factually supported, would be preempted by federal copyright law. And, for the reasons stated in Section V., below, O'Neil's conduct is not infringing.

**IV.  THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE BREACH OF CONTRACT CLAIM.**

The plaintiff has not demonstrated a genuine issue of material fact that establishes a breach of any contract with O'Neil that prohibited the acquisition of data, information and content in the Snap On hosted MCF electronic parts manuals. First, the plaintiff has not established that there is any contract to which O'Neil is a party. The plaintiff alleges, but has not established, that O'Neil encountered and agreed to an End User License Agreement in the process of connecting with the MCF web sites. The plaintiff further alleges, but has not established, that the EULA prohibits copying MCF's data, information and content. There is no claim alleged, and no evidence to establish, that copying the data hosted by the plaintiff would have breached the alleged EULA. Without intending to overstate a point already emphasized repeatedly, O'Neil did not copy the Software owned by the plaintiff.

**V.  THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE COPYRIGHT CLAIM.**

The plaintiff claims copyright ownership to a database relating to MCF. (Amended Complaint, Doc. , ¶¶ 12, 45-46.)  Databases are a form of compilation, defined in the Copyright

Act as a work "formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."  *See* 17 U.S.C. § 101.  All that is protectable in a compilation is the arrangement and the creative aspects embodying the structure of the compilation.  17 U.S.C. § 103(b); *Matthew Bender & Co. v. West Publ'g Corp.*, 158 F.3d 674 (2d Cir. 1998).  "The copyright in a compilation … extends only to the material contributed by the author of such work[.]"  *See* 17 U.S.C. § 101.  A copyright in a compilation does not "imply any exclusive right in the preexisting material."  *Id.*

There is no dispute that the plaintiff's software may be covered by copyright, but that is distinct from the ownership of and copyrights to the data and content in the database.  Any copyright over the content belongs to the author of that work, and not to the party contributing sweat equity in the compiling of the works of another.  In this case, the law and the contractual terms are in accord; Data belongs to MCF.

The limited breath of protection provided to compilations was clarified in *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 111 S.Ct. 1282 (1991).

> "A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement.  In no event may copyright extend to the facts themselves."  *Id.* at 350-51.

Because of this limitation on protectability,

> "the copyright in a factual compilation is thin.  Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement."  *Id.* at 349.

The Supreme Court expressly rejected the "sweat of the brow" doctrine, which urged copyright protection over the facts and other non-original elements of compilations on the basis of the labor invested in obtaining and organizing the information.  *Id.* at 359-60.  Scanning, or converting print material into an electronic version, does not create copyright protection.

*Feist* also required that for a compilation to obtain copyright protection, it must be independently created by the author and possess at least some minimal degree of creativity.  *Id.* at 340 (holding that a typical compilation of residential phone listings in the white pages of a phone book "d[id] not satisfy the minimum constitutional standards for copyright protection").

The Supreme Court explained that the thin protection afforded to a database or a factual compilation is consistent with the objective of copyright law:

> It may seem unfair that much of the fruit of the compiler's labor may be used by others without compensation. . . . [However, t]he primary objective of copyright is not to reward the labor of authors, but to promote the Progress of Science and useful Arts. To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work. This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship. As applied to a factual compilation, assuming the absence of original written expression, only the compiler's selection and arrangement may be protected; the raw facts may be copied at will. This result is neither unfair nor unfortunate. It is the means by which copyright advances the progress of science and art. *Id.* at 349-50.

In *Assessment Technologies of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003), the court opened its opinion with a description that is analogous to this case:

> This case is about the attempt of a copyright owner to use copyright law to block access to data that not only are neither copyrightable nor copyrighted, but were not created or obtained by the copyright owner. The owner is trying to secrete the data in its copyrighted program. *Id.* at 641-42.

*WIREdata* involved the owner of a copyrighted database that consisted of a copyrighted software program and uncopyrighted data. In the instant case, of course, the allegedly copyrighted database consists of software modules copyrighted to the plaintiff, and data that is not copyrightable by the plaintiff under either § 103 or the Agreements between Snap On and MCF. Just as O'Neil sought only the underlying data from the plaintiff's servers, the defendant in WIREdata only sought the underlying data.[6] The court considered whether copyright

---

[6] A question that has arisen in chambers while discussing this case is whether the data required by O'Neil were available directly from MCF. The data were scattered and in a variety of formats that would have had to be converted yet again to suitable electronic formats, entailing significant expense and delay. Such an issue was considered and commented on in *WIREdata*:

> AT argues that WIREdata doesn't need to obtain the data in digital form because they exist in analog form, namely in the handwritten notes of the assessors, notes that all agree are not covered by the [the plaintiff, AT's] copyright. But we were told at argument without contradiction that some assessors no longer make handwritten notes to copy into a computer at a later time. Instead they take their laptop to the site and type the information in directly. So WIREdata could not possibly obtain all the data it wants (all of which data are in the public domain, we emphasize) from the handwritten notes. But what is more fundamental is that since AT has no ownership or other legal interest in the data collected by the assessor, it has no legal ground for making the acquisition of that data more costly for WIREdata. AT is trying to use its copyright to sequester

infringement would result whether the defendant (1) employed the copyrighted program to extract the data, (2) used a third party program to extract the data (i.e., a tool), or even if it (3) actually duplicated the copyrighted program to accomplish the data extraction. Under any scenario, the court concluded that retrieving the data did not infringe the copyright to the database, or the copyright to the software program.

> From the standpoint of copyright law all that matters is that the process of extracting the raw data from the database does not involve copying [the software program], or creating … a derivative work; all that is sought is raw data, data created not by [the plaintiff] but by [others]….
>
> A work that merely copies uncopyrighted material is wholly unoriginal and the making of such a work is therefore not an infringement of copyright. The municipalities would not be infringing [the plaintiff's copyrighted software] by extracting the raw data from the databases by either [using the plaintiff's copyrighted software or using MicroSoft Access]….
>
> [The plaintiff] would lose this copyright case even if the raw data were so entangled with [plaintiff's copyrighted program] that they could not be extracted without making a copy of the program. The case would then be governed by *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1520-28 (9th Cir.1992). *Id.* at 644.

Just as in *WIREdata,* O'Neil only sought the raw data – parts illustrations and their associated parts names, numbers, and product information. O'Neil did not copy the plaintiff's software. O'Neil's conduct is not infringing. Summary judgment on the copyright claim is warranted, and should be entered in O'Neil's favor.

## VI.  THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE TRADE SECRET CLAIM.

The plaintiff has alleged a claim for misappropriation of trade secrets, but no material facts supporting such a claim have been presented. In the absence of a genuine issue of fact to support the claim, the entry of summary judgment in O'Neil's favor is appropriate.

---

uncopyrightable data, presumably in the hope of extracting a license fee from WIREdata. *Id.* at 645.

## CONCLUSION

Based on the foregoing reasons, Defendants are entitled to judgment as a matter of law because no question of material fact remains for trial as to these claims.

Respectfully submitted,

*/s/ ALAN B. PARKER*
ALAN B. PARKER (0040008)
ROY A. HULME (0001090)
Reminger Co., L.P.A.
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio  44115
(216) 687-1311
(Fax) (216)687-1841
E-Mail: aparker@reminger.com
         rhulme@reminger.com

*/s/ MATTHEW L. SCHRADER*
MATTHEW L. SCHRADER (0074230)
Reminger Co., L.P.A
65 East State Street, 4th Floor
Capitol Square
Columbus, Ohio  43215
(614) 228-1311
(Fax) (614) 232-2410
E-Mail: mschrader@reminger.com

Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

I hereby certify that the instant matter has been assigned to the standard case track, and that the instant memorandum in support of Defendants' Motion for Partial Summary Judgment adheres to the page limitations set forth in Local Rule 7.1(f).

*/s/ ALAN B. PARKER*
ALAN B. PARKER  (0040008)
**Reminger Co., L.P.A.**

## CERTIFICATE OF SERVICE

    I hereby certify that on February 1, 2010, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

    */s/ ALAN B. PARKER*
    ALAN B. PARKER (0040008)
    **Reminger Co., L.P.A.**