```
 1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3                        - - -

 4   Snap-On Business Solutions, Inc.,   :
                                         :
 5              Plaintiff,               :
                                         :
 6       vs.                             : Case No.
                                         : 5:09-CV-01547-JG
 7   O'Neil & Associates, Inc.,          :
                                         :
 8              Defendant.               :

 9                        - - -

10       VIDEOTAPED DEPOSITION OF HEATHER M. COBB
                    **CONFIDENTIAL**
11               *ATTORNEYS' EYES ONLY*

12                        - - -

13

14                  Monday, December 14, 2009
                    10:15 o'clock a.m.
15                  Reminger Company, LPA
                    65 East State Street, Fourth Floor
16                  Columbus, Ohio  43215

17                        - - -

18
                    SHAYNA M. GRIFFIN
19           REGISTERED PROFESSIONAL REPORTER
               CERTIFIED REALTIME REPORTER
20                        - - -

21

22           ANDERSON REPORTING SERVICES, INC.
             3242 West Henderson Road, Suite A
23                  Columbus, Ohio 43220
                      (614) 326-0177
24                  FAX (614) 326-0214
```

**HEATHER M. COBB - December 14, 2009**          28
**Confidential - Attorneys' Eyes Only**

```
 1   Q.          Okay.  Have you seen the agreements?

 2   A.          No.

 3   Q.          Okay.  Did you ask Sam Herrick or anyone

 4   else at MCFA if you could see a copy of the

 5   agreement?

 6   A.          No.

 7   Q.          Have you ever accessed the Web solution on

 8   your -- on your own without -- when it's not just

 9   someone showing it to you?

10   A.          (Indicates.)

11   Q.          So you've accessed it?

12   A.          Yes, I have.

13   Q.          Okay.  And do you remember about how many

14   times you've accessed it?

15   A.          I don't recall an exact number, no.

16              MR. SCHRADER:  You're talking about the

17   Snap-On hosted Web portal?

18              MS. WILCOX:  Correct.

19   BY MS. WILCOX:

20   Q.          More than five?

21   A.          More than five, yeah.

22   Q.          More than ten?

23   A.          Probably.

24   Q.          Okay.  And did you need a user name or
```

**Anderson Reporting Services, Inc. (614) 326-0177**

**HEATHER M. COBB - December 14, 2009**          29
**Confidential - Attorneys' Eyes Only**

```
 1   password to access that site?

 2   A.        Uh-huh.

 3             MR. SCHRADER:  Yes?

 4   A.        Yes.  Sorry.

 5   Q.        And how did you -- how did you get one?

 6   A.        I was set up with credentials by MCFA.

 7   Q.        Who at MCFA forwarded those to you?

 8   A.        I believe Samuel Herrick.

 9   Q.        How did you first get involved with

10   O'Neil's current project for MCFA?

11   A.        Well, I would say I was involved in -- in

12   that we were offering a technology-driven solution,

13   so I was a part of that -- that contract and

14   establishing that -- that effort.

15   Q.        Was that something that was initiated by

16   MCFA or by O'Neil?

17   A.        I'm not sure how the business arrangement

18   surfaced.  But as far as proposing the solution,

19   O'Neil proposed a solution and MCF accepted the terms

20   of that solution.

21   Q.        Do you know who would have been involved

22   in the initiation of that for O'Neil, O'Neil's side?

23   A.        Myself, one of the sales reps, primarily,

24   yes.
```

```
 1   getting the rest of the data for you"?

 2   A.          I don't recall exact conversations with

 3   regard to getting their data any other way.

 4   Q.          So was there a point in time when it was

 5   decided between O'Neil and MCFA that the data needed

 6   to be acquired by using a scraper script?

 7   A.          Yes.

 8   Q.          Do you recall approximately when that was?

 9   A.          No.

10   Q.          Did MCFA say it was not going to be

11   possible to acquire the data through other means?

12   A.          No.  I don't recall them saying it wasn't

13   possible.  I recall them saying it was not economical

14   to provide data in any other format.

15   Q.          Did they ever tell you how much Snap-On

16   was planning on charging them for the raw data?

17   A.          No.  I was not aware of their relationship

18   or the details there.

19   Q.          Do you recall whose idea it was to use the

20   scraper tool to download the data?

21   A.          It was our idea, O'Neil's.

22   Q.          So MCFA said "We can't get our data," and

23   O'Neil said, "Okay.  We can go get it for you"?  I

24   mean, how did that discussion go?
```

 1          MR. SCHRADER:  Object to form.  You can

 2   answer, Heather.

 3   BY MS. WILCOX:

 4   Q.          You can answer.

 5   A.          I'm sorry.  Could you repeat the question

 6   then.

 7   Q.          Do you recall the discussion between

 8   O'Neil and MCFA where it was decided that the

 9   reclamation tool be used to acquire the data?

10   A.          I recall that that conversation happened,

11   yes.

12   Q.          And were you part of that conversation?

13   A.          Yes.

14   Q.          And who else from O'Neil was there?

15   A.          I believe Barbara Moore was there.  Samuel

16   was there.  I believe Armando Monzon was there.

17   Q.          And whose idea was it to use the tool?

18   A.          It was our -- O'Neil's idea to use the

19   tool.  It was an idea that MCF could decide if they

20   wanted to pursue.

21   Q.          But who at O'Neil suggested the use of the

22   reclamation tool?

23   A.          I believe I did.

24   Q.          Have you ever used a scraper or data

```
 1   mining script before?

 2   A.          No.

 3   Q.          Okay.  Do you know how they work, in

 4   general?

 5   A.          Yes.

 6   Q.          Can you tell me, just briefly, the general

 7   way that the tool operates, the tool that O'Neil was

 8   using.

 9   A.          Yes.  In general terms, the tool could

10   access a page on the website and download what is

11   visibly there on the site.

12   Q.          And when -- when you suggested to MCFA

13   that the data could be acquired this way, what did

14   MCFA say?

15   A.          Okay.

16               MS. WILCOX:  Can we go off the record.

17               THE VIDEOGRAPHER:  Off the record at 1127.

18                    (Recess taken.)

19               THE VIDEOGRAPHER:  On the record at 1143.

20   BY MS. WILCOX:

21   Q.          Ms. Cobb, did you meet with your counsel

22   during the break?

23   A.          I --

24               MR. SCHRADER:  We chatted.
```

1  A.           -- had a cigarette with him.

2  Q.           Okay.  Did you talk about your testimony

3  today?

4               MR. SCHRADER:  Objection.  You can answer.

5  A.           No, not really.

6  Q.           Okay.  Not really or no?

7  A.           No.

8  Q.           Back to the data reclamation tool,

9  Ms. Cobb, I'm handing you a document marked for

10  identification as Exhibit 88.  Can you tell me what

11  this document is, please.

12  A.           Uh-huh.  This document is a summary of

13  meeting notes and status.

14  Q.           And does this appear to be a true and

15  accurate copy of these meeting notes?

16  A.           Yes.

17  Q.           Do you recall this meeting on February 5th

18  of 2009?

19  A.           Not intimately, but I do recall that this

20  meeting took place and that I was a participant.

21  Q.           And do you recall when O'Neil first began

22  running the scraper script on the Snap-On website?

23  A.           I don't remember the exact date, no.

24  Q.           Okay.  If you refer to the first paragraph

**HEATHER M. COBB - December 14, 2009**          72
**Confidential - Attorneys' Eyes Only**

1          THE WITNESS:  Yes.  I'm sorry.  Yes.

2    BY MS. WILCOX:

3    Q.          How -- can you tell me how the data

4    appeared to be organized.

5    A.          It was organized by brand and by model.

6    Q.          And how was data linked within that

7    system?

8    A.          Well, in the example of using the P3000,

9    the P3000's data was available from the P3000 model

10   reference.

11   Q.          Was the parts data linked to an image on

12   that site?

13   A.          Oh, I can't answer how Snap-On designed

14   how it presented the information behind the scenes,

15   but I can say that if you accessed the website and

16   looked at the P3000's parts list, you would see the

17   corresponding graphic with that in the view.

18   Q.          Okay.  And you would see all of the

19   subparts that go with that -- within that portion of

20   the navigation?

21   A.          Yes.

22   Q.          Did you download data from that website?

23   A.          I did from viewing it.  You can right

24   click and download it, but I didn't retain that.

```
 1   Q.        Okay.  Now, how about using the

 2   reclamation tool?

 3   A.        Well, the reclamation tool was the user in

 4   that instance, so the tool accessed the site.

 5   Q.        Who operated the tool?

 6   A.        Dean Schuler, the developer of the tool.

 7   Q.        Was there anyone else who operated it?

 8   A.        Not that I'm aware of.

 9   Q.        When Sam Herrick gave you the user names

10   and passwords to log into those sites --

11   A.        Uh-huh.

12   Q.        -- did he also give you the URLs for the

13   websites?

14   A.        Yes.

15   Q.        Okay.  And did he create unique user names

16   and passwords for you and others at O'Neil?

17   A.        No.

18   Q.        Okay.  Do you know where he got the

19   passwords from?

20   A.        From the -- from the site.

21   Q.        Do you know whether they belonged to other

22   people at MCFA?

23   A.        I don't know who they belonged to.

24   Q.        But they didn't belong to people at
```

**HEATHER M. COBB - December 14, 2009**          75
**Confidential - Attorneys' Eyes Only**

```
 1   O'Neil?

 2   A.           No.  The tool used the credentials that

 3   were given by MCFA.

 4   Q.           And Samuel provided those credentials?

 5   A.           Yes.

 6   Q.           Ms. Cobb, I'm handing you a document

 7   marked for identification as Exhibit 85.  And you

 8   only need to look at the first page of that right

 9   now.

10               Can you tell me what this document is.

11   A.           It appears to be a document that contains

12   status of the project as of the date on the document.

13   Q.           And does this appear to be a true and

14   accurate copy of this status?

15               MR. SCHRADER:  Objection.  You can answer.

16   A.           Yes, it appears to be.

17               MR. SCHRADER:  The reason for my

18   objection, Amanda, is this appears to be an MCF

19   created document, so I'm not sure how Ms. Cobb can

20   tell you whether it's an accurate representation of

21   what MCF created.

22   BY MS. WILCOX:

23   Q.           If you can look at the bottom of the first

24   page where it says "User and passwords for all sites,
```

**Anderson Reporting Services, Inc. (614) 326-0177**

```
 1  A.          Uh-huh.

 2  Q.          -- what does that mean?  Can you explain

 3  that, please.

 4  A.          Yes.  What this means is that we did

 5  confirm that the site supports concurrent sessions of

 6  one authentication to the site.

 7  Q.          And was this because the passwords

 8  belonged to MCF employees?

 9            MR. SCHRADER:  Objection.  You can answer.

10  BY MS. JOHNSON:

11  Q.          You can answer.

12  A.          It was to -- it was to ensure that the

13  data acquisition tool could use the credentials and

14  that the MCFA user could also use the site

15  simultaneously.

16  Q.          Okay.  And if MCF had created new

17  passwords for O'Neil employees, would that have

18  needed to be done, or no?

19  A.          I'm not sure I follow your question.

20  Q.          Say MCF created a password for you for --

21  a user name and password for Heather Cobb.

22  A.          They did.

23  Q.          Okay.  And then so why would you need to

24  test that to see if simultaneous sessions were
```

1  allowed?  Why would you be -- if it's you, why would

2  you be logged in twice?

3  A.        I'm not -- I think I understand your

4  question, but I'm not sure.  We were provided

5  credentials that the tool could use of A, E and S.

6  And we confirmed with MCF that that credential could

7  be used more than once simultaneously; thus, the tool

8  could access the data and the user for those

9  credentials could access the data.

10  Q.        Okay.  So you were provided with your own

11  user name and password; correct, under your name?

12  A.        Yes, I was.

13  Q.        Okay.  And then MCF provided other

14  credentials belonging to MCF employees that were used

15  by the tool?

16  A.        I don't know whose credentials they were.

17  I just know that they were provided by MCF.

18  Q.        Okay.  So you didn't know who the

19  credentials belonged to that were provided by MCF;

20  correct?

21  A.        Correct.

22  Q.        Now, because you were testing to see if

23  simultaneous log-ins were allowed, were you assuming

24  that those passwords belonged to somebody else at

1   Q.          In the risk and mitigation strategy chart,

2   the second entry in that chart says, "The current

3   vendor, Snap-On, may pose objections to the wholesale

4   acquisition of MCFA source data."

5               What was meant by wholesale acquisition of

6   MCFA source data?

7   A.          Simply gathering all of the data from the

8   site.

9   Q.          And in that mitigation strategy, who

10  drafted that strategy or who -- who created that

11  strategy?

12  A.          This was created by O'Neil; so, again, I

13  believe Barbara or myself incorporated this -- this

14  comment.

15  Q.          And in the second sentence, it says,

16  "Launching this crawler from with the MCFA domain" --

17  I assume that was supposed to be within the MCFA

18  domain -- "may lessen objections by Snap-On; and,

19  alternatively, O'Neil can mask the origin DNS

20  information in the crawler."

21              Was the crawler ever launched from within

22  the MCFA domain?

23  A.          No.

24  Q.          And why not?

```
 1  A.          It just -- we developed the tool, we

 2  hosted the tool, so it just was an extra step that

 3  was never taken.

 4  Q.          Okay.  What about masking the origin DNS

 5  information?

 6  A.          No, that was not done either.

 7  Q.          And why not?

 8  A.          Well, we weren't trying to hide ourselves,

 9  per se.  So we didn't -- we didn't do that.

10  Q.          But at the time this was written, I mean,

11  that was a concern, and those would have been ways to

12  sort of reduce the chances of Snap-On knowing about

13  the data acquisition and objecting.  At the time that

14  this was created, were those options being

15  considered --

16              MR. SCHRADER:  Objection.

17  Q.          -- as mitigation strategies?

18              MR. SCHRADER:  Object to form.  You can

19  answer, Heather.

20  A.          I can't speak to MCF's reliance on this.

21  It just never came to be an issue, so...

22  Q.          What about after the IP address was

23  blocked, did O'Neil consider launching from MCFA's

24  domain or masking the IP?
```

1  Q.          Okay.  Was the design of the content

2  management system and the client product in progress

3  during the data acquisition phase?

4  A.          No.

5  Q.          So was the data acquisition mostly

6  completed before the design of the systems began?

7  A.          Can you ask that question again.

8  Q.          Was the data acquisition phase completed

9  before the building of the content management system

10  and electronic parts catalog or client?

11  A.          The data acquisition piece must happen

12  first before finalizing the design of the delivery

13  systems and the content management system.

14  Q.          Okay.  So is the data acquisition phase

15  complete as of now?

16  A.          It's complete in that we won't be

17  acquiring any more data.

18  Q.          Is there other ways that it could be

19  complete other than you won't be acquiring more data,

20  or do you -- who do you mean you won't be acquiring

21  more data from?

22          MR. SCHRADER:  Object to form.  You can

23  answer.

24  A.          The data acquisition tool will not acquire

**HEATHER M. COBB - December 14, 2009**          96
**Confidential - Attorneys' Eyes Only**

```
 1   any more data.

 2   Q.          Okay.  But you will be getting more data

 3   through other channels?

 4   A.          Correct.

 5   Q.          Okay.  And is that through MCFA?

 6   A.          Yes.

 7   Q.          Okay.  Do you know what O'Neil charged

 8   MCFA for the data acquisition phase of the project?

 9   A.          Yes.

10   Q.          And how much was that?

11   A.          It was $██████████

12               MR. SCHRADER:  That's highly confidential.

13               Is that just for the data reclamation or

14   the data services in total?

15               THE WITNESS:  It was the data services in

16   total.

17   BY MS. WILCOX:

18   Q.          And how much of that ████████ was for the

19   data reclamation?

20   A.          I don't have the complete breakdown to

21   answer that specifically.

22   Q.          Do you know how long it took to create the

23   reclamation tool?

24   A.          Yeah.  It took approximately 30 days.
```

**Anderson Reporting Services, Inc. (614) 326-0177**

**HEATHER M. COBB - December 14, 2009**     109
**Confidential - Attorneys' Eyes Only**

```
 1   MCFA that the site was blocked.

 2   Q.          Ms. Cobb, I'm handing you a document

 3   marked for identification as Exhibit 16.

 4   A.          Okay.

 5   Q.          Can you please tell me what this document

 6   is.

 7   A.          Yes.  It is an e-mail on the status of the

 8   data acquisition reclamation process.

 9   Q.          And you were copied on this e-mail;

10   correct?

11   A.          Yes, I was.

12   Q.          And does this appear to be a true and

13   accurate copy of this e-mail?

14   A.          Yes, it does.

15   Q.          And what is the date on this e-mail?

16   A.          July 1, 2009.

17   Q.          Where was the alternate IP referred to in

18   this e-mail?

19   A.          Well, the alternate IP was another O'Neil

20   IP.

21   Q.          And this is the second time that an IP of

22   O'Neil's was blocked.  What did O'Neil do after the

23   IP was blocked this time in terms of continuing with

24   the project?  Was O'Neil looking for an alternate IP
```

```
 1   to use or did O'Neil decide to halt the data

 2   acquisition through this avenue?

 3              MR. SCHRADER:  Object to form.

 4   A.         I can't specifically recall what happened

 5   after July 1.  There was a period of time where we

 6   were blocked and we rerouted through another IP.

 7   That was, hence, blocked.  I don't know the date of

 8   that.  And then -- then we ultimately ceased.

 9   Q.         Was that at MCF's instruction that you

10   ceased or was that an O'Neil decision?

11   A.         That was an O'Neil decision.

12   Q.         And who at O'Neil decided that?

13   A.         Well, both myself and Barbara made that

14   agreed upon decision.

15   Q.         What was the reason for that decision?

16   A.         Well, the decision was that it was clear

17   that Snap-On was blocking our access to the site and,

18   you know, we discussed this with Samuel, and it was

19   under concurrence that we agreed to halt any further

20   data acquisition.

21   Q.         Okay.  So Samuel agreed that that was a

22   good course of action at the time?

23   A.         Yes.

24   Q.         The first time that O'Neil's IP address
```

```
 1   much more relieved when we discussed, you know,

 2   that -- the responsibilities and where those stood.

 3   Q.          What responsibilities in particular?

 4   A.          Well, that we were acting as an agent for

 5   MCFA to retrieve their rightful data.

 6   Q.          And do you recall when that conversation

 7   occurred with Debbie?

 8   A.          I don't recall the exact date.

 9   Q.          Was it prior to --

10   A.          It was early in the process.

11   Q.          Okay.

12   A.          I can't recall the exact date, though,

13   Amanda.  I'm sorry.

14   Q.          Why did MCFA need O'Neil to download the

15   data from the Snap-On website?

16   A.          Because they did not have an electronic

17   copy of their data prior to the updates performed by

18   Snap-On.

19   Q.          Did you ever wonder why -- if it was

20   MCFA's data, why they needed you to get it from the

21   Snap-On website?

22   A.          I didn't wonder a great deal.

23   Q.          Did you ever discuss the ownership of the

24   data with anyone else at O'Neil?
```

```
 1   we're going to modify it to submit a request every 30

 2   seconds?  I mean, wouldn't that, in theory, lessen

 3   the load on the site to do a request every 30

 4   seconds?

 5             MR. SCHRADER:  Object to form.

 6   A.        We wanted to be as efficient as possible,

 7   to get data in an expeditious manner without -- you

 8   know, without troubling the site, or we wanted to

 9   simulate a user's session as best as possible.

10   Q.        Did O'Neil want to simulate a user session

11   to avoid detection by Snap-On?

12   A.        No.  We just wanted to be as careful as

13   possible with grabbing data from the site.  You know,

14   like I said, I mean, we could have masked who we

15   were.  We could have run it from different areas.

16   There were many things that we could have done, and

17   we did not.  We just wanted to be like a user and be

18   comfortable that the tool was getting data and not

19   being rogue with the site.

20   Q.        Ms. Cobb, I'm handing you a document

21   marked for identification as Exhibit 175.  If you

22   could please tell me what this document is, I would

23   appreciate it.

24   A.        Yes.  It is weekly meeting notes from the
```