1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION

3    SNAP-ON BUSINESS              )
     SOLUTIONS, INC.              )
4                                 )
          Plaintiff,             )
5                                 )
     vs.                          )  CASE NO. 5:09-cv-01547-JG
6                                 )
     O'NEIL & ASSOCIATES, INC. )
7                                 )
          Defendant.             )
8

9              ORAL VIDEOTAPED DEPOSITION

10                 SAMUEL A. HERRICK

11                  January 13, 2010

12

13        ORAL VIDEOTAPED DEPOSITION OF SAMUEL A. HERRICK,

14   produced as a witness at the instance of the

15   Plaintiff and duly sworn, was taken in the

16   above-styled and numbered cause on the 13th day of

17   January, 2010, from 10:12 a.m. to 4:24 p.m., before

18   Michelle Hartman, Certified Shorthand Reporter in and

19   for the State of Texas and Registered Professional

20   Reporter, reported by computerized stenotype machine

21   at the offices of Liskow & Lewis, 1001 Fannin Street,

22   Suite 1800, Houston, Texas 77002, pursuant to the

23   Federal Rules of Civil Procedure and the provisions

24   stated on the record or attached hereto.

1    does that mean, complete, if you know?

2                    MR. PARKER:  Objection.

3                    THE WITNESS:  It means that Snap --

4    that O'Neil believes that they had gathered MCFA's

5    data on www.catliftmanuals.com.

6        Q    (BY MR. GUAM)  And why do you -- why did

7    you refer to it as MCFA data?

8        A    Because it's our data --

9        Q    Why?

10       A    -- that they -- every publication that's

11   printed says, "Copyright MCFA," and it's copyrighted

12   because MCFA owns all rights to the information about

13   our lift trucks we produce.

14       Q    Did MCFA attempt to get its data back from

15   Snap-On?

16                    MR. SPECTER:  Objection.  Calls for

17   speculation.

18                    THE WITNESS:  Can you rephrase the

19   question?

20       Q    (BY MR. GUAM)  Well, what is it that you

21   don't understand?

22       A    What you mean by "attempt."

23       Q    Did MCFA ever ask Snap-On if it could have

24   its data back?

```
 1      A      Yes.

 2      Q      And who did that?  Who at MCFA did that?

 3      A      Multiple individuals.

 4      Q      List them, please.

 5      A      Jay Gusler, Matt Wilczek, Elena Hoppel,

 6  Samuel Herrick.

 7      Q      All right.  So you asked someone at Snap-On

 8  for the data back, correct?

 9      A      Yes.

10      Q      More than once?

11      A      Yes.

12      Q      Okay.  Let's go -- how many times?

13      A      More than five, less than ten.

14      Q      Did you ever do it in writing?

15      A      I can't be -- I can't remember.  I believe

16  the answer is yes, but I -- I'm not positive.

17      Q      Okay.  Who at Snap-On did you ask to have

18  the data back from?

19      A      Terri Keeler.

20      Q      I'm sorry, Terri Keeler?

21      A      Terri Keeler, T-E-R-R-I.

22      Q      Okay.  Anyone else?

23      A      Scott McCuin (sic).

24      Q      Okay.  Anyone else?
```

SAMUEL A. HERRICK - January 13, 2010        42

1      A      Sam Vongratana.

2      Q      I'm sorry, the last name again?

3             MR. SPECTER:  Could you spell it?

4             THE WITNESS:  V-O-N-G-R-A-T-A-N-A.

5      Q      (BY MR. GUAM)  Anybody else?

6      A      Jonathan Harvey.

7      Q      Anyone else?

8      A      Cory Roberts.

9      Q      Okay.  Anybody else?

10     A      I believe that's the list.

11     Q      Do you recall who the first person you

12  asked for the data back from?

13     A      Terri Keeler.

14     Q      Do you recall when approximately you asked

15  him that --

16     A      Her.

17     Q      -- her that?  Sorry.

18     A      I was hired in January 2007, Q1 of 2007.

19     Q      Did you do that in person, by phone, in

20  writing?

21     A      Yes.

22     Q      All of those?  I'm sorry, how did you

23  ask -- how did you first -- the first time you asked

24  Terri Keeler for the data back, was that in person?

1     A     No, on the phone.

2     Q     On the phone.  Okay.  And what specifically

3  did you say to her?

4     A     I couldn't tell you specifically.  I can

5  give you my recollection.

6     Q     Give me the best you can.

7     A     We -- our first request was to have an

8  electronic copy that they keyed for us to connect to

9  our warranty system.

10    Q     And what was the purpose of that?  I don't

11 understand keying to the warranty.  Can you explain

12 that a little bit more?

13    A     I'm sorry, keying -- which part do you want

14 me to -- is it the keying you want me to describe?

15    Q     Sure.

16    A     Snap-On's -- one of Snap-On's services for

17 MCFA is to take our data and to physically key each

18 character in its exact format.

19    Q     I don't understand keying.  Is that just

20 typing it in or what is keying?

21    A     Yes.

22    Q     It's just typing it in?

23    A     Yes.

24    Q     Well, you said "key to connect to a

```
 1     Q     And when you met with him, did you discuss
 2  getting data back from Snap-On?
 3     A     Yes.
 4     Q     And what did you say to him and what were
 5  his responses?  And I'm looking for more detail of
 6  the discussion.
 7     A     It was a very high-level
 8  direction-of-the-business, from Snap-On's
 9  perspective, meeting, and we asked him for our data,
10  and in that meeting I believe we also requested some
11  enhancements to their product catalog and asked them
12  if they were on the future direction of the company.
13     Q     Asked if they were on the future direction
14  of the company?
15     A     The -- sorry, the product development
16  schedule.
17     Q     Do you recall when this discussion took
18  place?  I'm not looking for an exact day unless you
19  know it, but --
20     A     Probably end -- later 2007, beginning of
21  2008.
22     Q     At the time that that discussion took place
23  with -- was it Mr. McCuin --
24     A     Yes.
```

1     Q     Well, what happened next after you guys

2   worked out a set of requirements for the data?

3     A     Sam Vongratana was no longer with Snap-On

4   and we were moved to another person.

5     Q     Who was that?

6     A     Jonathan Harvey.

7     Q     Okay.  What happened next?

8     A     We met at Snap-On with Jonathan Harvey,

9   Cory Roberts, Jewel Drass, Dan Gesacion.  Those were

10  the primary contacts.

11    Q     And you said "we met."  Who is "we,"

12  yourself and who?

13    A     Paul Fiala.

14    Q     Who is Paul Fiala?

15    A     Paul Fiala at that time was the service

16  parts manager at MCFA.

17    Q     Do you recall when this meeting took place?

18    A     Probably mid-2008.

19    Q     Can you tell me what happened at the

20  meeting?

21    A     We expressed our disappointments with

22  Snap-On and requested our data and we talked about

23  the roadmaps of the products.

24    Q     Anything else from this high level that

SAMUEL A. HERRICK - January 13, 2010          53

```
 1   online and the -- the Net Compass and Parts Manager
 2   Pro products, and faster publishing turnaround.
 3   Those are the -- those were the primary requests.
 4       Q     And you also said you requested the MCF
 5   data -- MCFA data back.  What response, if any, did
 6   you get from anyone in the meeting?
 7       A     Jonathan Harvey asked if we were asking for
 8   the data because we wanted to leave Snap-On.
 9       Q     Did you -- did you respond to his question?
10       A     Yes.
11       Q     And what did you say?
12       A     No.
13       Q     At the time of this meeting -- and I may
14   have asked this already, but at the time of this
15   meeting, had MCFA been discussing with O'Neil
16   replacing Snap-On?
17       A     No.
18       Q     Was MCFA considering replacing Snap-On with
19   O'Neil at the time of this meeting?
20             MR. SPECTER:  Objection.  Calls for
21   speculation.
22             THE WITNESS:  No.
23       Q     (BY MR. GUAM)  Do you know if MCFA had been
24   talking to anyone else about replacing Snap-On at the
```

```
1   time of this meeting?

2       A    Yes.

3       Q    Who had they been talking to?

4       A    Yes, I know.

5       Q    What do you know?  Maybe we're having a

6   failure to communicate.

7               MR. SPECTER:  I think your question

8   was whether he knew if MCFA was talking to someone

9   about replacing Snap-On.

10              MR. GUAM:  Okay.

11              MR. SPECTER:  His answer is, yes, he

12  knows whether MCFA was, in fact, doing so.

13      Q    (BY MR. GUAM)  Is that what you're saying?

14      A    Yes.

15      Q    Were they?

16      A    No.

17      Q    Okay.  And I think you said this meeting

18  was in mid-2008.  Do you have a -- is there a --

19  thinking about it now, can you put a more specific

20  time period on it, a date on it?

21      A    (Shakes head.)

22      Q    No?

23      A    Not really.

24      Q    Okay.  So Jonathan Harvey asked if you were
```

1   asking for the data to leave Snap-On.  You said no.

2   What, if anything, was said next?

3       A     Jonathan asked why we wanted it and I said

4   because we paid for it, it's ours, and we have a need

5   for it.

6       Q     Were you any more specific than that?

7       A     In the meeting we discussed at length

8   that -- some of the different uses, such as having

9   a -- having a part number verification in our

10  I-warranty system, assisting in our cross reference

11  information with Rapid Parts would be the two main

12  topics.

13      Q     Okay.  What else was discussed about

14  getting the data back, if anything?

15      A     I recommended that they would follow up

16  with us.

17      Q     Okay.  Was there anything more specific

18  than that?

19      A     Not that I recall.

20      Q     Did they just -- I mean, I'm trying to get

21  a feel for -- or understanding for what that means.

22  Did they just say, we're committed to following up

23  with you, and that was the end of the discussion

24  or --

1       A       In the near future.  They did not give us a

2   hard date that I remember.

3       Q       Okay.  All right.  Well, what happened

4   next?  Actually, I'm sorry.  Let me strike that.  Let

5   me back up.  You listed a couple -- I think four

6   different things that were discussed at a high level

7   in that meeting.  One was you had expressed your -- I

8   can't even read my handwriting here -- the problems

9   you had or disappointments with Snap-On, requested --

10  discussed requesting the data back, and then the

11  third was talked about a roadmap of products.

12              Who -- who talked about a roadmap of

13  the products?  Is it Snap-On?

14      A       Yes.

15      Q       And a roadmap of the products, what are

16  you -- what are you referring to?

17      A       Generally a timeline, at least a year, up

18  to five, and a feature inclusion on that timeline.

19      Q       Is this -- are these roadmaps of the two

20  products that MCFA was currently getting from

21  Snap-On?

22      A       Yes.

23      Q       Was the Net Compass and -- what was the

24  other one?

1      Q      Just so I'm clear, I mean, a week or two, a

2   month, something like that?

3      A      Yes.

4      Q      And you said his goal was to meet your

5   needs for the data and you started working with him

6   on this demo because they wanted to meet those needs

7   through some new means.  What happened next?

8      A      Cory Roberts called Matt Wilczek and told

9   him that -- that they would be able to deliver the

10  data to us for a fee comparable to a new contract or

11  he'd be able to include it in the contract of new

12  business.

13     Q      And you weren't a part of that

14  conversation, were you?

15     A      No.

16     Q      How do you know about it?

17     A      Matt Wilczek talked to me following the

18  conversation.

19     Q      What, if anything else, did he tell you

20  about that conversation?

21     A      That it was an unreasonable request.

22     Q      Did he discuss the details of the

23  conversation with you other than what you've told me?

24     A      No.

1      Q      Why -- do you know why he thought it was an

2  unreasonable request?

3      A      Yes.

4      Q      Why?

5      A      Because he told me.

6      Q      Okay.  And I -- maybe I'm wrong.  I thought

7  my question was do you know why he thought it was an

8  unreasonable request.

9      A      And I know what Matt told me.

10     Q      Which was what?

11     A      That we already paid for the data.  We

12  don't need to pay for it again.

13     Q      Did he say anything else?

14     A      Not that I recall.

15     Q      Do you recall if Snap-On provided MCFA with

16  two options, like a less expensive option for data?

17             MR. SPECTER:  Objection.  Calls for

18  speculation.  No foundation.

19             THE WITNESS:  Yes.

20     Q      (BY MR. GUAM)  You do recall if there was

21  another option?

22     A      I recall they gave us two options.

23     Q      What do you recall about the two options?

24     A      The unreasonable request clogs my memory

```
 1    and I don't remember what the other solution was

 2    except that we were not interested in it.

 3         Q     All right.  What, if anything, did you do

 4    after hearing of this telephone discussion to get the

 5    data back?

 6         A     Can you rephrase your question?

 7         Q     Well, I mean, did you do anything after

 8    this phone call to get the data back?

 9         A     Yes.

10         Q     What did you do -- or what did you do next?

11         A     I began talking with other suppliers.

12         Q     Why?

13         A     Because we needed to find a less expensive

14    way to have an electronic copy of our data.

15         Q     Well, what other suppliers did you speak

16    with?

17         A     Astoria.  I don't recall any others.  I

18    don't recall the names of others.

19         Q     Did you speak to O'Neil?

20         A     Yes.

21         Q     So just Astoria and O'Neil?

22         A     There were others but no one of note.

23         Q     Well, when did you first speak to O'Neil?

24               MR. SPECTER:  With respect to this
```

```
 1    matter?
 2                    MR. GUAM:  Correct.
 3                    THE WITNESS:  What is -- can you
 4    define "this matter"?
 5         Q    (BY MR. GUAM)  The -- what we're talking
 6    about that involves getting MCFA data back.
 7         A    I believe it was still 2008.
 8         Q    Okay.  Do you know when?
 9         A    Third or fourth quarter.
10         Q    Why did you -- did -- were you personally
11    the one that called O'Neil?
12         A    Yes.
13         Q    And why did you choose O'Neil?
14         A    I didn't.
15         Q    Who did?  I mean, I'm trying to find out --
16    I'm trying to ask you -- maybe this is just getting
17    too difficult and maybe it's my fault -- why did you
18    call O'Neil?  Did you already know them?  Did someone
19    recommend them?  Why did you call O'Neil?
20         A    Jay Gusler suggested I call them.
21         Q    Do you know why he would have suggested it?
22         A    Yes.
23         Q    Why?
24         A    He knew they provided comparable products.
```

```
 1        Q      Had they been doing any work for MCFA at

 2   that time?

 3        A      Yes.

 4        Q      And what was that work?

 5        A      E-learning.  They provided e-learning, an

 6   online tool for MCFA.

 7        Q      Okay.  So you called O'Neil and who -- who

 8   did you speak with?

 9        A      Heather Cobb.

10        Q      Did Mr. Gusler give you her name or did you

11   just call up and ask for whoever could help you?

12        A      Mr. Gusler gave me her name.

13        Q      Okay.  So what happened next once you

14   called her?

15        A      I requested a demo of their product line.

16        Q      Which product line?

17        A      The ones for their electronic data

18   management services.

19        Q      Did you discuss with her your -- MCFA's

20   difficulties in getting its data back from Snap-On?

21        A      Yes.

22        Q      During that first phone call?

23        A      No.

24        Q      When did you first discuss that with
```

1      Q      I'm sure it's me and I'm confused, but

2  didn't you say that MCFA also provided Snap-On with a

3  text file of the text that's in the hard copy

4  catalogs?

5      A      Yes.

6      Q      Why do you have to key that information if

7  it's already in a text file?

8      A      It's different.

9      Q      How is it different?

10     A      The text file does not contain up --

11 updates that were made in the paper manual.

12     Q      You say the text file would not contain

13 updates that were made in the paper file?

14     A      Yes.

15     Q      What is the paper file?

16     A      The paper manual.  Excuse me.

17     Q      Well, these updates to the paper manual,

18 how are they published?

19     A      They are provided to us by Mitsubishi Heavy

20 Industries in Japan from our engineering data.

21     Q      Okay.  So these updates you have in hard

22 copy form, correct?

23     A      Yes.

24     Q      Did you also have an accompanying text file

1    for those?

2        A    Yes.

3        Q    So for the updates you had the same as the

4    original catalog, if I understand you?  You had a

5    hard copy and a text file?

6        A    Yes.

7                 THE VIDEOGRAPHER:  You got one minute

8    of tape left.

9        Q    (BY MR. GUAM)  And did MCFA provide Snap-On

10   with those updates in both hard copy and text file

11   format?

12       A    No.

13       Q    Okay.  What -- what did you provide -- what

14   did MCFA provide Snap-On?

15       A    The updated parts manual and the original

16   text file.

17       Q    So they would get the update and hard copy

18   but not the text file for that update?

19       A    Correct.

20       Q    Why don't we -- we'll go ahead and change

21   it.

22                 THE VIDEOGRAPHER:  Going off the

23   record, 12:04 p.m.

24                 (Recess taken)

1            THE VIDEOGRAPHER:  Going back on the

2    record, 12:12 p.m., tape three.

3        Q    (BY MR. GUAM)  Mr. Herrick, is the -- the

4    reason that MCFA wanted the data from Snap-On because

5    these updates were keyed by Snap-On?

6            MR. SPECTER:  Objection.  Vague and

7    ambiguous.

8            THE WITNESS:  Yes, yes.

9        Q    (BY MR. GUAM)  But MCFA did have text files

10   of those updates, correct?

11       A    No.

12       Q    Okay.  I -- I thought you had said yes

13   earlier, so maybe we better backtrack a little.

14            I thought you said that the updates --

15   that you had the updates in both hard copy and

16   corresponding text files but only provided Snap-on

17   with the hard copies.

18       A    The text file does not include the update.

19       Q    Okay.  So we're just miscommunicating.

20   I -- to make sure I am clear, let me just back up.

21            The update is a hard copy, correct?

22       A    Yes.

23       Q    The update doesn't have its own

24   corresponding text file?

1    A    Yes.

2    Q    I'm correct or it does?

3    A    Yes, you're correct.

4    Q    It -- it does not have a corresponding text

5    file?

6    A    Yes.

7    Q    Okay.  Maybe if you -- if -- if I could get

8    you to say "correct" or "not correct" on this one,

9    maybe that will help us get past this.  I am

10   correct -- no, that's not how I want to ask this.

11            MR. SPECTER:  Just ask it directly.

12   Q    (BY MR. GUAM)  There's no text file for the

13   updates; is that -- is that -- I can't --

14   A    The text file we're given does not include

15   the update.

16   Q    So there's one text file for the original

17   catalog and then you get hard copy updates?

18   A    Yes, correct.

19   Q    And what do you do when you get those hard

20   copy updates, you give them to Snap-On?

21   A    No.

22   Q    Did you used to give them to Snap-On?

23   A    No.

24   Q    All right.  Can you tell me how you kept --

1    how Snap-On kept this database updated for you?  I

2    mean, I'm missing something.  I'm just -- going to

3    just ask it casually.  I mean, what did -- what did

4    you do with these updates?

5         A     We manually correct poor English and

6    specify the manuals to our market in the pdf only and

7    create a final version from the version provided to

8    us from Japan that we then publish to our market and

9    provide to Snap-On.

10        Q     Well, let's go back through that, because I

11   heard pdf in there, which is an electronic file,

12   correct?

13        A     Yes, print document file.

14        Q     Now, you said you manually correct for poor

15   English.  When you -- that's the updates that you

16   received from -- from who again?

17        A     Mitsubishi Heavy Industries, our parent

18   company in Japan.

19        Q     Okay.  And what do they send you, an

20   electronic file or pieces of paper or both?

21        A     Both.

22        Q     So they send you -- so I'm -- so I'm clear,

23   they send you a printed update and a corresponding

24   electronic file for that?

```
 1       Q      How far behind schedule is it?

 2       A      At my last review, I believe we were about

 3   a month behind.

 4       Q      When was that last review?

 5       A      December.

 6       Q      Is the CMS in beta testing right now?

 7       A      No.

 8       Q      Is that because of the -- the delay in the

 9   data services?

10       A      No.

11       Q      Can you tell me why it's not in beta

12   testing yet?

13       A      O'Neil is not complete with the milestones.

14       Q      Is the data services milestone still

15   incomplete?

16       A      Yes.

17       Q      Let me hand you what I've marked as

18   Exhibit 4.  Do you recognize this document?  You

19   know, I'm sorry, I don't care about this document.

20              MR. SPECTER:  Join.  That means you

21   can stop reading it.

22              THE WITNESS:  Yeah, I'm trying to

23   figure out why he doesn't care about it.

24       Q      (BY MR. GUAM)  Part of the mind game.  I
```

```
 1   What's -- what was the missing data?  Was that data

 2   that MCF -- or that O'Neil couldn't obtain from the

 3   Snap-On servers?

 4        A     Yes.

 5        Q     And was that due to Snap-On blocking

 6   O'Neil's IP address?

 7                   MR. SPECTER:  Objection.  Calls for

 8   speculation.  No foundation.

 9                   THE WITNESS:  According to what I was

10   told by O'Neil, that is correct.

11        Q     (BY MR. GUAM)  And what you say in your

12   e-mail, you talk about all but 56 of the manuals.

13   These 56 of the manuals, is that all of the -- the

14   missing data that MCFA -- that MCFA needs to complete

15   the data services?

16        A     No.

17        Q     Is that part of it?

18        A     Yes.

19        Q     What else does MCFA need?

20        A     It needs the missing data for MCFE and

21   MCFS.

22        Q     Looking at the second page of this exhibit,

23   Exhibit 10, it says, "CMS project update:  July

24   31st."  It's kind of an interesting document with
```

1   May 15th, 2009, was Snap-On aware that MCFA was going

2   to have O'Neil replace it?

3       A    No.

4       Q    Looking at the second page, right at the

5   top, there's an e-mail that appears to be an e-mail

6   from you to Barbara Moore dated May 15th.  Do you see

7   that, where it starts, "Do the passwords work

8   manually for you?"

9       A    Yes.

10      Q    What were you referring to?

11      A    The best I could recall it would be that

12  this would be related to the second block of IP

13  addresses with O'Neil.

14      Q    Okay.  Now, the sentence I asked about was

15  do the passwords work manually for you, question

16  mark.  What passwords are you referring to?

17      A    The passwords I gave them.

18      Q    Well, what passwords did you give O'Neil?

19      A    I gave them passwords to access the Europe

20  and Singapore and American data on the Mitsubishi and

21  Caterpillar portals.

22      Q    Did you have passwords assigned to various

23  O'Neil employees?

24      A    No.

1      Q      Well, what passwords did you provide

2    O'Neil?

3      A      Preexisting passwords.

4      Q      How many passwords did you provide O'Neil?

5      A      I'm not sure of the exact number.  It was

6    five to 15 for each website.

7      Q      How many websites are we talking about,

8    three?

9      A      Six.

10     Q      Six.  Were any of the passwords -- or I'm

11   sorry.  Strike that.

12            Were the passwords per website unique

13   to that website?

14     A      Yes.

15            MR. PARKER:  Objection.

16     Q      (BY MR. GUAM)  Okay.  And what I -- to

17   clarify, if it's necessary, I just wanted to know if,

18   you know, one password could be used on several

19   different websites or if it's only good for one

20   website.

21     A      Correct.

22     Q      So if -- I just want to be make sure I

23   understand this.  If it was a minimum of five

24   passwords per website, we're talking at least 30

1    passwords, correct?

2        A      Five times six is 30.

3        Q      I think you -- you testified that these

4    were preexisting passwords; is that correct?

5        A      Yes.

6        Q      What did you mean by preexisting passwords?

7        A      I used passwords that were already existing

8    on the portal.

9        Q      Who did those passwords belong to?

10               MR. SPECTER:  Objection.  Vague and

11   ambiguous.

12       Q      (BY MR. GUAM)  You can still answer.

13               MR. SPECTER:  If you can as phrased.

14               THE WITNESS:  In general, they -- they

15   belonged to MCFA dealers.

16       Q      (BY MR. GUAM)  Maybe "belonged to" isn't

17   the right word.  Were pass -- how were passwords

18   assigned to MCFA dealers?

19       A      MCFA set them up.

20       Q      And did a dealer have more than one

21   password?

22       A      No -- yes.

23       Q      All right.  I'm going to need you to

24   clarify that a little bit.

```
 1      Q      Okay.  What was provided to O' -- and I may
 2   have asked this but I've gotten lost already.
 3                    What was provided to O'Neil, just the
 4   global user ID, or user names and passwords?
 5      A      Both.
 6      Q      Okay.
 7      A      But I -- I'm going to -- this whole
 8   conversation we just had is specific to MCFA.
 9      Q      Yes.  Is -- okay, yes.  Is there a
10   difference with MCFE and MCFS?
11      A      Yes.  So the answer for MCFA is global user
12   names and passwords were provided to Snap -- to --
13      Q      O'Neil?
14      A      -- to O'Neil.
15      Q      And again -- I'm sorry to ask again, just
16   to make sure I'm clear, though, global user ID still
17   ties back to a single person, correct?
18      A      Yes.
19      Q      Okay.  And how does it work for MCFE and
20   MCFS?
21      A      MCFE uses a single account for all users in
22   Europe.  MCFS has user names and passwords that MCFA
23   assigned to MCFS users.
24      Q      So on the MCFS site, the user name and
```

1    password would relate to a specific individual?

2          A     Yes.

3          Q     Going back to the MCFE site, can you

4    explain to me what you meant by a single account for

5    all users in Europe?

6          A     Yes.

7          Q     Is that -- is that literally the way it

8    sounds, everybody has one sign-on or -- or I'll let

9    you explain it, but --

10         A     Yes.

11         Q     Well, go ahead and explain it in case I'm

12   wrong, but -- or how does that work?

13         A     MCFE dealers log onto an MCFE portal with a

14   unique user name and password.  If they want to go

15   view the tool provided by Snap-On, the Web portal

16   sends them to a -- to the site using a single user

17   name and password behind the scenes for all users.

18         Q     Huh.  In order for O'Neil to scrape the

19   MCFE website, what did MCFA provide it, you know, to

20   gain access?

21         A     Five to 15 passwords.

22         Q     And would those have included user names

23   with each password?

24         A     Yes.

1    for the dealers are?

2        A     I determined them by talking with our call

3    center and asking them when they need to staff more

4    people.

5        Q     Do you know whether the scraping tool could

6    run multiple threads?

7        A     Yes.

8        Q     And what's the purpose of running multiple

9    threads?

10       A     To gather data faster.

11       Q     Who decided how many threads to run at once

12   when using the scraping tool?

13       A     I don't know.

14       Q     Did you have any feedback or involvement in

15   those decisions?

16       A     Yes.

17       Q     Okay.  What was the -- well, explain to me

18   how you were involved in those decisions.

19       A     I, per O'Neil's request, gave them the

20   ability to do between five and 15 multiple threads

21   and let them determine how many to run at once.

22       Q     Did they request that five to 15 number or

23   did you decide that?

24       A     They requested it.

1      Q      And are you referring to just the number of

2   passwords you gave them?

3      A      That's correct.

4      Q      Was O'Neil aware -- or strike that.

5             Did you inform O'Neil that the

6   passwords you gave them belonged to MCFA dealers?

7      A      No.

8      Q      Was there -- well, was there any effort to

9   make sure that the -- that the users assigned to

10  those passwords could log on simultaneously with

11  running the scraping tool?

12     A      No effort was needed.

13     Q      Why not?

14     A      Snap-On allows simultaneous log-ons.

15     Q      And how did you know that?

16     A      That's how we were able to get the MCFE

17  system to allow multiple log-ins through a single

18  user account.  So one of the features of what they

19  provide us is to allow multiple log-ins to a single

20  account.

21     Q      I'm going to hand you what I've marked as

22  Exhibit 43, again a string of e-mails with the -- the

23  ones starting at the bottom of the first page appears

24  to be from you to Heather Cobb and a number of other