**DAVID C. STACKHOUSE - December 17, 2009**     1
**Confidential - Attorneys Eyes' Only**

```
 1           UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION

 3                       - - -

 4    Snap-On Business Solutions, Inc.,  :
                                         :
 5              Plaintiff,                :
                                         :
 6       vs.                              : Case No.
                                         : 5:09-CV-01547-JG
 7    O'Neil & Associates, Inc.,         :
                                         :
 8              Defendant.                :

 9                       - - -

10       VIDEOTAPED DEPOSITION OF DAVID C. STACKHOUSE
                      **CONFIDENTIAL**
11                 *ATTORNEYS' EYES ONLY*

12                       - - -

13

14              Thursday, December 17, 2009
                 10:17 o'clock a.m.
15              Hahn, Loeser & Parks, LLP
                 65 East State Street, 14th Floor
16              Columbus, Ohio

17
                         - - -
18
                  SHAYNA M. GRIFFIN
19         REGISTERED PROFESSIONAL REPORTER
             CERTIFIED REALTIME REPORTER
20
                         - - -
21

22        ANDERSON REPORTING SERVICES, INC.
           3242 West Henderson Road, Suite A
23              Columbus, Ohio 43220
                  (614) 326-0177
24              FAX (614) 326-0214
```

**DAVID C. STACKHOUSE - December 17, 2009**     23
**Confidential - Attorneys Eyes' Only**

```
 1   Q.         Okay.  Fair enough.
 2              Let's go to Paragraph -- this will go
 3   quick, but we're going to do it the hard anyway.
 4   A.         Okay.
 5   Q.         Paragraph 48, it says, "Snap-On is barred
 6   from any equitable relief by the doctrines of waiver
 7   and unclean hands."
 8              Do you know of any facts that support that
 9   statement?
10   A.         No.
11   Q.         Do you even understand that statement?
12   A.         Yeah, I'm having a hard time getting my
13   head around it.  Yeah.
14   Q.         I wouldn't have necessarily expected you
15   to.
16              Let's go to 49, which might be a little
17   easier.  It says, "Any O'Neil access to MCFA data was
18   with authorization or permission and did not exceed
19   such authorization."
20              Let me start with do you understand that
21   sentence?
22   A.         Yes.
23   Q.         Well, what does it mean by any O'Neil
24   access to MCFA data was with authorization?
```

**DAVID C. STACKHOUSE - December 17, 2009**     24
**Confidential - Attorneys Eyes' Only**

1         MR. SCHRADER: Objection. You can answer,
2  David.
3  A.        It means that MCFA provided us with the
4  necessary credentials which were authorized.
5  Q.        What -- this is just a term I hadn't heard
6  before this case. What exactly are credentials?
7  A.        Credentials is a set of information used
8  to authenticate you into an information system. So
9  the most common example of that would be a user name
10  and password combination.
11  Q.        And when -- and when credentials are used
12  in relation to this matter, is that what it means,
13  user name and password?
14  A.        Yes.
15  Q.        Or is there anything else?
16  A.        That's what it means to me, user name and
17  password, credentials authorization.
18  Q.        Okay. So when you say MCFA provided
19  O'Neil with the necessary credentials, you just mean
20  with passwords?
21  A.        That's right.
22  Q.        User names and passwords?
23  A.        Right. They authorized us to access --
24  you know, they -- they authorized us by providing us

1   with a credential set.

2   Q.          Okay.  And how many credential sets were

3   you provided -- was O'Neil provided?

4   A.          I can't recall exactly.  There should be,

5   you know, an e-mail trail to show that.  I believe

6   that it was five or six.

7   Q.          And what did those credentials provide

8   O'Neil access to?

9   A.          It's my understanding that it provided us

10  access to the hosted sites, the MCFA hosted sites

11  that Snap-On was hosting for MCF.

12  Q.          Were there more than one sites -- more

13  than one site?

14  A.          Yes, I believe there were.  I think there

15  were six altogether.

16  Q.          Do you know what those six sites are?

17  A.          I don't know the UR -- the specific URLs,

18  I mean, from memory.  It's my understanding that

19  there was an America's, a European and a -- kind of a

20  Pacific or Asian site, and then you had two for each

21  one of those, giving you the six.

22  Q.          I'm sorry.  Two for each one of those?

23  A.          Two, so you've got your America's,

24  European and then Asian Pacific.  So there's three

 1   you provide that so that the application can run on
 2   it, and then you provide Internet access so that that
 3   piece of software can communicate over the Internet
 4   to whatever it needs to talk to, in this case, the
 5   Snap-On hosted sites; and then the necessary band
 6   width, you know, or the capacity to do that in a
 7   fairly, you know, quick manner.
 8   Q.         What kind of band width was needed for the
 9   -- well, let me back up.
10              You said they said they had a tool.  We're
11   talking about Armando Monzon and Dean Schuler?
12   A.         Uh-huh.
13   Q.         What was the tool?
14   A.         The reclamation tool.
15   Q.         I think I've also seen it referred to as a
16   data acquisition tool.  Does that sound familiar?
17   A.         I think I've heard it called that before.
18   Q.         Okay.  Have you also heard it called a
19   scraper?
20   A.         Yes.
21   Q.         And is a reclamation tool and a scraper
22   the same thing?
23   A.         Yes.
24   Q.         And what exactly does a reclamation tool

 1   or scraper do?  We'll get into the specifics of the
 2   tool because I've got some documents.  But, just
 3   generally, what does it do?
 4   A.         Generally what would any one --
 5   Q.         Yeah.
 6   A.         Well, generally, the idea is that it would
 7   simulate what a user could do interactively with the
 8   website by pointing and clicking, only it's
 9   automated, and, therefore, able to point, click and
10   do other things that the user would do in an
11   automated manner, making it able to run unattended in
12   a much more efficient way than if, you know, a person
13   were behind the -- interactively using the site.  And
14   then it -- when it interacts with the site, then it
15   then copies what data it can via that interaction and
16   stores it.
17   Q.         And you're saying site.  Is this websites?
18   Is that what you're talking about?
19   A.         Yes.
20   Q.         Now, is this run through a browser?
21   A.         Does the reclamation tool run through a
22   browser?
23   Q.         Correct.
24   A.         To my knowledge, no.

**DAVID C. STACKHOUSE - December 17, 2009**                30
**Confidential - Attorneys Eyes' Only**

```
 1   Q.         Okay.  Does it simulate a browser?
 2   A.         Yes.  I think that would be an accurate
 3   statement to say that it simulates a browser.
 4   Q.         Okay.  And so when you run a reclamation
 5   tool, does it take a website link and go to that
 6   website, or what does -- how does the process work?
 7   A.         Well, you know, I'm not the one to speak
 8   in detail about exactly how that works.  I know that
 9   we did provide extensive documentation detailing
10   that.
11   Q.         I'm still talking generally.
12   A.         Generally.
13   Q.         If you're using a scraper or a reclamation
14   tool on a website, how does that work?
15   A.         Well, I mean, I would say you would have
16   to give it a URL or a website address because it has
17   to know where to go, of course.  And then once it
18   knows where to go, then it navigates the site and
19   does what I mentioned, which is simulate user
20   interaction and then copy the data and store it.
21   Q.         Okay.  When you say "copy the data," what
22   do you mean by that?
23   A.         Well, copy the data.  And I'm not trying
24   to be difficult.  I mean, you know, basically, so if
```

DAVID C. STACKHOUSE - December 17, 2009        31
Confidential - Attorneys Eyes' Only

```
 1   you were to see it on the screen, you know, if you
 2   were to interact with the website, you know, it would
 3   be the same as right click, copy.  I mean, you've
 4   done that.  You've used a computer.
 5   Q.        Sure.
 6   A.        And you would paste it into a file and
 7   move on to the next one.  So it's similar to that.
 8   Q.        Okay.  So you're talking about looking at
 9   the screen and picking certain pieces of information
10   that you want to then copy?
11   A.        Right.
12   Q.        Does the reclamation tool actually
13   download the website page that you're then cutting
14   and pasting from?
15   A.        No.  To download the page, no, I don't
16   believe that's the case.  Understanding that, you
17   know, a website page when you see it is rendered, you
18   know, there's HTML, there's Java Script, there's
19   graphics, there's the actual text.
20   Q.        Uh-huh.  Uh-huh.
21   A.        You know, all of that is being combined
22   and parsed and then displayed in the browser.  So
23   when you're doing it, performing that action in a
24   non-interactive way, in other words, in a browser
```

 1   with a person, you know, to say that you're

 2   downloading the page and copying the page, I don't

 3   think that's accurate.

 4   Q.         Is the page being stored in a cache on the

 5   computer?

 6   A.         I don't -- again, you know -- and this is

 7   very specific, so I don't even think you can

 8   generalize it in terms of talking about a reclamation

 9   tool in a general sense.  I don't know.  I would say

10   the fact cache is copied information.  That's its

11   definition.  So the fact that the reclamation tool is

12   copying information, I would say almost, by

13   definition, it's caching it.  But when you say cache,

14   that generally means that you're caching it so that

15   you don't have to retrieve it again in order to make

16   the next operation more expedient.

17   Q.         Okay.  Okay.

18   A.         That wasn't our, you know, purpose.  The

19   purpose was to copy the information.  So I don't

20   think that caching --

21   Q.         Okay.

22   A.         -- is quite the right...

23   Q.         Well, and when you -- when -- and we're

24   still talking generally, but when a reclamation tool

```
 1   cuts and pastes certain information, where is it
 2   cutting and pasting that information from?  I mean,
 3   is it still over on somebody else's computer or is it
 4   on the computer you're running the reclamation tool?
 5   Where is it?
 6   A.         Well, you said cut and paste.  You know,
 7   it's not a cut and paste.  It would be --
 8   Q.         I'm sorry.  Was it right click?
 9   A.         -- more akin to a copy and paste.
10   Q.         Okay.
11   A.         So you cut something, it's no longer on
12   the source.
13   Q.         Fair enough.
14   A.         Right.  And then you paste it and it's on
15   the destination.  So in a copy and paste scenario,
16   you're still leaving it, of course, on the source.
17              Yeah, I mean, the paste operation is the
18   -- you're copying it, you're duplicating it and then
19   you're storing it on the destination system, which is
20   our system, and you're keeping --
21   Q.         But before you copy and then paste it --
22   before you copy it --
23   A.         Uh-huh.
24   Q.         -- where is that information?  Whose
```

DAVID C. STACKHOUSE - December 17, 2009        34
Confidential - Attorneys Eyes' Only

 1  computer is that information on?
 2  A.           Well, the information is transmitted from
 3  the source system to the destination system.  So it
 4  originates from the source system; in this case,
 5  Snap-On, well, and the hosted site, either, you know,
 6  maintained for MCF and then being transmitted over
 7  the wire to us or to any client who would be
 8  retrieving the information.
 9  Q.           So a copy of that information ends up on
10  O'Neil's computers?
11  A.           That's right.
12  Q.           And where on O'Neil's computers does that
13  end up?
14  A.           On that same server upon which the
15  reclamation tool is running.  So, you know, it does
16  its thing.  We have a back end SQL database where
17  it's storing information that it's copy and pasted,
18  basically.  And we also store -- I know that we
19  stored the graphics images that we copy and pasted
20  onto the file system.
21               So the data that was reclaimed existed in
22  two areas on our server once it was pasted, so to
23  speak, into the server.  It existed in a SQL -- in
24  SQL databases and on the file system as graphics

1   images.

2   Q.          Let me go back, because I am interested in
3   before you actually do that copy and paste, if you
4   will --
5   A.          Okay.
6   Q.          -- of the text and the certain
7   illustrations.  When you copy that information to
8   then save it to -- was it SQL database --
9   A.          Sure, SQL in the file system.
10  Q.          -- where is that information that you're
11  copying?
12  A.          Prior to being transmitted to us?
13  Q.          No.  Once it's -- once it's transmitted to
14  you --
15  A.          It is stored -- it's transmitted over the
16  wire and then stored, so that's where it's at in the
17  SQL database in the file system.
18  Q.          Okay.  Let me back up, though.
19              Are you actually only retrieving certain
20  data from the Snap-On server, or do you actually
21  download a Web page and then on O'Neil's computer you
22  cut and then save that information?
23  A.          Okay.  Now -- now we've transitioned from
24  the general to the specific.

**DAVID C. STACKHOUSE - December 17, 2009**          36
**Confidential - Attorneys Eyes' Only**

```
 1   Q.         Yeah.  We've been doing that.
 2   A.         We have been doing that, just so we're
 3   clear.
 4   Q.         You started, so I'm going to run with you
 5   on that.
 6   A.         Yeah, and that's fine.  But just so we're
 7   clear, you know.
 8              It is my understanding -- and, again, the
 9   specifics of the application are, you know, better
10   addressed by others who were closer to it.  But it's
11   my understanding that we are only retrieving the
12   parts that we need.  So I would say the former
13   scenario that you mentioned there, which was, you
14   know, only the pieces that we need, not downloading
15   an entire page and then attempting to, you know, take
16   apart what we need, so --
17   Q.         And I'm wondering if -- how you only
18   retrieve certain pieces of information from a website
19   hosted on another person's computer without bringing
20   that website page over onto your computer.
21   A.         Well, again, I think you would want to
22   talk to the folks directly involved in the
23   development of the reclamation tool, because they are
24   going to be most familiar with that kind of thing.
```

```
 1   Q.        Okay.  You ever heard of a RAM disk?
 2   A.        Sure.
 3   Q.        What's a RAM disk?
 4   A.        What's a RAM disk?
 5   Q.        Uh-huh.
 6   A.        A RAM disk is where you use RAM and you
 7   simulate hard drive storage so that you can send
 8   information to it, and it behaves like a hard disk.
 9   So it's -- it's -- RAM is addressable as a hard disk,
10   and the advantages are that it's much faster.  But
11   it's volatile, so when the machine is turned off, it
12   goes away.
13   Q.        A RAM disk is volatile?
14   A.        A RAM disk is volatile, uh-huh.
15   Q.        Hard drive and RAM are both considered
16   memory, aren't they?
17   A.        Storage or memory, yes.
18   Q.        Let me go back to Exhibit 205.  I think
19   it's in front of you still.
20   A.        Okay.
21   Q.        Paragraph 49 again.  I want to get the
22   last part of that sentence.  "Any O'Neil access to
23   MCFA data was with authorization or permission and
24   did not exceed such authorization."
```

1          Do you know what that last part is
2   referring to?
3          MR. SCHRADER:  Objection.  You can answer,
4   David.
5   A.     No, I don't.
6   Q.     Don't know what it means --
7   A.     Well, I mean, did not -- you're asking if
8   I know what did not exceed such authorization --
9   Q.     Correct.
10  A.     I mean, to my knowledge, we were given the
11  credentials, we accessed the site with those
12  authorized credentials, and that was it, using the
13  reclamation tool.  And, you know, we were authorized
14  to do that by MCF, so we did not exceed that
15  authorization.
16  Q.     Those credentials, do you know who they
17  belong to?
18  A.     No.  If I were to look at the e-mail, I
19  mean, I assume there would be user names and that
20  would be then who those credentials belong to.
21  Q.     How about -- let's go to the next one.
22  This will probably go quickly.  But Paragraph 50, it
23  says, "Any use O'Neil may have made of MCFA data was
24  with authorization or permission and did not exceed

**DAVID C. STACKHOUSE - December 17, 2009**    101
**Confidential - Attorneys Eyes' Only**

1  Q.         By this document, you mean Exhibit 201?

2  A.         Exhibit 201, yes.

3  Q.         Okay.

4  A.         We transmitted the reclaimed data itself,
5  and that was the databases and the graphics files.
6  That's about all of it, you know.  Anywhere there was
7  information pertaining to Snap-On or MCF, we sent
8  that out.

9             MR. SCHRADER:  I don't want to testify for
10 the witness, but just to be sure, you might want to
11 ask him whether he provided the reclamation tool in
12 executable format also.

13            MR. GAUM:  Okay.

14 BY MR. GAUM:

15 Q.         Did you file -- did you provide the
16 reclamation tool in executable form as well?

17 A.         I believe that we did, yes.

18            MR. GAUM:  Anything else you want me to
19 ask?

20            MR. SCHRADER:  How did I know that answer?
21 And I hope you don't -- I just want --

22            MR. GAUM:  You want a complete list.

23            MR. SCHRADER:  Yeah.

24            MR. GAUM:  And that's fine.