# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SNAP-ON BUSINESS SOLUTIONS, INC., | ) | Case No.: 5:09-CV-01547-JG |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| vs. | ) | |
| | ) | |
| O'NEIL & ASSOCIATES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SNAP-ON BUSINESS SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT O'NEIL & ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

I.     BRIEF STATEMENT OF THE ISSUES ........................................... 1

II.    SUMMARY OF THE ARGUMENTS .............................................. 1

III.   STATEMENT OF FACTS ................................................................ 1

IV.   LAW AND ARGUMENT ................................................................. 6

     A.    O'Neil Accessed Snap-on's Computers Without Authorization In Violation Of The Computer Fraud And Abuse Act.................................... 7

          1.    The Agreements Between Snap-on And MCF Forbid MCF From Giving A Third Party Access To Snap-on's Computers And Software ................................................... 7

          2.    The End-User License Agreement Warned O'Neil That Access Was Unauthorized. ........................................... 8

          3.    O'Neil Knew That It Was Accessing Snap-on's Computers Without Authorization. ................................... 8

     B.    O'Neil Has Not Shown An Absence Of Genuine Issues Of Material Fact And Is Not Entitled To Summary Judgment On Snap-on's Trespass to Chattels Claim. ................................ 9

          1.    O'Neil Deprived Snap-on Of Its Chattel When It Damaged Snap-on's Computers. ...................................... 9

          2.    Snap-on's Trespass To Chattels Claim Is Not Preempted By Federal Law. ............................................ 12

     C.    O'Neil Was Unjustly Enriched By Copying Snap-on's Proprietary Database And Improved Data. ......................... 14

     D.    O'Neil Breached The End-User License Agreement Governing The Use Of Snap-on's Websites. ................................ 15

     E.    O'Neil Made Direct Copies Of Snap-On's Copyrighted Data Thereby Infringing Snap-On's Copyrights. ................................ 17

          1.    Snap-on Owns A Valid Copyright In The Enhanced Data And Compilation. ........................................... 17

          2.    O'Neil Directly Copied All Of Snap-on's Protected Works. ........ 18

     F.    O'Neil's Motion For Summary Judgment In Its Favor On The Trade Secret Claim Is Woefully Inadequate. ............................ 19

V.    CONCLUSION ............................................................................... 20

CERTIFICATION OF COUNSEL .................................................................... 22

CERTIFICATE OF SERVICE ........................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrams v. Toledo Auto. Dealer Assn.,*
    145 Ohio App. 3d (Ohio App. 2001) ........................................................................9

*Am. Family Mutual. Ins. Co. v. Rickman,*
    554 F. Supp. 2d 766 (N.D. Ohio 2008) ...................................................................7

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...........................................................................................6, 7

*Automated Solutions Corp. v. Paragon Data Sys.,*
    Case No. 1:05cv1519, 2006 U.S. Dist. LEXIS 98050 (N.D. Ohio July 5, 2006) ....................14

*Cairo, Inc. v. Crossmedia Servs., Inc.,*
    Case No. C-04-04825-JW, 2005 U.S. Dist. LEXIS 8450 (N.D. Cal. Apr. 1, 2005) ...............15

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .......................................................................................19, 20

*Compuserve, Inc. v. Cyber Promotions, Inc.,*
    962 F. Supp. 1015 (S.D. Ohio 1997) ...............................................................10, 11

*Doe v. SexSearch.com,*
    502 F. Supp. 2d 719 (N.D. Ohio 2007) .................................................................15

*eBay, Inc. v. Bidder's Edge, Inc.,*
    100 F. Supp. 2d 1058 (N.D. Cal. 2000) .........................................................10, 11, 13

*Facebook, Inc. v. Power Ventures, Inc.,*
    Case No. C 08-5780 JF (RS), 2009 U.S. Dist. LEXIS 42367 (N.D. Cal. May 11, 2009) ...........................................................................................................19

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
    499 U.S. 340, 111 S.Ct. 1282, 113 L. Ed. 2d 358 (1991) .................................17, 18

*Hancock v. Dodson,*
    958 F.2d 1365 (6th Cir. 1992) ..............................................................................6

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey,*
    497 F. Supp. 2d 627 (E.D. Pa. 2007) ...................................................................13

*Jones v. Memphis Light, Gas, and Water Division*,
Case No. 08-6212, 2009 U.S. App. LEXIS 20831 (6th Cir. Sep. 17, 2009) ..........................20

*LVRC Holdings LLC v. Breeka*,
581 F.3d 1127 (9th Cir. 2009) ...........................................................................................7

*Lynn v. Sure-Fire Music Co., Inc.*,
237 Fed. Appx. 49 (6th Cir. June 6, 2007) ..........................................................................12

*MAI Systems Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993) ............................................................................................19

*Major v. McCallister*,
Case No. SD29871, 2009 Mo. App. LEXIS 1829 (Mo. Ct. App. Dec. 23, 2009)..................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)........................................................................................................20

*MCI Worldcom Network Servs., Inc. v. W.M. Brode Co.*,
411 F. Supp. 2d 804 (N.D. Ohio 2006).............................................................................10

*NCR Corp. v. The ATM Exchange, Inc.*,
Case No. 1:05cv383, 2006 U.S. Dist. LEXIS 30296 (S.D. Ohio May 17, 2006)...................19

*Perfect 10, Inc. v. Google, Inc.*,
Case No. CV-04-9484-AHM, 2008 U.S. Dist. LEXIS 79200 (C.D. Cal. July 16,
2008) ..............................................................................................................................14

*Register.com, Inc. v. Verio, Inc.*,
356 F. 3d 393 (2d Cir. 2004)............................................................................................15

*Register.com v. Verio, Inc.*,
126 F.Supp. 2d 238 (S.D.N.Y. 2000)..............................................................................9, 10

*Ronald Mayotte & Associates v. MGC Building Co.*,
885 F.Supp. 148 (E.D. Mich. 1994)..................................................................................17

*SecureInfo Corp. v. Telos Corp.*,
387 F. Supp. 2d 593 (E.D. Va. 2005). ...........................................................................7, 8

*Southwest Airlines Co. v. BoardFirst, L.L.C.*,
Case No. 3:06-cv-0891-B, 2007 U.S. Dist. LEXIS 96230 (N.D. Tex. Sep. 12, 2007)...........15

*State v. Perry*,
Case No. C-960297, 1997 Ohio App. LEXIS 453 (1st Dist. Feb. 12, 1997)..........................19

*Tastefully Simple, Inc. v. Two Sisters Gourmet, L.L.C.*,
134 Fed. Appx. 1...........................................................................................................14

*Ticketmaster L.L.C. v. RMG Techs, Inc.*,
   507 F.Supp. 2d 1096 (C.D. Cal. 2007) ........................................................19

*Universal Tube & Rollform Equip. Corp. v. YouTube, Inc.*,
   504 F. Supp. 2d 260 (N.D. Ohio 2007).............................................10, 11, 12

*Wilcom Pty. v. Endless Visions*,
   128 F.Supp. 2d 1027 (E.D. Mich. 1998)......................................................19

*Wrench LLC v. Taco Bell Corp.*,
   256 F.3d 446 (6th Cir. 2001) ..............................................................12, 13

### STATUTES

17 U.S.C. § 101 ........................................................................................19

17 U.S.C. §§ 102 ...............................................................................12, 14

17 U.S.C. §§ 103 ...............................................................................12, 14

17 U.S.C. § 102(a) ...................................................................................12

17 U.S.C. §§ 102(a) .................................................................................12

17 U.S.C. §§ 202 .....................................................................................12

17 U.S.C. § 106 ..........................................................................12, 13, 14

17 U.S.C. § 301(a) ............................................................................12, 13

17 U.S.C. § 410(c) ............................................................................17, 18

Computer Fraud and Abuse Act, 18 U.S.C. §1030.................................1, 7

### OTHER AUTHORITIES

*1-1 Nimmer on Copyright*, § 1.01[j] ........................................................13

Fed. R. Civ. P. 56.............................................................................14, 19, 20

Wright & Miller, *Federal Practice and Procedure*, §2726 ..........................7

## I.     BRIEF STATEMENT OF THE ISSUES

At issue is whether O'Neil accessed Snap-on's protected computers without authorization in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030, and whether Snap-on's claims for Trespass to Chattels, Breach of Contract, Unjust Enrichment, and Trade Secret Misappropriation are preempted by copyright law.

## II.     SUMMARY OF THE ARGUMENTS

O'Neil violated the Computer Fraud and Abuse Act when it accessed Snap-on's protected computers without authorization and used a "scraper" tool to copy a database for a third party. O'Neil also infringed Snap-on's copyright in the database when it copied the data, however, there is no adequate remedy under copyright law for the damage O'Neil caused to Snap-on's computers, and therefore, the additional claims for Trespass to Chattels, Breach of Contract, Unjust Enrichment, and Trade Secret Misappropriation are not be preempted by copyright law. At a minimum, there are genuine issues of material fact relating to these claims such that O'Neil's motion for summary judgment should be denied.

## III.     STATEMENT OF FACTS

Snap-on Business Solutions, Inc. ("Snap-on") is a leading provider of electronic parts catalogs in the automotive and heavy equipment industries.  Customers provide Snap-on with raw data, such as parts catalogs, and Snap-on transforms the data into a vibrant searchable database, where parts data, images, and vehicle and equipment data are organized and linked to provide customers with easy access to the information.  Mitsubishi Caterpillar Forklift[1] ("MCF"), a manufacturer of heavy construction equipment, has been a customer of Snap-on and its predecessor companies for over ten years.

Snap-on and MCF entered into their most recent contract for services in June, 2005.[2] (*See* Ex. A to O'Neil's Motion for Summary Judgment ("O'Neil's Motion")).  The agreement provides MCF with a license to use Snap-on's Net-Compass application, which allows

---

[1] Mitsubishi Caterpillar Forklift America ("MCFA"), Mitsubishi Caterpillar Forklift Europe ("MFCE"), and Mitsubishi Caterpillar Forklift Singapore ("MCFS") are related companies all using Snap-on as the provider for electronic parts catalogs, and will be referred to collectively as "MCF."

[2] In its Memorandum in Support of its Motion for Summary Judgment, O'Neil relies upon a provision in the license agreement from 2000 stating that MCF owned the rights to the information in the databases.  This reliance is misguided, as the 2005 License Agreement included an integration clause, making it the only agreement still in place.  (Ex. A to O'Neil's Motion, at MCFA 1039 ("26.  Entire Agreement.")).

authorized dealers to search for and view parts diagrams, parts lists, pricing, service publications, and bulletins related to industrial equipment, such as forklifts. (*Id.*)  Net-Compass is accessed by MCF dealers on a website hosted and maintained by Snap-on on its computer servers.  Each MCF dealer has a unique username and password used to log into the system to retrieve information.  Each MCF division (MCFA, MCFE, and MCFS) has a separate login site and a separate database maintained on separate Snap-on servers.

Snap-on obtains raw data from MCF and transforms it into a vibrant and fully featured application that allows licensed dealers to quickly access information electronically.  Snap-on converts paper catalogs into digital format, and enhances the raw and unstructured data in several ways, including creating relationships between parts lists, line items, and diagrams, referred to as "hot spots," which are then entered into Snap-on's proprietary database.  (*See* Declaration of Jewel M. Drass ("Drass Decl."), ¶¶ 11-16; Ex. 2, Deposition of Jay N. Gusler ("Gusler Dep.") at 12:6-15:8.)  The hot spots and associated relationships between the various types of raw data were created by and are wholly original to Snap-on.  (Drass Decl. at ¶¶ 13-16; Gusler Dep. at 12:6-15:8.)

In February, 2007, MCF began talks with the Defendant, O'Neil & Associates, Inc. ("O'Neil") regarding it providing an electronic parts catalog that would replace the Snap-on system.  (*See* Ex. 9, 1/29/07 MCF internal e-mail; Ex. 10, 3/1/07 e-mail from O'Neil to MCF; Ex. 11, Letter Agreement for Services.)  In mid-2008, MCF approached Snap-on for copies of the improved data from the Snap-on hosted sites. (Ex. 12, 7/28/08 e-mail from MCF to Snap-on.) What Snap-on did not know at the time was that O'Neil needed the data for the new system it was designing for MCF. (*See* Ex. 1, Deposition of Heather M. Cobb ("Cobb Dep.") at 47:15-48:4.)  Obtaining the data in improved format from Snap-on would save MCF the cost of having O'Neil reproduce the data from paper and then make all the improvements that Snap-on had made. (Cobb Dep. at 52:12-14.)  Snap-on's improvements to the data are proprietary. (Drass Decl. at ¶¶ 13-16.)  According to the 2005 License Agreement between Snap-on and MCF, the improved data is Snap-on's intellectual property.

> 13.     ProQuest[3] Materials and Intellectual Property.  All materials, including, but not limited to any computer software, **data or information developed or provided by ProQuest**...shall remain the sole and exclusive property of ProQuest.  (emphasis added)  (Ex. A to O'Neil's Motion, MCFA 1050)

---

[3] Snap-on is the corporate successor to ProQuest Business Solutions, Inc.

The License Agreement between Snap-on and MCF neither requires Snap-on to return the improved and enhanced data that it created to MCF during or after termination of the Agreement, nor does it obligate Snap-on to do so at no cost, as MCF had demanded.  (Ex. A to O'Neil's Motion).

Snap-on was nevertheless willing to negotiate with MCF for the sale of the improved data.  MCF and Snap-on discussed several options and prices for the improved data.  Snap-on offered to sell MCF the "raw" data for $31,000, and the "improved" data, which included the hto spots and database navigation elements, for $450,000. (Ex. 12.)  MCF rejected both of Snap-on's offers and decided to pursue other options for obtaining the data. (Gusler Dep. at 27:7-31:21.) Despite the failed negotiations, the License Agreement between Snap-on and MCF remains in place today.  The Agreement is renewed automatically every six months unless either party gives notice of termination thirty (30) days prior to the next renewal date. (Ex. A to O'Neil's Motion, MCFA 1037-38.)  The current term will renew on June 1, 2010, unless either party terminates by May 1, 2010.

After negotiations with Snap-on fell through, MCF and O'Neil proceeded with O'Neil's plan to acquire Snap-on's improved data through surreptitious means.  O'Neil's plan, approved by MCF, was to design and implement a "scraper" tool to copy and download all data in the licensed databases stored on Snap-on's servers. (Cobb Dep. at 53:18-20; Gusler Dep. at 31:8-21, 32:9-33:12.)

O'Neil knew going in that the use of a scraper was risky.  O'Neil's Statement of Work from June 2008 stated that one "risk" was that "the current vendor, Snap-On, may pose objections to the wholesale acquisition of MCFA source data." (Ex. 13, relevant portion of O'Neil's Statement of Work[4].)  At the time, one of O'Neil's suggested mitigation strategies was to "mask the origin DNS information in the crawler" so that Snap-on could not trace the scraper back to O'Neil. (*Id.*)  Ironically, Bob Heilman, CEO of O'Neil, testified that O'Neil takes measures to make sure that data scraping tools are not run on its own servers. (Ex. 7, Deposition of Robert J. Heilman ("Heilman Dep.") at 48:13-50:24.)

O'Neil obtained usernames and passwords from MCF, which it used to log onto the Snap-on servers, in violation of the terms of the License Agreement between Snap-on and MCF.

Under the 2005 License Agreement, the usernames and passwords were for MCF employees and authorized dealers only, and were required to be kept confidential:

> 2. Customer may use the Software internally and may permit Dealers to use the Software only in connection with their authorized use of Customer's Data. Customer shall require all access to the Software to be **limited to individuals associated with Dealers** who are registered to use the System and to whom a user ID and password have been assigned. Customer shall require its personnel who use the System and all Dealers to **maintain the confidentiality of their respective user IDs and passwords** and to use the Software **only for its intended purpose** as part of the System. (emphasis added) (Ex. A to O'Neil's Motion, MCFA 1033-34).

Giving usernames and passwords to O'Neil was not authorized under the License Agreement. O'Neil is a direct competitor of Snap-on and not an authorized dealer of MCF. O'Neil's use was not "internal" to MCF. O'Neil is a separate corporation and an independent contractor of MCF. (Ex.11 at MCFA 46976, Para. I.)

By January 2009, O'Neil was finalizing its strategy for scraping the improved data from Snap-on's servers. O'Neil had received spreadsheets from Samuel Herrick, an MCF and former Snap-on employee, which were used as a "checklist" to make sure O'Neil scraped all the improved data. (Ex. 15, 1/15/08 MCF Data Acquisition Status and Summary; Ex. 3, Deposition of Armondo Monzon ("Monzon Dep.") at 81:13-86:18.) Before O'Neil ran the scraper, it took several precautions designed to ensure that Snap-on would not discover its scraping activity. MCF provided O'Neil with usernames and passwords that belonged to other MCF dealers to avoid detection by Snap-on. (Ex. 4, Deposition of Samuel Herrick ("Herrick Dep.") at 133:1-134:21.) O'Neil confirmed that the Snap-on hosted system allowed simultaneous logins, which would allow the authorized dealer to use its username and password even when O'Neil was using it. (Ex. 15; Monzon Dep. at 59:17-61:5.) This was important because O'Neil did not want a "legitimate" user at an authorized MCF dealer to be locked out of the system while O'Neil was scraping data using the same login information, as this could have resulted in a call to Snap-on's helpdesk, alerting Snap-on to O'Neil's activities. (*Id.*)

O'Neil also used many different usernames and passwords belonging to MCF dealers to login and scrape Snap-on's servers. (Herrick Dep. at 124:14-126:8, 132:3-134:21 Ex. 5, Deposition of Dean M. Schuler ("Schuler Dep.") at 74:14-24.) This was done because use of a single username and password, especially if used simultaneously on the MCFA, MCFE, and

---

[4] O'Neil's Statement of Work is a thirty-four page document, and as Snap-on is only referring to one page of the document, only

MCFS systems, would raise red flags at Snap-on.  (Declaration of Gregory D. Feezel ("Feezel Decl."), ¶¶ 5-8. )

Since the scraper tool could download many items per second, O'Neil knew that the scraper would place a significant load on Snap-on's servers, which could also alert Snap-on to O'Neil's activities.  (*See* Monzon Dep. at 134:4-135:9.)  O'Neil initially tested the scraper to see if it affected performance of Snap-on's servers.  (Ex. 17, 11/20/08 O'Neil/MCF Weekly Meeting Minutes; Monzon Dep. at 57:7-58:2.)  O'Neil's scraper identified and followed the "tree" structure of the Snap-on database, meaning that it went through all of the data and subsets of data in order, and captured the hyperlink lists and hotspot data. (Schuler Dep. at 52:23-53:14, Ex. 17.) Once testing was done, O'Neil began scraping the improved data from Snap-on's servers in late February, 2009.  (Monzon Dep. at 89:5-15; Ex. 17.)

O'Neil continued to scrape data through March and April, and modified its scraping tool to download text and images separately.  (Ex. 18, CMS Project Update; Ex. 6, Deposition of Barbara J. Moore ("Moore Dep.") at 70:2-71:10; Schuler Dep. at 21:20-22:19.)  Downloading images caused much larger spikes in traffic on Snap-on's servers as compared to downloading text.  (Moore Dep. at 70:2-6.)  During scraping in April 2009, O'Neil's downloading of images placed such a load on Snap-on's servers that the site crashed.  (Feezel Decl. at ¶¶ 9-11.)  While investigating and repairing the outage, Snap-on noticed enormous spikes in site traffic, and determined that this was the cause of the outage complained of by its customers.  (*Id.* at ¶¶ 9-11, 18.)  The traffic was so high that it had the same effect as a denial-of-service attack.[5]

Snap-on was again forced to spend significant time and resources diagnosing and repairing another site outage on May 7, 2009, which was again due to a spike in traffic on its servers.  (Feezel Decl. at ¶¶ 10-11.)  Snap-on traced the IP address that was the source of the spike to O'Neil.  (Feezel Decl. at ¶ 11.)  Snap-on then blocked O'Neil's IP address at its firewall to prevent further access to Snap-on's websites. (Feezel Decl. at ¶ 18.)  O'Neil suspected that the scraper caused the problems on Snap-on's servers and discussed this with MCF.  (*See* Ex. 19, 5/7/09 E-mail from O'Neil to MCF.)  MCF, in turn, went to Snap-on asking what the problem

---

one page has been filed.  If the Court finds it necessary, Snap-on can file this document in its entirety.
[5] A denial-of-service, or DoS, attack renders a computer unavailable for its intended users by intentionally flooding the computer with external requests so that it either cannot respond to legitimate requests, or responds so slowly that it is essentially unavailable.

was while knowing that O'Neil had caused the problem in the first place.  (*Id.;* Herrick Dep. at 122:19-123:23.)

O'Neil alerted MCF to the fact that its IP address had been blocked by Snap-on, but that it could still log onto Snap-on's servers from a different O'Neil IP address.  (*See* Ex. 20, 5/15/09 E-mail from O'Neil to MCF.)  O'Neil, now concerned about whether its scraping was legal, advised MCF that it would not resume the scraping until MCF agreed to indemnify and defend O'Neil if the scraping resulted in litigation.  (*See* Ex. 21, 6/22/09 E-mail from O'Neil to MCF; Moore Dep. at 90:1-91:5.)  After MCF and O'Neil entered into an Indemnity Agreement, O'Neil further modified the scraper tool to randomize the time between requests to between 1 and 15 seconds.  (*See* Ex. 21; Heilman Dep. at 74:15-76:5.)  Randomizing the requests would make it more difficult for Snap-on to detect data scraping.  The purpose of randomizing the time between requests was to "make it appear less consistent" and "appear not to be automated."  (Schuler Dep. at 71:2-18, 101:16, Ex. 21.)  This was done in response to Snap-on blocking O'Neil's IP address, as there was no randomizing built into the code prior to the blocking. (Schuler Dep. 102:5, 104:3-8.)

In late June 2009, Snap-on learned that O'Neil was scraping from an alternate IP address. (Feezel Decl. at ¶ 16.)  O'Neil's scraper tool caused more server problems for Snap-on, resulting in complaints from customers and the further expenditure of internal resources to diagnose and repair damage.  (Feezel Decl. at ¶ 17.)  Snap-on blocked this IP address as well, but by this time O'Neil had scraped most of Snap-on's improved data needed for the new MCF system.  From April through June 2009, Snap-on's computer technicians spent approximately 200 hours diagnosing and repairing the damage caused by O'Neil's scraping activities. (Feezel Decl. at ¶ 19.)

The present litigation was instituted shortly after the second IP address was blocked. O'Neil continues to work on its new system for MCF and is believed to be in the process of beta-testing the system at this time.  MCF plans to terminate the License Agreement with Snap-on as soon as the O'Neil system is ready.

IV.     **LAW AND ARGUMENT**

Summary judgment must be denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in

favor of either party." *Hancock v. Dodson*, 958 F.2d 1365, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

A. **O'Neil Accessed Snap-on's Computers Without Authorization In Violation Of The Computer Fraud And Abuse Act.**

O'Neil violated the Computer Fraud and Abuse Act, ("CFAA"), 18 U.S.C. § 1030, when it accessed Snap-on's protected computers without authorization, copied Snap-on's proprietary database, and caused damage to Snap-on's computers. The statutory purpose of the CFAA is to "punish trespassers and hackers." *Am. Family Mutual. Ins. Co. v. Rickman*, 554 F. Supp. 2d 766, 771 (N.D. Ohio 2008). Under the CFAA, "a person who uses a computer 'without authorization' has no rights, limited or otherwise, to access the computer in question." *LVRC Holdings LLC v. Breeka*, 581 F.3d 1127, 1133 (9th Cir. 2009). O'Neil claims that it had authorization to access Snap-on's protected computers because MCF gave O'Neil permission to do so. However, that permission was not MCF's to give, and O'Neil knew this. Otherwise O'Neil would not have taken all of the steps that it did to conceal its scraping, or sought indemnification from MCF.

O'Neil relies upon *SecureInfo Corp. v. Telos Corp.* for the proposition that the CFAA does not apply to a non-party to a licensing agreement when the non-party was authorized by a party to the agreement. 387 F. Supp. 2d 593 (E.D. Va. 2005). However, for the facts of *SecureInfo* to apply to the present case, MCF would have had to host the Snap-on software and database on <u>MCF's computers</u>, and then give O'Neil authorization to access <u>MCF's computers</u>. Instead, O'Neil accessed Snap-on's computers, containing Snap-on's software and the database created and owned by Snap-on. Whether or not this was at MCF's request is irrelevant, as it does not change the fact that O'Neil did not have authorization from Snap-on to access Snap-on's protected computers.

1. **The Agreements Between Snap-on And MCF Forbid MCF From Giving A Third Party Access To Snap-on's Computers And Software.**

Under the License Agreement, MCF is not permitted to give a third party - such as O'Neil - authorization to log into the system, or to even *see* the software.  The 2005 License Agreement provides that:

> 2.  Customer shall require all access to the Software to be **limited to individuals associated with Dealers** who are registered to use the System and to whom a user ID and password have been assigned. (emphasis added) (Ex. A to O'Neil's Motion, MCFA 1034.)

Further, the License Agreement expressly states that the Software is a Trade Secret of Snap-on. (*Id*, at ¶ 13(c))  Under the Nondisclosure and Confidentiality provisions of the License Agreement, MCF is required to:

> 13. (a)  …hold the Trade Secrets disclosed by Owner [Snap-on] in strictest confidence and not to, …**reveal**, …or otherwise transfer the Trade Secrets…for any purpose whatsoever other than as expressly permitted by this Agreement.  (emphasis added) (*Id*. at MCFA 1036.)

O'Neil was not authorized to *see* Snap-on's Net-Compass application, let alone log onto the system and engage in the wholesale downloading of Snap-on's improved data.

### 2.  <u>The End-User License Agreement Warned O'Neil That Access Was Unauthorized.</u>

The login screens for each of the MCFA, MCFE, and MCFS applications hosted by Snap-on state that "the use of and access to the information on this site is subject to the terms and conditions set out in our legal statement" and provide a link to the End-User License Agreement ("EULA") governing the use of the application. (See Ex. 22, Screenshots of MCF websites and EULA.)  The EULA was a warning to O'Neil that it was accessing Snap-on's protected computers, without authorization, as the EULA states:

> 7.  <u>**Authorized Dealer**</u>  Your right to use the Software is conditioned upon your status as an authorized dealer or customer of a manufacturer or other organization that has licensed Net-Compass software from Snap-on. (Ex. 22)

While no O'Neil employees would admit to having read the EULA, O'Neil is still bound by its terms as "browse-wrap" agreements are enforceable in Ohio.  (See Sec. D, *infra*.)  Since O'Neil was not an authorized dealer, the EULA provided sufficient warning that O'Neil's access was "without authorization."  Therefore, this requirement of the CFAA has been satisfied.

### 3.  <u>O'Neil Knew That It Was Accessing Snap-on's Computers Without Authorization.</u>

O'Neil's chicanery surrounding its scraping activities illustrates that it knew that it was not authorized to access Snap-on's protected computers.  If O'Neil had been authorized, O'Neil would not have needed to conceal its scraping activities.  If there was any question at O'Neil about whether the access was authorized, that question should have been answered the first time Snap-on blocked O'Neil's IP address.  (*See, e.g., Register.com v. Verio, Inc.*, 126 F.Supp. 2d. 238, 249 (S.D.N.Y. 2000) (The court reasoned that although authorization under Register.com's terms of use may have been ambiguous, it should have been clear after the lawsuit was filed that subsequent access was unauthorized.)

Instead of stopping the data scraping activities altogether, O'Neil sought indemnification from MCF and resumed its scraping of Snap-on's servers from an alternate IP address.  (*See* Ex. 23, 5/29/09 Indemnification Agreement.)  O'Neil sought indemnification because it was concerned that its activities could result in litigation.[6]  (*See* Ex. 24, 4/15/09 e-mail from O'Neil to MCF; Heilman Dep. at 58:22-59:24.)  As a result of Snap-on blocking O'Neil's IP address, O'Neil also re-programmed the scraper tool to further randomize time between requests to between 1 and 15 seconds so as to make the activity "appear not to be automated" and avoid detection by Snap-on. (Ex. 21; Schuler Dep. at 102:24-104:15; Heilman Dep. at 74:15-76:5.)

The written agreements between Snap-on and MCF, and the EULA governing the use of Snap-on's websites, state that a third party like O'Neil is not authorized to access Snap-on's websites.  O'Neil's actions further insinuate that it knew it was not authorized to access Snap-on's websites, and Snap-on therefore requests that the Court rule in its favor on its claims for violations of the CFAA.  At a minimum, Snap-on has shown that there are genuine issues of material fact as to whether O'Neil was authorized to access Snap-on's computers.

**B.**	**O'Neil Has Not Shown An Absence Of Genuine Issues Of Material Fact And Is Not Entitled To Summary Judgment On Snap-on's Trespass to Chattels Claim.**

**1.**	**O'Neil Deprived Snap-on Of Its Chattel When It Damaged Snap-on's Computers.**

In order to establish trespass to chattels, Snap-on must demonstrate its possessory interest in the chattels and either: (1) dispossession of the chattel; or (2) "intermeddling" with the chattel,

---

[6] Although this e-mail from O'Neil's CEO claims that O'Neil was acting as MCF's "agent," the relationship between O'Neil and MCF is defined in the agreements between the parties, which state that O'Neil is an independent contractor of MCF.  Therefore, any authorized access by MCF cannot be imputed to O'Neil, acting as MCF's agent. (See Exs. 11 and 14;  *See Abrams v. Toledo Auto. Dealer Assn.*, 145 Ohio App. 3d, 187, 191 (Ohio App. 2001) for a discussion of agents compared to independent contractors.)

which means intentionally bringing about a physical contact with the chattel. *Universal Tube & Rollform Equip. Corp. v. YouTube, Inc.*, 504 F. Supp. 2d 260, 269 (N.D. Ohio 2007). One who commits a trespass to chattel is liable where either he: (1) dispossesses the owner of the chattel; (2) the chattel is impaired as to its condition, quality or value; (3) the possessor is deprived of his use of the chattel for a substanial time; or (4) bodily harm is caused to the possessor or a person or thing in which the possessor has a legally protectable interest. *MCI Worldcom Network Servs., Inc. v. W.M. Brode Co.*, 411 F. Supp. 2d 804, 810 (N.D. Ohio 2006).

The use of electronic means to unlawfully interfere with the computer or server of another is sufficiently physical and tangible to support a cause of action for trespass to chattels. *Compuserve, Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1021 (S.D. Ohio 1997). In *Compuserve*, the court found that defendant's sending of emails to (and through) plaintiff's server constituted a trespass upon that server: "It is undisputed that plaintiff has a possessory interest in its computer systems. Further, defendants' contact with plaintiff's computers is clearly intentional." *Id*. Because defendants' interference with plaintiff's server caused it damage by placing a burden on its capacity and interfering with plaintiff's customers' ability to fully utilize the benefits of the server, defendants' conduct was actionable.[7]

The electronic interference with the plaintiff's computer systems or servers need not fully "dispossess" the plaintiff of its property in order to be actionable for trespass to chattels. *See Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 249 (S.D.N.Y. 2000) (defendant liable for harm caused by its use of a "search robot" to access plaintiff's database, and even "evidence of mere possessory interference is sufficient to demonstrate the quantum of harm necessary to establish a claim for trespass to chattels") (citing *Compuserve*). The trespasser need not destroy or dispossess the owner of its property, so long as it interferes with it in such a way as to deprive the plaintiff of its ability to fully utilize it. (*See eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1071 (N.D. Cal. 2000))[8].

---

[7] The court in *Compuserve* ultimately held that "defendants' persistent affirmative efforts to evade plaintiff's security measures" further "underscores that the damage sustained by plaintiff is sufficient to sustain an action for trespass to chattels." *Compuserve*, 962 F. Supp. at 1023. Here, Snap-on implemented security measures to prevent O'Neil from continuing its unlawful access to its servers, including twice blocking the IP address from which the data scraping tool was run. (Cobb Dep. at 35:14-16; 108:3-110:8.) O'Neil's persistent efforts to evade these security measures further highlight that what it was doing was wrong.

[8] "BE argues that its searches represent a negligible load on plaintiff's computer systems, and do not rise to the level of impairment to the condition or value of eBay's computer system required to constitute a trespass. However, it is undisputed that eBay's server and its capacity are personal property, and that BE's searches use a portion of this property. Even if, as BE argues, its searches use only a small amount of eBay's computer system capacity, BE has nonetheless deprived eBay of the ability to use that portion of its personal property for its own purposes. The law recognizes no such right to use another's personal property." *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1071 (N.D. Cal. 2000).

O'Neil's conduct in unlawfully accessing Snap-on's servers constitutes a trespass to Snap-on's chattels. O'Neil attempts to cloud the issue by stating that it did not commit trespass because the MCF data was copied, "not removed or destroyed, and [Snap-on] was not dispossessed of property in any meaningful or actionable sense." (Doc. 41-1, at p. 9.) The flaw in O'Neil's position is two-fold. First, the fact that data was not removed or destroyed is irrelevant to the fact that O'Neil had to access Snap-on's servers to copy the data. The chattels at issue are Snap-on's, including its improved data, that reside on its servers, not MCF's raw data. Therefore, O'Neil did not have to remove or destroy data to be guilty of trespass; its accessing of Snap-on's servers, and the subsequent harm that resulted, is sufficient.

Second, Snap-on did not have to be "dispossessed" of its property in order for O'Neil's conduct to be actionable. As in *Compuserve*, *Register.com*, and *eBay*, the effect that O'Neil's use of its data scraping tool had on Snap-on's servers was enough to impair the servers' conditions and deprive Snap-on and its other customers of the opportunity to fully utilize the servers for a substantial time. By running the data scraping tool on Snap-on's servers, O'Neil interfered with and impaired the servers, and cost Snap-on the ability to effectively utilize them to their otherwise full potential. O'Neil trespassed upon Snap-on's property, and its summary judgment motion should be denied.

O'Neil cites *Universal Tube & Rollform Equip. Corp. v. YouTube, Inc.*, 504 F. Supp. 2d 260 (N.D. Ohio 2007) for the proposition that "the use of software in a database is not the use of physical equipment as required by Ohio law." (Doc. 41-1, at p. 9.) However, *YouTube* does not stand for such a proposition, and in fact supports Snap-on's position.[9] The court's opinion never mentions the words "software" or "database," let alone holds that software does not constitute a chattel under Ohio law. The two flaws in the *YouTube* plaintiff's trespass claim are not present here in Snap-on's trespass claim.

Here, O'Neil trespassed upon Snap-on's servers, which are undisputedly owned by Snap-on, and unlike the defendants in *YouTube*, O'Neil actually made contact with Snap-on's property by accessing Snap-on's servers to copy data. (*See* Feezel Decl. at ¶¶ 8-11.) As described above, the interference with Snap-on's servers, and the resulting harm of Snap-on being unable to use its

---

[9] In *YouTube*, the plaintiff claimed to own the Internet domain name "utube.com," and that defendant's maintenance of "youtube.com" for its website "trespassed" upon plaintiff's use of their domain. *YouTube*, 504 F. Supp. 2d at 267-68. The court dismissed the trespass count on the grounds that: (1) plaintiff could not demonstrate a "possessory interest" in its alleged property since its website was hosted on a third party's computer; and (2) defendant never made any physical contact with the computers hosting plaintiff's website. *Id.* at 269.

servers at full capacity, constitutes a "touching" or "intermeddling" with Snap-on's property and is actionable.  Thus, *YouTube* is inapplicable to these facts.

>    **2.      Snap-on's Trespass To Chattels Claim Is Not Preempted By Federal Law.**

Under § 301(a) of the Copyright Act, a state law claim is preempted only if: (1) the work is within the scope of the "subject matter of copyright" as outlined in 17 U.S.C. §§ 102, 103; **and** (2) the rights granted under state law are **equivalent** to any **exclusive** rights within the scope of federal copyright as set forth in 17 U.S.C. § 106.  *Lynn v. Sure-Fire Music Co., Inc.*, 237 Fed. Appx. 49, 53 (6th Cir. June 6, 2007) (holding that plaintiff's state law claims for declaratory judgment, replevin, conversion, breach of contract, breach of implied duty of good faith and fair dealing, and an accounting were not preempted by federal copyright law) (citing *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001)).  Snap-on's trespass to chattels claim is not preempted by the Copyright Act for two reasons, each of which, standing alone, is enough to deny O'Neil's motion for summary judgment on preemption grounds.

First, at least some of the trespassed-upon property at issue (Snap-on's computer servers) is not within the scope of the "subject matter of copyright," as defined in 17 U.S.C. § 102(a), because it is tangible property.  In *Lynn*, the Sixth Circuit held that the plaintiff's claims for replevin and conversion were outside the scope of the Copyright Act because they were "concerned with dominion over tangible personal property," and thus outside the scope of the "subject matter of copyright."  *Lynn*, 237 Fed. Appx. at 54; *citing* 17 U.S.C. §§ 102(a), 202. Because Snap-on's servers are tangible, personal property, the Copyright Act does not preempt Snap-on's claim for trespass upon the servers.

O'Neil claims that the scope of federal preemption based on the Copyright Act is broader than the scope of protection afforded by the Copyright Act, and cites *Wrench*, *supra*, in support. (Doc. 41-1, at p. 10.)  While this proposition in its broadest sense is true, O'Neil's argument is wholly misplaced.  In *Wrench LLC*, the property at issue was the predecessor to the popular "Taco Bell Chihuahua," which the Sixth Circuit held was an "element[] of expression" that, although perhaps not covered by the Copyright Act, would still subject a state law claim based upon it to preemption.  *Wrench*, 256 F.3d at 455.  The Court held that, because Congress has determined that federal preemption is designed to "prevent states from giving special protection to **works of authorship** that Congress has decided should be in the public domain," the forerunner to the "Taco Bell Chihuahua," an intangible work of authorship, satisfied the first

prong of the preemption analysis, as it was within the "subject matter of copyright."  *Id.* (emphasis added).

Unlike in *Wrench LLC*, the property at issue here is neither an "element[] of expression," nor a "work[] of authorship" which may be on the cusp of – although not quite within – federal copyright protection.  Snap-on's property is tangible computer servers that host databases, into which O'Neil trespassed and caused Snap-on damage.  O'Neil's data scraping tool literally trespassed upon Snap-on's physical servers and databases; it did not philosophically "trespass" upon Snap-on's copyrighted ideas.[10]  Therefore, Snap-on's claim for trespass to chattels is not preempted by the Copyright Act because the property trespassed upon was tangible.

Second, Snap-on's trespass to chattels claim is not preempted by the Copyright Act because the claim does not assert rights that are "equivalent to any of the exclusive rights within the general scope of copyright as specified by *section 106*."  (emphasis added) 17 U.S.C. § 301(a).  A state law claim will not be preempted where "an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display…provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim."  *Wrench LLC*, 256 F.3d at 456.  The Sixth Circuit in *Wrench LLC* (cited by O'Neil) held that plaintiffs' state law claim for implied-in-fact contract survived preemption because it failed the equivalency test.  *Id*.  The "additional element" required under the equivalency test is often found in a trespass to chattels claim such as Snap-on's.  (*See eBay, Inc.*, 100 F. Supp. 2d at 1072 (cited in *1-1 Nimmer on Copyright*, § 1.01[j])[11]

Much like in *eBay, Inc.*, Snap-on's claim for trespass to chattels is not preempted by the Copyright Act because the claim requires the additional element of O'Neil's unauthorized entrance onto Snap-on's physical property, making the claim "qualitatively different from a copyright infringement claim."  (*Id*.)  Such a claim would lie against O'Neil even without a claim for copyright infringement.  O'Neil entered Snap-on's physical property without

---

[10] To be sure, O'Neil did copy those protected works as described in Snap-on's claim for copyright infringement.  But when it came to O'Neil's trespassing, it was done upon Snap-on's tangible property.

[11] This Court should not give weight to the case of *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627 (E.D. Pa. 2007), cited by O'Neil for the proposition that "[a] trespass to chattel claim is preempted when it arises from a set of factual allegations that establishes copyright infringement."  (Doc. 41-1, at p. 10.)  In *Healthcare*, the issue was whether the plaintiff's taking of "screen shots" of the defendant's archived websites was a trespass to chattels preempted by the Copyright Act.  *Healthcare*, 497 F. Supp. 2d at 630-31.  The *Healthcare* court bizarrely offers the blanket statement of: "[t]he tests for [trespass to chattels and conversion] require nothing more than what is required under copyright law to establish infringement."  *Id*. at 650.  Support for such a bright-line rule is not found in any other case involving preemption of trespass to chattels claims, and O'Neil does not even posit that such a rule is warranted.  Therefore, this Court should give no effect to a decision so far removed from mainstream jurisprudence on this issue.

authorization and caused damage to it.  Even if O'Neil's data scraping tool was unable to copy data from Snap-on's servers, O'Neil would still be liable for trespass to chattels because of the effect that the presence of its tool had on Snap-on's servers and databases.  Therefore, Snap-on's claim for trespass to chattels requires proof of additional elements outside of federal copyright law, and is thus not preempted.

**C.**     **O'Neil Was Unjustly Enriched By Copying Snap-on's Proprietary Database And Improved Data.**

In five short sentences, O'Neil urges this Court to grant it summary judgment on Snap-on's claim for unjust enrichment because such a claim "remains factually unsupported" and is preempted by federal copyright law.  (Doc. 41-1, at p. 11.)  O'Neil's first "argument," that Snap-on's claim is factually unsupported, procedurally fails as insufficient pleading under Rule 56 and should not be countenanced.  (*See* Sec. F, *infra*).  O'Neil's second position fails because Snap-on's claim for unjust enrichment and the imposition of a constructive trust is not preempted by federal copyright law.

As discussed above, a state law claim is preempted only if: (1) the work is within the scope of the "subject matter of copyright" as outlined in 17 U.S.C. §§ 102, 103; **and** (2) the rights granted under state law are **equivalent** to any **exclusive** rights within the scope of federal copyright as set forth in 17 U.S.C. § 106.  A state law claim of unjust enrichment will only be preempted where the cause of action rests "only on a claim that a defendant misappropriated plaintiff's intellectual property."  *Automated Solutions Corp. v. Paragon Data Sys.*, Case No. 1:05cv1519, 2006 U.S. Dist. LEXIS 98050, at *47 (N.D. Ohio July 5, 2006) (magistrate's opinion) (Claim for unjust enrichment not preempted because, among other things, claim based on plaintiff's false and misleading statements, distinct from the rights granted to copyright owners).

Furthermore, as with a trespass to chattels claim, an unjust enrichment claim will not be preempted where the subject matter of the unjust enrichment is not within the scope of the Copyright Act's protection.  *See Tastefully Simple, Inc. v. Two Sisters Gourmet, L.L.C.*, 134 Fed. Appx. 1, 6 at fn. 3 (6th Cir. Apr. 8, 2005) (Copyright Act did not preempt portion of plaintiff's unjust enrichment claim based on property not within the scope of the subject matter of copyright); *Perfect 10, Inc. v. Google, Inc.*, Case No. CV-04-9484-AHM, 2008 U.S. Dist. LEXIS

79200, at *26-27 (C.D. Cal. July 16, 2008) (unjust enrichment claim not preempted to the extent it relied on non-preempted claims).

**D.      O'Neil Breached The End-User License Agreement Governing The Use Of Snap-on's Websites.**

O'Neil entered into a contract with Snap-on and then breached the contract each time it accessed the MCFE and MCFS websites, all of which incorporate an End User License Agreement ("EULA").[12]  Under Ohio law, a "browse-wrap" agreement, similar to the EULAs at issue, are enforceable as valid contracts between a website's host and its user.  Browse-wrap agreements are those contained on a website which allow the user to view the terms of the particular agreement, but do not require the user to take any affirmative action before the website performs its end of the contract.  *See Doe v. SexSearch.com*, 502 F. Supp. 2d 719, 729 at fn. 1 (N.D. Ohio 2007) (distinguishing "browse-wrap" and "clickwrap" agreements).

The enforceability of a browse-wrap agreement as a valid contract turns on whether the website user has actual or constructive knowledge of the site's terms and conditions prior to using the site.  *Southwest Airlines Co. v. BoardFirst, L.L.C.*, Case No. 3:06-cv-0891-B, 2007 U.S. Dist. LEXIS 96230, at *15-16 (N.D. Tex. Sep. 12, 2007) (finding that defendant had actual knowledge of the website's terms, and thus browse-wrap agreement was enforceable).  Furthermore, in *Cairo, Inc. v. Crossmedia Servs., Inc*., Case No. C-04-04825-JW, 2005 U.S. Dist. LEXIS 8450, at *12-13 (N.D. Cal. Apr. 1, 2005), the court held that:

> [i]t is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes acceptance of the terms, which accordingly become binding on the offeree.

*Cairo, Inc*., 2005 U.S. Dist. LEXIS at *12 (quoting *Register.com, Inc. v. Verio, Inc*., 356 F. 3d 393, 403 (2d Cir. 2004)).  Constructive knowledge will be imputed to a website user where the hyperlink which leads the user to the agreement is located conspicuously near a point on the site which is accessed by the user.  *See Major v. McCallister*, Case No. SD29871, 2009 Mo. App. LEXIS 1829, at *6 (Mo. Ct. App. Dec. 23, 2009) (website at issue contained "immediately

---

[12] Snap-on's logs documenting access to the MCF websites show access from O'Neil IP addresses to the four MCFE and MCFS sites, and although Snap-on has not identified logs showing O'Neil's access to the two MCFA sites, the EULAs for all six cites are identical.  (Feezel Decl. at ¶¶12-14, Drass Decl. at ¶9.)  A question of fact exists as to whether O'Neil accessed the log-in pages for the MFCA sites, as Dean Schuler from O'Neil indicated that he manually signed on to the MCFA site.  (Schuler Dep. at 93:15-18.)

visible notice of the existence of the license terms," as the link to the license terms was located directly next to the button pushed by user).

The EULAs at issue in this case constitute enforceable contracts against O'Neil.  The homepages for each of the MCF websites contain log-in and password boxes which MCF's customers use to access the website and the data contained therein.  (Ex 22; Feezel Decl. at ¶¶ 12-13.)  Just below the "ENTER" button, which grants users access to the website after entering their log-in and password information, is a statement which warns users that: "The use of and access to the information on this site is subject to the terms and conditions set out in our legal statement."  (Ex. 22.)  Immediately following this text is a green box containing an arrow which users may click to read the EULA in its entirety, as shown below.  (*Id.*)

© 2000-2009 Snap-on Business Solutions. All Rights Reserved. The use of and access to the information on this site is subject to the terms and conditions set out in our legal statement. ➲

O'Neil is bound by the terms of the EULA because it had at least constructive knowledge of the EULA each time it accessed one of Snap-on's websites to run the data scraping tool.  The link to the EULA was located conspicuously near the point on the MCF website where O'Neil logged in to run the tool, and that link provided "immediately visible notice of the existence of the license terms." (Ex. 22.) O'Neil made the decision to take the benefit of using the website with knowledge as to the existence and terms of the EULA.  Therefore, the EULA constitutes a valid, enforceable contract against O'Neil.

Furthermore, it is undisputed that O'Neil's actions in accessing the MCF websites constituted a breach of the EULA.  Paragraph 7 of the EULA provides, in pertinent part:

> 7.  **Authorized Dealer**   Your right to use the Software is conditioned upon your status as an authorized dealer or customer of a manufacturer or other organization that has licensed Net-Compass software from Snap-on.

(Ex. 22 at p. 2.)  O'Neil does not dispute that it accessed the MCF websites.  (*See* Doc. 41-1, at pp. 1, 3-4; Deposition of David M. Stackhouse ("Stackhouse Dep.") at 42:10-15; Cobb Dep. at 28:7-13.)  Additionally, O'Neil cannot claim that is an "authorized dealer or customer," which has the right to access the websites.  O'Neil's mere logging in to the websites constitutes a breach of the EULA, which caused Snap-on damage by virtue of O'Neil's use of its scraping tool.  As described in the EULA, O'Neil is further required to "pay or reimburse Snap-on for all reasonable costs and expenses, including reasonable legal fees, incurred to protect or enforce its

rights under" the EULA. (Ex. 22 at p. 2.) Therefore, O'Neil's motion for summary judgment on Snap-on's breach of contract claim should be denied.

**E.      O'Neil Made Direct Copies Of Snap-On's Copyrighted Data Thereby Infringing Snap-On's Copyrights.**

To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L. Ed. 2d 358 (1991). Where a registration is filed within five years of first publication of the work, the certificate of registration constitutes *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate, including the requirements of originality and susceptibility to copyright protection. 17 U.S.C. § 410(c); *Ronald Mayotte & Associates v. MGC Building Co.*, 885 F.Supp. 148, 152 (E.D. Mich. 1994).

**1.      Snap-on Owns A Valid Copyright In The Enhanced Data And Compilation.**

Snap-on does not dispute that MCF owns the original information that it provided to Snap-on. Nor does Snap-on claim copyrights to that information. None of O'Neil's contract arguments are relevant because Snap-on is not contesting the fact that the data provided to it by MCF is owned by MCF. [13]

What Snap-on claims copyrights in, and that are covered by its copyright registration, are the improvements Snap-on made to the original information and the other creative aspects to the database compilation, all of which were directly copied by O'Neil. Nowhere in any of the contracts cited by O'Neil is Snap-on obligated to hand over its original work product based on the underlying information.

As a preliminary matter, Snap-on is the owner of a valid copyright, as required by the first prong of the test for infringement. Attached as Exhibit A to Snap-on's Amended Complaint (Doc. #34), is Copyright Certificate of Registration No. TXu 1-611-299, to Snap-on's database

---

[13] In fact, the passages from the various agreements O'Neil cites to clearly define "Data" as the raw data supplied by MCF, not the improvements and enhancements made by Snap-on. (Doc. #41-1, at p. 5) ("Each of the Net-Compass and PartsManager Pro Software operates with data (including, but not limited to parts and service information) <u>supplied by Customer (collectively, the "Data")</u>.") Nor do the provisions of the Web Hosting Agreement support O'Neil's argument. (Doc. #41-1, at pgs. 5-6). Section 13 of the Web Hosting Agreement provides that "All materials, including but not limited to any computer software, <u>data or information developed or provided by ProQuest . . . pursuant to this Agreement . . . shall remain the sole and exclusive property of ProQuest . . .</u>" (Ex. A to O'Neil's Motion, MCFA001050). Even the September 2000 Agreement with ProQuest's predecessor, Bell & Howell, (which has been superseded by the 2005 License Agreement – see footnote 2) is referring to the raw data supplied by MCF, e.g., "Customer's products, service manuals, operators manuals, parts manuals, and bulletins." (Doc. #41-1, at p. 6).

compilation.  The certificate of registration is *prima facie* evidence that Snap-on owns a valid copyright to its database compilation and the enhanced data.  17 U.S.C. § 410(c).

Snap-on takes raw data from MCF entities (MCFA, MCFE, and MCFS), primarily in the form of printed catalogs, and transforms it into a vibrant and fully featured application that allows licensed dealers to quickly access information electronically.  Snap-on starts by converting paper catalogs into digital format and then enhances the raw and unstructured data.  (Drass Decl. at ¶¶ 11-12.)  For example, Snap-on creates relationships between parts lists, line items, and diagrams, referred to as "hot spots," which are then entered into Snap-on's proprietary database.  (Drass Decl. at ¶¶ 13-16; Gusler Dep. at 14:1-18.)  The hot spots and associated relationships between the various types of raw data were created by and are wholly original to Snap-on.  (Drass Decl. at ¶¶ 13-16.) The raw data provided by MCF never included hot spots and associated relationships, which were all created by and are original to Snap-on.  (Gusler Dep. at 12:6-15:8.)

Originality only requires that the author make the selection or arrangement independently, and that it display some minimal level of creativity.  *Feist,* 499 U.S. at 358-59.  As the *Feist* court noted, the vast majority of compilations will pass this test.  *Id.*  Snap-on's selection and arrangement of MCF's raw data and Snap-on's enhancements to that raw data are original to Snap-on and entitled to copyright protection.

**2.      O'Neil Directly Copied All Of Snap-on's Protected Works.**

O'Neil argues that it only sought the raw data that MCF originally provided to Snap-on.  (Doc #41-1, at 14).  O'Neil does not deny copying data directly from Snap-on's computer servers.  In fact, nowhere in its motion does O'Neil even deny that it copied data in excess of the raw data; it merely argues that it only wanted the raw data.  O'Neil sought more than just the raw data and, in the process of doing so, O'Neil took everything.

O'Neil's scraper tool downloaded not only the raw data originally provided by MCF but also Snap-on's proprietary link structure, the navigational information from the websites, and hot spot location information.  (Schuler Dep. at 52:23-24, 53:1-12; Drass Decl. at ¶¶ 18-23.)  O'Neil and MCF were even aware that the hot spot files were in a proprietary Snap-on format.  (Schuler Dep. at 142:21-24, 143:1; Ex. 26, 2/17/09 O'Neil Meeting Minutes Summary.)

During testing of a prototype of the scraper tool, O'Neil downloaded whole pages of information, including the improved data, images, logos, and style sheet information, from Snap-

on's servers, i.e., identical copies of everything from the websites, which were then stored in random access memory ("RAM") on O'Neil's computers.  (Schuler Dep., at 21:11-24, 22:1-24; 55:6-12.)  After the scraper tool was completed, O'Neil continued to download all of Snap-on's improved data only now without logos and irrelevant information used for viewing the pages.  (Schuler Dep., at 21:20-24, 22:1-24.)  In particular, O'Neil downloaded the hot spot information, which was saved in a database table on a hard drive in O'Neil's computers.  (Schuler Dep. at 81:2-19.)

When O'Neil downloaded Snap-on's proprietary and enhanced data onto its computers, it necessarily included loading of the data into the computer's RAM and, for important information like the hot spots, onto its hard drive, all of which constitutes direct copyright infringement.  "In the absence of ownership of the copyright or express permission by license, such acts constitute copyright infringement."  *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993).  Neither O'Neil nor MCF own the copyright in the enhanced data and O'Neil did not have express permission by license to take the enhanced data, thereby making it liable for copyright infringement.[14]

## F.    O'Neil's Motion For Summary Judgment In Its Favor On The Trade Secret Claim Is Woefully Inadequate.

O'Neil's attempt at moving the Court for summary judgment on Snap-on's claim for misappropriation of trade secrets is woefully insufficient under Rule 56 and should be denied.  While Rule 56 only requires the moving party to demonstrate a lack of a genuine issue of material fact, the moving party must still make an affirmative showing as to exactly *how* such a lack of a genuine issue is demonstrated in the record.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).)[15]  In *Celotex*, although the central issue was whether a party moving under Rule 56 was absolutely required to attach affidavits or other evidence to its motion, the Court clearly

---

[14] Furthermore, because the copy created in the RAM can be "perceived, reproduced, or otherwise communicated," it is a "copy" under 17 U.S.C. § 101.  *See also Wilcom Pty. v. Endless Visions*, 128 F.Supp. 2d 1027 (E.D. Mich. 1998) (copy in RAM sufficient for infringement); *NCR Corp. v. The ATM Exchange, Inc.*, Case No. 1:05cv383, 2006 U.S. Dist. LEXIS 30296 (S.D. Ohio May 17, 2006) (copy in memory sufficient for infringement); *State v. Perry*, Case No. C-960297, 1997 Ohio App. LEXIS 453, fn. 16 (1st Dist. Feb. 12, 1997) ("the placement of copyrighted material into a computer's memory is a reproduction of that material…[and] [w]hen a work is placed into a computer, whether on a disk, diskette, ROM, or other storage device or in RAM for more than a very brief period, a copy is made."); *Facebook, Inc. v. Power Ventures, Inc.*, Case No. C 08-5780 JF (RS), 2009 U.S. Dist. LEXIS 42367, at *8-9 (N.D. Cal. May 11, 2009), *citing Ticketmaster L.L.C. v. RMG Techs, Inc.*, 507 F.Supp. 2d 1096, 1106 (C.D. Cal. 2007) ("copies of webpages stored automatically in a computer's cache or random access memory ("RAM") upon a viewing of the webpage fall within the Copyright Act's definition.").

[15] "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

indicated that the moving party must do *something* more than just identify that it is entitled to summary judgment.

Justice White, in *Celotex*, agreed that the moving party need not attach an affidavit to its motion in order to succeed under Rule 56, but stated that "the movant must discharge the burden the Rules place upon him: It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case."  *Celotex*, 477 U.S. at 328 (White, J., concurring).  This admonition that the moving party do more than offer a conclusory assertion that he is entitled to summary judgment has been identified and followed by the Sixth Circuit, which recently stated that "the moving party bears the initial burden of **identifying parts of the record** that demonstrate the absence of a genuine issue of material fact."  *Jones v. Memphis Light, Gas, and Water Division*, Case No. 08-6212, 2009 U.S. App. LEXIS 20831, at *10 (6th Cir. Sep. 17, 2009) (citing *Celotex*) (emphasis added). The requirement of a prima facie showing by the moving party is further highlighted by the fact that, in considering a motion for summary judgment, the court must draw all inferences in a light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

O'Neil disregards Rule 56, the Supreme Court's holding in *Celotex*, and common sense by moving this Court for summary judgment based on nothing more than two sentences casually thrown in at the end of its Motion.  (Doc. 41-1 at p. 14.)  O'Neil does not cite any evidence in the record, does not "inform[] the district court of the basis for its motion," and only offers the "conclusory assertion that [Snap-on] has no evidence to prove [its] case."  Therefore, O'Neil has failed to meet its initial burden under Rule 56, and summary judgment should be denied.[16]

## V.    <u>CONCLUSION</u>

For the foregoing reasons, O'Neil's has not established that there are no genuine issues of material fact.  On most of the issues raised by O'Neil, the Court should grant summary judgment to Snap-on.  At the very least, O'Neil's motion for summary judgment should be denied in whole.

---

together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[16] Should it try, O'Neil should not be permitted to meet its initial burden on summary judgment in its reply.  If O'Neil attempts to do so, and the Court is willing to hear them on the trade secret issue, Snap-on requests leave to file a sur-reply directed to O'Neil's newly raised arguments.

Respectfully submitted,

Dated:  February 15, 2010                    HAHN LOESER & PARKS LLP

                                             By:  /s/  Amanda H. Wilcox
                                             Amanda H. Wilcox (Ohio Reg. No. 73,832)
                                             ahwilcox@hahnlaw.com
                                             R. Eric Gaum (Ohio Reg. No. 66,573)
                                             regaum@hahnlaw.com
                                             200 Public Square, Suite 2800
                                             Cleveland, Ohio 44114
                                             Phone:  (216) 621-0150
                                             Fax:  (216) 241-2824

                                             Phillip G. Eckenrode (Ohio Reg. No. 84,187)
                                             pgeckenrode@hahnlaw.com
                                             65 East State Street, Suite 1400
                                             Columbus, Ohio 43215
                                             Phone:  (614) 221-0240
                                             Fax:  (614) 221-5909

                                             Attorneys for Plaintiff
                                             Snap-On Business Solutions, Inc.

## CERTIFICATION OF COUNSEL

I hereby certify that the instant matter has been assigned to the standard case track, and that the instant Opposition to Defendant O'Neil & Associates, Inc.'s Motion for Summary Judgment adheres to the page limitations set forth in Local Rule 7.1(f).


/s/  Amanda H. Wilcox
One of the Attorneys for Plaintiff
Snap-on Business Solutions, Inc.




## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2010, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ Amanda H. Wilcox
One of the Attorneys for Plaintiff
Snap-on Business Solutions, Inc.