IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SNAP-ON BUSINESS SOLUTIONS, INC., | ) | CASE NO. 5:09-CV-1547 |
| | ) | |
| | ) | JUDGE JAMES S. GWIN |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | **DEFENDANT'S REPLY IN SUPPORT** |
| O'NEIL & ASSOCIATES, INC., | ) | **OF MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendant | ) | |

May it Please the Court:

Snap-On's Memorandum in Opposition (Doc. # 47) fails to create any issue of material fact with regard to Snap-On's claims against O'Neil. Because no genuine issue of material fact remains, O'Neil is entitled to summary judgment in its favor, and against Snap-On, with regard to each of Snap-On's claims against O'Neil. For the reasons set forth in O'Neil's Motion for Summary Judgment (Doc. # 41), and for the reasons set forth in this Reply, summary judgment in favor of O'Neil must issue.

**I.     RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS**

The Statement of Facts submitted by Plaintiff in its opposition is rife with contradiction, and ultimately fails to establish any genuine issue of material fact that could establish a triable issue on any of Plaintiff's claims.

On one hand, Snap-On repeatedly describes O'Neil's authorized access to the MCF web sites as "surreptitious," insisting that O'Neil took deliberate steps to conceal its activities, and even goes so far as to describe O'Neil's activities as "chicanery." (Memorandum in Opposition (Doc. # 47), pp. 3, 7, 9). On the other hand, Snap-On concedes that it was able to easily identify O'Neil's activities by twice tracing IP addresses back to O'Neil. (Memorandum in Opposition

1

(Doc. # 47), pp. 5-6).  Gamesmanship aside, O'Neil's authorized access to the MCF web sites was overt and nothing was done to hide O'Neil's authorized access to the MCF web sites.  (Cobb depo. 86 (attached as Ex. 1), 125; Moore depo. 98-99 (attached as Ex. 2); Schuler depo. 146-147 (attached as Ex. 3)).

On one hand, Snap-On repeatedly describes itself as a "leading provider of electronic parts catalogs," providing a "vibrant searchable database * * * provid[ing] customers with easy access to the information" through a "vibrant and fully featured application."  (Memorandum in Opposition (Doc. # 47), pp. 1-2).  On the other hand, Snap-On concedes that its lost the business of MCF to O'Neil.  (Memorandum in Opposition (Doc. # 47), p. 2).

Snap-On concedes that the 2005 Contract Documents (Motion for Summary Judgment (Doc. # 41), Ex. A) govern the relationship, and respective responsibilities, between Snap-On and MCF.  (Memorandum in Opposition (Doc. # 47), pp. 1-4).  Snap-On further concedes that O'Neil's activities were being performed at the behest of MCF, as its agent.  (Memorandum in Opposition (Doc. # 47), pp. 2-4).  A further examination of the 2005 Contract Documents, in addition to those portions cited in O'Neil's Motion for Summary Judgment (Doc. # 41), demonstrates the complete folly of Snap-On's position:

*Snap-On was responsible for maintaining a "consistent link twenty-four hours per day, every day of the year" for MCF's access to the MCF web sites.*  In each of the 2005 Contract Documents, MCF is referred to as the "Customer." (Motion for Summary Judgment (Doc. # 41), Ex. A, MCFA001032, MCFA001042, MCFA001047).  In the 2005 Web Hosting Agreement, Snap-On:

> "* * * agrees that it will use its commercially reasonable efforts to maintain the computer hardware, software and telecommunications connections and take all commercially reasonable steps (consistent with then-current industry practice) to establish and maintain a consistent link twenty-four hours per day, every day of

the year, except for reasonable downtime, including, but not limited to, general maintenance, hardware and software upgrades, power and telecommunications outages not attributable to the actions or omissions of ProQuest and other causes beyond ProQuest's direct control, as more particularly described in Exhibit A." (MCFA001047); *see also* Exhibit A to the 2005 Web Hosting Agreement (MCFA001055).

*MCF was responsible for paying the domain name registration for each of its web sites.*

The 2005 Web Hosting Agreement further provides that MCF was responsible for its domain name with regard to each of its web sites:

> "Customer shall be solely responsible for paying the domain name registration and maintenance fees to the Registrar at such times and in such amounts as are required by the Registrar. The inability to use a domain name shall not entitle Customer to a refund by ProQuest of any fees paid with respect to the registration of such unusable domain name." (MCFA001048).

*MCF was responsible for password security for access to each of its web sites. MCF was responsible for determining --- by checking server usage logs --- whether "unauthorized access" to each of its web sites had occurred. MCF was "solely responsible for assigning users names and passwords to authorized users." Snap-On disclaimed liability for "unauthorized access" to each of MCF's web sites.* With regard to security measures for MCF's web sites, the 2005 Web Hosting Agreement provides that:

> "Customer believes that the security procedures described on Exhibit A to safeguard the Customer Web Site should be adequate to protect Customer's interests, if any, in the information therein." (MCFA001048).

Exhibit A to the 2005 Web Hosting Agreement provides:

> "**Customer.** Customer will be solely responsible for authorization security, which includes, without limitation, using commercially reasonable efforts to prevent password or similarly protected pages within the Customer Web Site from being accessed by persons (including individuals and entities) other than authorized users or being automatically indexed and linked to search engine robots or spiders, and for any damages to Customer caused by or resulting from any breach of authorization security (except to the extent such damage is directly caused by or arises from the acts or omissions of ProQuest and/or its contractors and agents). Without limiting the generality of the foregoing, Customer

3

acknowledges that the server usage logs provided by ProQuest are necessary, but insufficient, to identify accurately unauthorized use of the Customer Web Site and Customer agrees that it shall be responsible from comparing the server usage logs to its internal records of authorized users to determine if any breach has occurred.

The parties intend that authorized users will be required to enter a user name and password to access the Customer Web Site. The user name and password will be assigned and administered so as to allow access only to such modules as authorized for such user. Customer will be solely responsible for assigning user names and passwords to authorized users. ProQuest will grant Customer limited rights to access the Customer Web Site using an administrator user name and password for the purpose of administering the user names and passwords of authorized users and for amending, modifying or updating any content or information contained on or within the Customer Web Site. Customer agrees not to use the access granted to the Customer Web Site for any other purpose without the express prior written consent of ProQuest.

*   *   *

IN NO EVENT SHALL PROQUEST BE LIABLE FOR UNAUTHORIZED ACCESS TO, OR ALTERATION, THEFT OR DESTRUCTION OF INFORMATION DISTRIBUTED OR MADE AVAILABLE FOR DISTRIBUTION VIA THE HOSTING SERVICES THROUGH FRAUDULENT MEANS OR OTHER INTENTIONAL SECURITY BREACHES EXCEPT TO THE EXTENT SUCH ARISES FROM OR IS CAUSED BY THE ACTS OR OMISSIONS OF PROQUEST AND/OR ITS CONTRACTORS, AGENTS AND SUPPLIERS." (MCFA001054).

***MCF's "license" to each of its web sites allowed "an unlimited number of individual users."*** Exhibit A to the 2005 License Agreement and 2005 Support Agreement between Snap-On and MCF provides that the Annual License Fee, with respect to each MCF web site, covers:

"Software license, including use by an unlimited number of individual users at Dealers and within MCFA, MCFE and MCFS." (MCFA001023).

Snap-On claims that it was not obligated to return MCF's trade secrets upon termination of the 2005 Contract Documents. (Memorandum in Opposition (Doc. # 47), pp. 2-3). Snap-On's position is belied, again, by the 2005 Contract Documents:

"(c) Upon the termination of this Agreement, each party shall return or destroy, with adequate certification of such destruction, of (sic) the other party's Trade Secrets." Web Hosting Agreement (MCFA001050).

4

Based upon these facts, and the Record evidence that supports them, O'Neil is entitled to summary judgment in its favor on each of Snap-On's claims against it.

## II.   REPLY TO PLAINTIFF'S LAW AND ARGUMENT

### A.   Computer Fraud and Abuse Act.

Snap-On argues --- in direct contravention to the 2005 Contract Documents --- that "permission was not MCF's to give, and O'Neil knew this."  There is no factual support for either part of this assertion.  In fact, the 2005 Contract Documents establish that MCF "will be solely responsible for authorization security."  (MCFA001054).

The authority cited by Snap-On, *LVRC Holdings, LLC v. Breeka*, 581 F.3d 1127 (9th Cir. 2009), actually strengthens O'Neil's position that there is no liability under the CFAA.  The *LCRC Holdings* court concluded that the statutory language, "intentionally accesses a computer without authorization," means to access a computer ***without any permission at all.*** *Id.* at 1133.  It can not be credibly argued that that O'Neil was without any permission at all to access the MCF web site; O'Neil indisputably had MCF's authority to do so.  Moreover, the court notes that the CFAA is primarily a criminal statute in which any ambiguity should be resolved in favor of lenity*.*  *Id.* at 1134.  Even though *LVRC Holdings* and the instant case arise in the civil context, the statute should not be interpreted in surprising or novel ways that impose unexpected burdens on O'Neil.  In the instant case, authorization was MCF's --- and only MCF's --- to give.

Snap-On seizes upon O'Neil's desire for indemnification from MCF, and wrongfully concludes that O'Neil believed the data retrieval was illegal or wrongful.  There is no factual support for that conclusion.  To the contrary, the cited deposition passage stands for the proposition that O'Neil knew that the Plaintiff was being "contentious" with respect to MCF's data.  (Moore depo. 90-91.)  There was a good basis for concluding that Snap-On would be

5

contentious; MCF had concluded that its data was being held "hostage" by Snap-On. (Gusler depo. 25-31, 51 (attached as Ex. 4)). To transform O'Neil's concern that Snap-On could object, obstruct, or even sue, into an allegation that O'Neil believed or knew its conduct was unlawful, is unwarranted and unfair.

As has been demonstrated above, MCF was responsible for password security to each of its web sites. MCF was responsible for determining whether "unauthorized access" to each of its web sites had occurred. In fact, Snap-On disclaimed liability for "unauthorized access" to the MCF web sites. Finally, it was MCF's sole responsibility to assign user names and passwords to each of its web sites. Based upon the Records evidence, there can be no doubt that O'Neil's access to the MCF web sites was authorized and did not exceed the access provided to it by MCF.

      **B.**     **Trespass to Chattels.**

Although Snap-On argues that trespass to chattel is recognized under Ohio law, it does not point to a factual predicate to establish any one of the elements of the tort. Assuming that the chattel is the Snap-On server (for if the chattel is the data or the software it is preempted by copyright law), Snap-On has not established: (1) that Snap-On was dispossessed of its server; or (2) that the server was impaired as to its condition, quality or value; or (3) that the possessor (MCF under the Web Hosting Agreement but, implicitly, Snap-On based on its unsupported argument) was *deprived* of the use of the server for a *substantial* time; or (4) bodily harm to the person or server.

At one point, Snap-On argues that "the chattels at issue are Snap-On's * * * improved data * * *." (Memorandum in Opposition (Doc. # 47), p. 11.) Clearly, this cannot be the basis for trespass to chattels without being impermissibly inconsistent with copyright law. After all, if

copying the improved data is infringing then it is covered by the Copyright Act; if copying the data is non-infringing then a claim for trespass is preempted. (The Plaintiff has not claimed or established that the data was altered, removed, or damaged.) If, on the other hand, the trespass to chattels was based on "the effect that O'Neil's use of its data scraping tool had on Snap-On's servers," (Memorandum in Opposition (Doc. # 47), p. 11) then Snap-On has failed to establish a genuine issue of material fact that the possessor was deprived of use of the servers for a substantial time.

To the contrary, again as demonstrated above, MCF was solely responsible for assigning user names and passwords to authorized users. MCF's "license" permitted an unlimited amount of users. MCF's access to its web sites was not limited in the 2005 Contract Documents. If, as alleged by Snap-On, scraper activity resulted in a denial of service error, such was due to the frailty of the infrastructure at Snap-On since Snap-On was responsible for maintaining a "consistent link twenty-four hours per day, every day of the year" for MCF's unlimited access to its web sites, rather than wrongful activity by O'Neil.

  C. **Unjust Enrichment.**

Snap-On fails to elicit any issue of fact to establish how an unjust enrichment claim is based on anything other than the copying of data. And that conduct --- copying --- is the essence of copyright law. The defense does not contest that an unjust enrichment claim can exist in theory to cover conduct that is not preempted by copyright. If, for instance, a defendant hacked a computer system in order to force the server to host the defendant's web site without paying the hosting fees, an unjust enrichment claim might lie. But in this case, the only argument appears to be that O'Neil's copying of MCF's data was improper, and that O'Neil was unjustly

enriched by virtue of that copying. No other argument, let alone evidentiary fact, has been articulated. Therefore the claim is preempted by copyright law.

The authority cited by Snap-On does not support the proposition that the claim for unjust enrichment is not preempted. In *Tastefully Simple, Inc. v. Two Sisters Gourmet, L.L.C.*, 134 Fed.Appx. 1, 6 at fn. 3 (6th Cir. Apr. 8, 2005), the unjust enrichment claim was held to be preempted by the Copyright Act to the extent the claim relied on the defendant's alleged copying of various forms because: (1) they fell within the scope of "the subject matter of copyright;" and, (2) the "claim depends on nothing more than the unauthorized use of these forms." The same is true in the instant case. The same is true in the instant case: (1) the unjust enrichment claim is based on software and data, which fall within the subject matter of 17 U.S.C. §§ 102 and 103, and (2) the unjust enrichment claim is based on the unauthorized use of the software or data.

Finally, Snap-On cites *Perfect 10, Inc. v. Google, Inc.*, Case No. CV 04-9484 AHM (SHx), 2008 WL 4217837 (C.D. Cal. July 16, 2008), for the proposition that an unjust enrichment claim is not preempted to the extent it relies on non-preempted claims. While the general proposition is true, the *Perfect 10, Inc.* plaintiff specifically avoided relying on its copyright claims. Instead Perfect10 plead right of publicity and trademark theories to support its unjust enrichment claim. In the instant case, however, Snap-On alleged ill-specified "business related benefits." *(See* Amended Complaint (Doc. # 33) ¶¶ 34-37). Those benefits refer to "the value of the information [Snap On] unwillingly provided." (Amended Complaint (Doc. # 33) ¶ 36). The authorities cited by Snap-On support, rather than counter, preemption of the unjust enrichment claim by the Copyright Act.

  **D. Breach of Contract.**

The End User License Agreement for Net-Compass ("EULA") is the sole basis for Snap-On's breach of contract claim.  (Memorandum in Opposition (Doc. # 47), pp. 15-17).   An examination of the EULA reveals that there was simply no breach (assuming that it is even enforceable against O'Neil).  The EULA provides:

> "This License Agreement (the "Agreement") is a legal agreement between you (individually and the company you represent) and Snap-[O]n Business Solutions Inc. f/k/a ProQuest Business Solutions Inc. ("Snap-[O]n").  Snap-[O]n is granting you limited rights to use its Net-Compass software product, together with the associated media, printed materials and online or electronic documentation (collectively, the "Software").  The Software may be delivered to you on disc or downloaded from the Internet.  In either case, this Agreement applies." (Memorandum in Opposition (Doc. # 47), Ex. 22).

The EULA purports to give the user the following rights:

> "a.  You may install from disc or download and use one copy of the Software, or any prior version for the same operating system, on a single computer, your license for the Software is non-transferrable and non-exclusive.
>
> b.  You may not reverse engineer, decompile or disassemble the Software.  You may use the Software in object code format only.  Snap-[O]n does not grant you any license to the source code for the Software.
>
> c.  The Software is licensed as a single product.  Its component parts may not be separated for use on more than on computer.
>
> d.  You may not rent, lease or lend the Software.
>
> e.  Without prejudice to any other rights, Snap-[O]n may terminate this license if you fail to comply with the terms and conditions of this Agreement.  In such event, you must return to Snap-[O]n or destroy (at Snap-[O]n's option) all copies of the Software and all of its component parts." (Memorandum in Opposition (Doc. 47), Ex. 22).

A key provision of the EULA indicates that "[i]f you signed a written license agreement with Snap-On covering the Software, the written agreement will continue in effect and its terms will control over any inconsistent terms of this Agreement." (Memorandum in Opposition (Doc. # 47), Ex. 22., ¶ 9).  As has been demonstrated, a License Agreement did exist between MCF and

Snap-On.  O'Neil was acting pursuant to the authorization that it received from MCF.  The terms of the License Agreement are, therefore, controlling.  Just as important, there is no Record evidence that would support the contention that Snap-On's access to the MCF web sites exceeded the "rights" described in paragraphs (a.) through (e.) of the EULA.

Even if the EULA could override the 2005 Contract Documents by vesting Snap-On with the right to determine access to the web site, the EULA does not apply to O'Neil's activity.  The EULA is specific to the Net-Compass software, and specifically licenses a user to install, or download and use, one copy of the Net-Compass software.  O'Neil neither installed, nor downloaded and used, the Net-Compass software.  O'Neil's only access to the MCF database was through an internet connection that did not require or entail installing Net-Compass software, or downloading and using Net-Compass software.  As such, there is no genuine issue of fact that establishes the applicability of the EULA and summary judgment as to the breach of contract claim in favor of O'Neil is warranted.

      E.    **Copyright.**

Snap-On asserts that its improvements to MCF's data are "proprietary," and that "hot spots and associated relationships between the various types of raw data were created by and are wholly original to Snap-On." (Memorandum in Opposition (Doc. # 47), p. 2).  This assertion is contrary to the Record evidence.  The hot spot information that was reclaimed by O'Neil for MCF was simple coordinate information, an (x,y) coordinate that identified where a part is located in a parts diagram.  (Cobb depo. 60, 61-62; Moore depo. 63-64, 165; Monzon depo. 84-85 (attached as Ex. 5); Schuler depo. 54-55).  Where a part is located in a diagram is a physical fact; it is not a creative expression that is subject to the Copyright Act.

Snap-On's assertions do not establish copyright. "Proprietary" does not mean copyrightable. The creation of "hot spots" and relationships (that followed an MCF table of contents) by Snap-On does not confer authorship upon Snap-On. For a valid copyright to exist, the claim material must be an original work of authorship. 17 U.S.C. § 102. This requires not only independent creation by the author, but also some minimal degree of creativity. *Tastefully Simply, Inc. vs. Two Sisters Gourmet, LLC*, 134 Fed. Appx. 1, 5 (6th Cir. 2005) (spreadsheet not subject to copyright protection because it has no minimal level of creativity); *Kohus v. Mariol*, 328 F.3d 848 (6th Cir. 2003).

Such activity is not protectable by copyright. It does not constitute a work of authorship. In *Tastefully Simply, Inc.,* a case relied upon by Snap-On, the Sixth Circuit discussed the non-protectability of works that consist of merely organizing factual information. For a valid copyright to exist, the copyrighted material must be an original work of authorship. 17 U.S.C. § 102. "Originality * * * means only that the work was independently created by the author (as opposed to copied from other works), and that it possess at least some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345 (1991).

The Sixth Circuit has adopted a two-step process in determining whether an artist's work is protectable by copyright. *Kohus,* 328 F.3d at 855. The first step "requires identifying which aspects of the artist's work, if any, are protectable by copyright." *Id.* (citations omitted). The second step "involves determining whether the allegedly infringing work is 'substantially similar' to protectable elements of the artist's work." *Id.* (citations omitted). The premise for this two-step process is the fact that "[n]ot all 'copying' is actionable, however: it is a constitutional requirement that a plaintiff brining an infringement claim must prove 'copying of

11

constituent elements of the work *that are original.'"* *Id.* at 853 (emphasis in original) (citations omitted).

"The essence of the first step is to filter out the unoriginal, unprotectable elements --- elements that were not independently created by the inventor, and that possess no minimal degree of creativity." *Id.* at 855. "It is axiomatic, to begin with, that mere abstract ideas are not protectable, but the expression of an idea is." *Id.* (citations omitted). Copyright protection is given only to the expression of an idea, not the idea itself. *Id.* In cases that involve a "functional object rather a creative work, it is necessary to eliminate those elements dictated by efficiency." *Id.* at 856 (citations omitted). "[E]lements that are 'dictated by external factors such as particular business practices,'" are filtered out; such elements are not subject to copyright protection. *Id.* *Scenes a faire,* "those elements that follow naturally from the work's theme, rather than the author's creativity," are also filtered out during the first step. *Id.*

For example, "Once upon a time," and "It was a dark and stormy night," are elements that flow naturally from a work's theme, a children's story or a detective novel, and are not expressions subject to copyright. Snap-On's work with MCF's data included keying text into a data base, scanning pictures into a data base and creating relationships between spots on the picture and specific parts numbers on the parts list. Parts numbers were also linked to service bulletins. When new part numbers were issued that superseded previous part numbers, the data base would reflect those changes. (Gusler depo. 13-15). Thus, the hot spots and associated relationships lack the creativity required to be a protected work of authorship. Moreover, the merger doctrine "establishes that when there is essentially only way to express an idea, the idea and its expression are inseparable, *i.e.,* they merge, and copyright is no bar to copying that expression." *Kohus,* 328 F.3d at 856 (internal quotations omitted). As Snap-On has failed to

12

allege that the infringing work is substantially similar to its own, the second step under *Kohus* is not reached.

Snap-On has not demonstrated any protectable interest in the kind of so-called functional conversion and enhancement of the MCF data that was performed in this case. Accordingly, Snap-On's claim of copyright infringement fails, and summary judgment should be granted. In the same way that the selection, coordination and arrangement of white pages did not satisfy the minimum constitutional standards for copyright protection in *Feist,* 499 U.S. at 362, Snap-On has failed to demonstrate that there is any protectable interest in the material in this case. Snap-On describes its activities as "convert[ing] paper catalogs into digital format," and "creating relationships between parts lists, line items[] and diagrams." This work might be laborious and time consuming, technical and even valuable, but it is not authorship. Instead it is "sweat of the brow," a one-time justification for copyright protection that was disavowed by the Supreme Court in *Feist*.

    **F.**    **Trade Secret.**

Snap-On has not pointed the Court to a single fact supporting its claim for misappropriation of a trade secret. Instead, it only criticizes the defense for failing to affirmatively establish the absence of evidence on the subject. Affirmatively establishing the existence of a void seems akin to identifying the outside of a möbius strip --- by definition it cannot be done. The parties have disclosed the program used to retrieve data. The data that was reclaimed has been disclosed. Depositions of key personnel at O'Neil and of MCF have been completed. If there is any evidence to support a claim of misappropriation of a trade secret, it has not been revealed to the defense or to the Court. To the contrary, there has been no fact elicited to establish a misappropriation of a Snap-On trade secret, and Snap-On has failed to

13

demonstrate a genuine issue of fact on the subject. To the contrary, the Record evidence establishes that the only reclaimed data that O'Neil used was MCF's. Snap-On claims that the data that was reclaimed by O'Neil from Snap-On's "[p]roprietary [d]atabase" is a protected trade secret. (Amended Complaint (Doc. # 33), ¶¶ 52-58). To the extent that such data is, indeed, a trade secret --- it is the trade secret of MCF, not Snap-On.

## **CONCLUSION**

For all of the foregoing reasons, O'Neil is entitled to an Order granting summary judgment in its favor.  No genuine issue of material fact remains for Trial.

Respectfully submitted,

*/s/ ALAN B. PARKER*

ALAN B. PARKER (0040008)
ROY A. HULME (0001090)
**Reminger Co., L.P.A.**
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio  44115
(216) 687-1311
(Fax) (216)687-1841
E-Mail: aparker@reminger.com
rhulme@reminger.com

*/s/ MATTHEW L. SCHRADER*

MATTHEW L. SCHRADER (0074230)
**Reminger Co., L.P.A**
65 East State Street, 4th Floor
Capitol Square
Columbus, Ohio  43215
(614) 228-1311
(Fax) (614) 232-2410
E-Mail: mschrader@reminger.com

Attorneys for Defendant

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the above-captioned case has been assigned to the standard case track, and that the foregoing Reply in Support of Motion for Summary Judgment adheres to the page limitations set forth in Local Rule 7.1(f).

*/s/ MATTHEW L. SCHRADER*
_____
MATTHEW L. SCHRADER (0074230)

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2010, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ MATTHEW L. SCHRADER*
_____
MATTHEW L. SCHRADER (0074230)

**DECLARATION**

This Declaration is made pursuant to 28 U.S.C. § 1746:

1. I am one of the attorneys for Defendant relative to the above-captioned case.
2. I have personal knowledge of the statements set forth in this Declaration.
3. The Exhibits attached hereto are true and correct copies of pages from the respective deposition transcripts taken relative to the above-captioned case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 24, 2010.

*/s/ MATTHEW L. SCHRADER*
_____
MATTHEW L. SCHRADER (0074230)