UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SNAP-ON BUSINESS SOLUTIONS, INC. ) | |
| ) | CASE NO. 5:09-CV-01547-JG |
| Plaintiff, ) | |
| ) | JUDGE JAMES S. GWIN |
| v. ) | |
| ) | **PLAINTIFF'S MEMORANDUM IN** |
| O'NEIL & ASSOCIATES, INC. ) | **OPPOSITION TO DEFENDANT'S** |
| ) | **MOTION *IN LIMINE* REGARDING** |
| Defendant. ) | **INDEMNIFICATION AGREEMENTS** |

Defendant O'Neil & Associates, Inc., in its *Motion* In Limine *Regarding Indemnification Agreements* (the "Motion") [Doc. 92], seeks to exclude highly relevant and probative evidence on the grounds that the introduction of the same will somehow prejudice O'Neil before the jury. Not only is evidence of the indemnification agreement (the "Agreement") between O'Neil and Mitsubishi Caterpillar Forklift America, Inc. ("MCFA") relevant to proving several elements of Plaintiff Snap-on Business Solutions, Inc.'s claims against O'Neil, but the type of "concerns" cited by O'Neil are not relevant here. Further, the Agreement at issue is not liability insurance and thus not excluded by Rule 411 of the Federal Rules of Evidence. As such, O'Neil's Motion should be denied.

**I.   THE AGREEMENT IS RELEVANT TO SNAP-ON'S CLAIMS.**

O'Neil's Motion begins with a faulty, fatal premise: that the Agreement is not at all relevant. [*See* Doc. 92 at p. 3.] To the contrary, the Agreement is probative and will provide valuable insight to the jury in support of several of the elements which will demonstrate Snap-on's claims.

CLE - 2748941.1

A. **The Computer Fraud and Abuse Act.**

The Agreement is relevant to proving several elements under each of Snap-on's claims based on the CFAA. First, Snap-on must demonstrate that O'Neil intentionally accessed Snap-on's protected computers without authorization. The Agreement demonstrates on its face that O'Neil acknowledged that its use of the data scraping tool on Snap-on's servers might raise the ire of Snap-on for the very reason that O'Neil's access **was without Snap-on's authorization.** Several of O'Neil's witnesses testified to this concern at deposition, including project manager Barbara Moore, who testified that the Agreement "came up once Snap-on blocked our IP, and we felt that they were concerned with our activity and we wanted additional assurance." [Deposition of Barbara Moore at 90:13-15 – Doc. 47 at Ex. 6.] Had O'Neil been given the proper authorization which would bar Snap-on's claims under the CFAA, there would have been no need for them to enter into the Agreement.

The Agreement is also relevant to proving the second element under the Impairing Computer Facilities CFAA claim, that O'Neil caused damage or recklessly caused damage. Recklessness is defined in Ohio as conduct which was committed

> knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Rankin v. Cuyahoga Co. Dept. of Children and Family Servs.*, 118 Ohio St. 3d 392, 398 (2008). The Agreement demonstrates that O'Neil had reason to know of facts which would otherwise lead a reasonable company in its position to know that its conduct was creating the risk of harm to Snap-on's servers. The very reason that O'Neil requested indemnification from MCFA in the first place was because it was concerned over objection by Snap-on to the data scraping activity and potential legal action against O'Neil for damages caused by that activity. In fact, O'Neil

refused to continue with scraping data until MCFA signed the Agreement. [*See* Deposition of Heather Cobb at 112:12-113:2.][1] Therefore, the existence of the Agreement directly proves the recklessness with which O'Neil caused damages to Snap-on's protected computers and is probative of Snap-on's claims.

B.     **Misappropriation of Trade Secrets.**

The Agreement is similarly relevant to Snap-on's claim for misappropriation of trade secrets. Under this claim, Snap-on must demonstrate that O'Neil acquired Snap-on's trade secrets while knowing or having reason to know that they were being acquired by improper means. *See* R.C. 1333.63. As discussed above, the Agreement is practically an admission by O'Neil that it had concerns that the activity it had already been engaged in prior to the Agreement was improper and would be objected to by Snap-on. As described in more detail below, this was not the case of an indemnification agreement put into place **before** any potentially actionable activity took place; this was the case of two companies acknowledging that what they had already been doing might be improper. Therefore, the Agreement is directly relevant to demonstrating that O'Neil's acquisition of Snap-on's trade secrets was done through improper means.

Secondly, an element of Snap-on's misappropriation of trade secrets claim is O'Neil's disclosure of Snap-on's trade secrets without the express or implied consent of Snap-on. The Agreement is relevant and probative of the issue of whether O'Neil had the express or implied consent of Snap-on to scrape its servers. The Agreement clearly demonstrates that O'Neil **did not** have Snap-on's consent, or O'Neil would not have had to be indemnified by MCFA for any

---

[1] Snap-on is currently requesting permission from O'Neil to attach the relevant portions of Heather Cobb's and Bob Heilman's deposition transcripts, as the same have been designated "Highly Confidential" by O'Neil. Snap-on will supplement these pages with the Court once permission from O'Neil is obtained.

claims brought by Snap-on as a result of the scraping. As such, the Agreement is directly relevant to Snap-on's claim for misappropriation of trade secrets and should be admitted.

## II. THE AGREEMENT IS NOT BARRED BY FEDERAL RULES OF EVIDENCE 403 OR 411.

O'Neil argues that, even if the Agreement is relevant to Snap-on's claims – which it is – it should not be introduced into evidence because it is substantially more prejudicial than probative and is a form of liability insurance excluded under Rule 411 of the Federal Rules of Evidence. However, the agreement at issue is not liability insurance and would satisfy one of the Rule 411 exceptions even if considered to be so. As such, evidence of the Agreement should be admitted.

### A. The Agreement Is Not Liability Insurance.

The Agreement is not barred by Rule 411 because it does not share the same characteristics and qualities of liability insurance as contemplated by the Rule. Liability insurance bears certain characteristics: (1) the insurer is paid to take the risk in question; (2) the insurer is well able to pay; (3) the insurer has agreed to indemnify the insured from liability to third persons as contrasted with coverage from losses sustained by the insured; (4) the insurer will spread the loss among its policy holders; (5) the insured will be disinclined to take an action which might cause the insurer to pay on a liability claim since the insured's premiums will rise; and (6) the insured is insuring a future risk. *DSC Communications Corp. v. Next Level Communications*, 929 F. Supp. 239, 243 (E.D. Tex. 1996) (finding that indemnification agreement was not barred by Rule 411 because it did not satisfy factors 4-6) (citing numerous authorities, including the Advisory Committee notes on Rule 411) (a copy of which is attached hereto as Exhibit A).

In *DSC Communications*, the plaintiff brought claims for theft of trade secrets against two of its former employees and the new company they founded after resigning from the plaintiff. *Id*. at 241. Soon after the lawsuit was filed, the new company was acquired by a second company, which agreed to indemnify the individual defendants in the lawsuit as part of the acquisition. *Id*. The *DSC Communications* court held that the indemnification agreement was admissible, both under a Rule 403 prejudicial v. probative analysis and despite the defendants' argument that, under Rule 411, the agreement was one for liability insurance. The court found Rule 411 not applicable for a variety of reasons, including that: (1) the indemnifying non-party is unable to spread its risk among its "policy holders" (because there were none, as it was not in the business of insurance); (2) the agreement was an isolated business arrangement, and the defendants were "no more worried about the effect than an adverse judgment might have on their next indemnity agreement than a person with life insurance worries about his death causing his future life insurance rates to rise"; and (3) "most importantly, [the defendants] **were not insuring a future risk."** *Id*. at 244 (emphasis added).

To this last point, the court found it particularly instructive that the defendants had engaged in no *forethought* with the indemnifying party; "[r]ather, they negotiated the indemnity agreements *after they had already committed the acts that gave rise to this lawsuit*." *Id*. (emphasis in original). In *DSC Communications*, the plaintiff was not attempting to use the

> tenuous inference of fault that might arise from the fact that the individual defendants obtained an indemnity policy and then engaged in conduct which might be covered by the policy. To the contrary, the fact that [the individual defendants] felt it necessary to "insure" against the contingency that they might be found to have stolen [plaintiff's] trade secrets **is some evidence that they believed that they may not have owned the trade secrets. An individual's subjective belief that an act already taken is wrongful is probative…as to whether the individual's conduct was wrongful.**

*Id* (emphasis added) (citing the Supreme Court's quote of Proverbs 28:1: "The wicked flee when no man pursueth."). Because the agreement was entered into *after* the actionable conduct had taken place, evidence of such an agreement was admissible as an admission by the defendants that what they had done was wrong.

The Agreement in the instant case is similar to that above. Here, the Agreement does not have the usual characteristics of liability insurance agreements, in that MCF cannot spread the cost of the risk out amongst any other "policy holders" and the Agreement was entered into *after* O'Neil began scraping the data and Snap-on blocked its IP address. Much like in *DSC Communications*, the acts which give rise to the lawsuit had already been commenced. As such, the Agreement is probative, as it was in *DSC Communications*, as evidence that O'Neil believed that what it was doing was actionable. Were Snap-on to try and introduce evidence of O'Neil's general liability insurance policy as evidence of O'Neil's wrongdoing, that would no doubt be barred by Rule 411, as it would raise the impressive inference that O'Neil obtained insurance because it planned on acting recklessly. But the fact that O'Neil entered into the Agreement after it had already committed its actionable conduct is markedly different and, thus, admissible.

> **B.** **Even If The Agreement Is Liability Insurance Under Rule 411, It Should Be Admissible As To The Issue Of Ownership.**

Should this Court find that the Agreement at issue is liability insurance under Rule 411, it should nonetheless be admissible because of one of the enumerated exceptions to Rule 411's ban on such evidence. Rule 411 does not require the exclusion of evidence of insurance against liability when offered "for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness." Fed. R. Evid. 411. In *DSC Communications*, the court found this exception applicable to the indemnity agreement, because it was "the alleged *lack of ownership* of the trade secrets that caused the Defendants to secure the indemnity agreements." *DSC*

*Communications*, 929 F. Supp. at 248 (emphasis in original). The fact that the defendants felt it necessary to "insure" against the possibility that they might be found to have stolen the plaintiff's trade secrets "is evidence that they believed that they may not have owned the trade secrets." *Id*.

Similar issues of ownership are present in this case. O'Neil has argued throughout this case, and will no doubt continue to argue at trial, that its actions in scraping the Snap-on servers were not actionable, in that O'Neil only scraped data "owned by" MCFA. [*See e.g.*, Doc. 41-1 at p. 1: "This case arises from O'Neil's authorized retrieval of data authored and owned by O'Neil's customer from a web site hosted by the plaintiff."] Evidence of the Agreement in this case directly refutes that argument and instead suggests that O'Neil was genuinely concerned about its activities and the fact that neither it, nor MCFA, might own the data being scraped. Even if the Agreement constitutes liability insurance, the jury should be able to consider the Agreement for this purpose as contemplated by the exceptions of Rule 411.

    C.    **The Agreement Is Not Prejudicial In The Same Way That Insurance Contracts Are Traditionally Considered Prejudicial.**

O'Neil's only claim in the Motion as to how the Agreement will allegedly be unduly prejudicial is its argument that "[t]he jury may decide to award damages under the mistaken belief that [MCFA], and not O'Neil, will be responsible for paying them." [Doc. 92 at p. 3.] O'Neil's concern is that Snap-on will somehow suggest to the jurors that they reach into the "deep pockets" of MCFA when deciding how much to award Snap-on in damages. Such a concern should not be an issue.

This is not a case of a small business defendant who has the indemnified or insured backing of a large national insurance company. In such a case, there is an obvious distinction between the size of the "pockets" of the actual defendant and the entity which will ultimately

foot the bill. The plaintiff in such a case might be tempted to use this size disparity to lead the jury to a prejudiced conclusion and gain access to the deeper pockets. *See, e.g., Shoultes v. Collins*, 720 F.2d 679 (6th Cir. 1983) (plaintiff's counsel "clearly left the impression that any damage award would, in the last instance, fall upon the municipality (with its unlimited taxing authority) rather than the defendant"). Here, however, Snap-on would derive no benefit from suggesting that the MCFA coffers will satisfy a Snap-on verdict, as O'Neil itself is a multi-million dollar company with more than deep enough pockets to satisfy any judgment. [*See* Heilman Depo. at 47:3-4: "I'm the CEO of a multi-million dollar company...."] Therefore, O'Neil does not stand the risk of being prejudiced by introduction of the Agreement into evidence. If it would address O'Neil's concerns, Snap-on would have no objection to a limiting instruction by the Court to the jury which states that evidence of the indemnification agreement should not be considered in determining how much in damages to award Snap-on.

## CONCLUSION

For the foregoing reasons, Snap-on respectfully requests this Court deny O'Neil's Motion and allow the introduction of evidence regarding the Indemnification Agreement between O'Neil and MCFA. To the extent that a limiting instruction is necessary to ensure that the jury not consider this evidence in its damages calculation, Snap-on poses no objection to such an instruction at this time.

CLE - 2748941.1                                   8

        Respectfully submitted,

        HAHN LOESER & PARKS LLP

        By: /s/ Phillip G. Eckenrode
        Phillip G. Eckenrode (Ohio Reg. No. 84,187)
        65 East State Street, Suite 1400
        Columbus, Ohio 43215
        614-233-5147 (phone)
        614-233-5194 (fax)
        peckenrode@hahnlaw.com (e-mail)

        and

        R. Eric Gaum (Ohio Reg. No. 66,573)
        Amanda H. Wilcox (Ohio Reg. No. 73,832)
        200 Public Square, Suite 2800
        Cleveland, Ohio 44114
        216-621-0150 (phone)
        330-864-7986 (fax)
        regaum@hahnlaw.com (e-mail)
        awilcox@hahnlaw.com (e-mail)

        *Counsel for Plaintiff Snap-on Business Solutions, Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 14th day of May, 2010, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following counsel by operation of the Court's electronic filing system.

Alan B. Parker
REMINGER CO., L.P.A.
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio 44115
aparker@reminger.com

Matthew L. Schrader
REMINGER CO., L.P.A.
65 East State Street, 4th Floor
Capitol Square
Columbus, Ohio 43215
mschrader@reminger.com

*Counsel for Defendant*
*O'Neil & Associates, Inc.*

                                        /s/ Phillip G. Eckenrode
                                        One of the Attorneys for Plaintiff
                                        Snap-on Business Solutions, Inc.