UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SNAP-ON BUSINESS SOLUTIONS, INC., | ) | CASE NO. 5:09-CV01547-JG |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM IN** |
| O'NEIL & ASSOCIATES, INC., | ) | **SUPPORT OF MOTION FOR COSTS** |
| | ) | **AND EXPENSES, INCLUDING** |
| Defendant. | ) | **ATTORNEYS' FEES, UNDER** |
| | ) | **CONTRACT** |

Snap-on Business Solutions Inc. ("Snap-on") sued O'Neil & Associates, Inc. ("O'Neil") in July 2009, asserting various violations of federal and state laws, including breach of contract. On May 19, 2010 the jury returned a general verdict in Snap-on's favor. The End User License Agreement ("EULA") that was the basis for Snap-on's breach of contract claim, entitles Snap-on to reimbursement for "all reasonable costs and expenses, including reasonable legal fees, incurred to protect or enforce its rights under" the EULA. Snap-on seeks $634,310.50 in reasonable attorney fees and $39,366.81 in reasonable costs and expenses,[1] for a total of $673,677.31.

### STATEMENT OF FACTS

Snap-on is in the business of creating searchable databases that serve as electronic parts catalogues for clients in the automotive and heavy equipment industries. After several years of business with Mitsubishi, Snap-on entered into its latest contract with the company in June 2005. Under this License Agreement (Plaintiff's Trial Ex. 148), Mitsubishi supplied Snap-on with

---

[1] Costs sought by this motion are separate and apart from those submitted concurrently with Snap-on's Bill of Costs.

catalogue data to load into its software, and after improving and incorporating the data, Snap-on licensed the finished database to Mitsubishi. The License Agreement limited Mitsubishi's use of the database, allowing only internal use and use by Mitsubishi dealers. Further, the Agreement required Mitsubishi employees and dealers to keep their usernames and passwords confidential, and to use the software only for its intended purpose.

A dispute arose between Mitsubishi and Snap-on regarding ownership of the information stored in the database that Snap-on created. And in 2007, Mitsubishi began discussions with O'Neil to provide an electronic parts catalogue to replace the one created by Snap-on. In October 2008, Mitsubishi and O'Neil entered into an agreement by which O'Neil would provide a database to replace the one that Snap-on had created.

To create the replacement database, O'Neil requested from Mitsubishi electronic versions of Mitsubishi's parts manuals, graphics, pricing information, service information and other content to fill the database. Though Mitsubishi had paper copies of this data, Mitsubishi determined that it was not economical to provide it to O'Neil because the data was not useful in that form. As an alternative, O'Neil suggested that it could scrape the electronic information from the database that Snap-on had created. O'Neil's electronic scraper would access the Snap-on database, copy information, and save it to an O'Neil database, where the company could manipulate the data for its own use.

Mitsubishi agreed to have O'Neil use the scraping tool to gather data from the Snap-on database, and provided O'Neil with a checklist to ensure that O'Neil collected all necessary information. Mitsubishi also provided O'Neil with approximately thirty existing logon credentials, so that the electronic scraper could mimic a user accessing Snap-on's password-protected database.

O'Neil began running the scraper program in February 2009.  From the time that O'Neil started scraping the Snap-on website, the site contained a link to an End User License Agreement ("EULA") governing the use of the application.  (Plaintiff's Trial Exhibit 170).  The EULA warned against accessing Snap-on's protected computers without authorization, it stated:

> 7.  **Authorized Dealer**  Your right to use the Software is conditioned upon your status as an authorized dealer or customer of a manufacturer or other organization that has licensed Net-Compass software from Snap-on.

(Plaintiff's Trial Exhibit 170, Section 7).

It has always been uncontested that O'Neil is not an "authorized dealer or customer" of Mitsubishi or any other organization that has licensed Net-Compass from Snap-on.

Moreover, the EULA provided that as a consequence of a breach, the faulty party was obligated to reimburse Snap-on for all reasonable costs and expenses, including reasonable legal fees, to enforce the agreement.  Section 8 of the EULA states:

> 8.  **Default**   If you fail to comply with any of the terms or conditions of this Agreement, Snap-on may, at its option, terminate this Agreement and your license to use the Software and exercise any and all other rights and remedies available to Snap-on under this Agreement or applicable law.  <u>You agree that you will pay or reimburse Snap-on for all reasonable costs and expenses, including reasonable legal fees, incurred to protect or enforce its rights under this Agreement</u>.

(Plaintiff's Trial Ex. 170, Section 8) (emphasis added).

In April and May 2009, Snap-on's website crashed due to spikes in traffic on Snap-on's server.  Snap-on determined the spikes originated from an IP address registered to O'Neil, and put a firewall in place to block the address from accessing the website.

On May 15, 2009, O'Neil informed Mitsubishi that Snap-on had blocked its IP address, and suggested that they could still run the scraper from an external IP address.  O'Neil modified

its scraping efforts, randomizing the amount of time between data requests, and started running the scraper again.

In June 2009, Snap-on discovered O'Neil's scraping activities, and blocked O'Neil's new IP address. Soon after, O'Neil decided to cease scraping data from Snap-on's database. And in July 2009, Snap-on filed suit against O'Neil.

Snap-on's fifth claim for relief in its Amended Complaint (Doc #: 34, p. 8-9) specifically plead a breach of contract claim based on the EULA and that under the EULA "the user agrees to pay or reimburse [Snap-on] for all reasonable costs and expenses, including reasonable legal fees, incurred to protect or enforce its rights under the End User License Agreement for Net-Compass." (Doc #: 34, ¶ 41).

On May 24, 2010 this Court entered judgment for Snap-on pursuant to the general verdict returned by the jury, which included Snap-on's breach of contract claim based on the EULA.

Snap-on now seeks its reasonable costs and expenses, including reasonable legal fees, pursuant to Section 8 of the EULA as these issues could only be resolved after the trial on the basis of the judgment entered at the trial. *Eastern Trading Company v. Refco, Inc.*, 229 F.3d 617, 626-67 (7th Cir. 2000).[2]

---

[2] *Cf. Clarke v. Mindis Metals, Inc.*, 1996 U.S. App. LEXIS 27925, *26-27 (6th Cir. 1996) ("There is a split of authority over whether attorney's fees mandated by contract should be decided by the judge or a jury … We need not decide this issue for the circuit here…").

## LAW AND ARGUMENT

**I.   BECAUSE THE JURY DETERMINED THAT O'NEIL BREACHED THE END USER LICENSE AGREEMENT, SNAP-ON IS ENTITLED TO ITS REASONABLE COSTS AND EXPENSES, INCLUDING REASONABLE LEGAL FEES**

### A.   General Verdict Presumes Jury Found Against O'Neil On Every Claim

While the court did not require the jury to fill out interrogatories or special instructions, it is clear that the law presumes that the jury found in Snap-on's favor on its claim for breach of the EULA.  Interpreting Ohio law, the Sixth Circuit in *Keet v. Svc. Machine Co., Inc.,* 472 F.2d 138, 140 (6th Cir. 1972) held that when a jury returns a general verdict that is not tested by interrogatories to determine the basis of the decision, "it is presumed that all the issues were decided in favor of the prevailing party."  *See also, Centrello v. Basky,* 128 N.E.2d 80, 86 (Ohio 1955) ("where a general verdict is returned for one of the parties, and the mental processes of the jury have not been tested by special interrogatories to indicate which issue was determinative of the verdict, it will be presumed that all issues were resolved in favor of the prevailing party."); *Bush v. Harvey Transfer Co.,* 67 N.E.2d 851, 856 (Ohio 1946) ("where there are two causes of action . . . thereby raising separate and distinct issues, and a general verdict has been returned, and the mental processes of the jury have not been tested by special interrogatories to indicate which of the issues was resolved in favor of the successful party, it will be presumed that all issues were so determined"); *Dual Mfg. & Engineering, Inc. v. Berkline Corp.,* 619 F.2d 660, 667 (7th Cir. 1980) ("A general verdict, without more, will of course give rise to the presumption that material fact issues have been resolved in favor of the prevailing party").

### B. O'Neil's Breach Of The End User License Agreement Entitles Snap-On To Its Reasonable Costs And Expenses, Including Reasonable Legal Fees

The EULA provides for an award of "reasonable costs and expenses, including reasonable legal fees, incurred" to enforce Snap-on's rights under the EULA. (Plaintiff's Trial Ex. 170, Section 8). Snap-on's case against O'Neil included a claim for breach of the EULA, and the jury found in Snap-on's favor on all claims. Therefore, Snap-on's action to enforce its rights under the EULA falls within the coverage of Section 8 of the EULA. (*Id.*)

The Supreme Court has recognized that in litigation over a contract, the winning litigant may collect attorney fees from the loser if the contract expressly provides for a fee award. *United States v. Pioneer American Ins. Co.,* 374 U.S. 84, 90-92 (1963). Moreover, the validity of a fee-shifting agreement between parties is a matter to be resolved under state law, unless some federal law or policy invalidates the agreement. *Security Mortgage Co., v. Pwers,* 278 U.S. 149, 154 (1928). No such federal law or policy is implicated in this action.

Moreover, as the Court has already recognized, Ohio law enforces "browse-wrap" agreements such as the EULA in this case. Under Ohio law, a "browse-wrap" agreement, similar to the EULA at issue, is enforceable as a valid contract between a website's host and its user. Browse-wrap agreements are those contained on a website which allow the user to view the terms of the particular agreement, but do not require the user to take any affirmative action before the website performs its end of the contract. *See Doe v. SexSearch.com*, 502 F. Supp. 2d 719, 729 at fn. 1 (N.D. Ohio 2007) (distinguishing "browse-wrap" and "clickwrap" agreements).

The enforceability of a browse-wrap agreement as a valid contract turns on whether the website user has actual or constructive knowledge of the site's terms and conditions prior to using the site. *Southwest Airlines Co. v. BoardFirst, L.L.C.*, Case No. 3:06-cv-0891-B, 2007

U.S. Dist. LEXIS 96230, at *15-16 (N.D. Tex. Sep. 12, 2007) (finding that defendant had actual knowledge of the website's terms, and thus browse-wrap agreement was enforceable). Furthermore, in *Cairo, Inc. v. Crossmedia Servs., Inc.*, Case No. C-04-04825-JW, 2005 U.S. Dist. LEXIS 8450, at *12-13 (N.D. Cal. Apr. 1, 2005), the court held that:

> [i]t is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes acceptance of the terms, which accordingly become binding on the offeree.

*Cairo, Inc.*, 2005 U.S. Dist. LEXIS at *12 (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F. 3d 393, 403 (2d Cir. 2004)). Constructive knowledge will be imputed to a website user where the hyperlink which leads the user to the agreement is located conspicuously near a point on the site which is accessed by the user. *See Major v. McCallister*, Case No. SD29871, 2009 Mo. App. LEXIS 1829, at *6 (Mo. Ct. App. Dec. 23, 2009) (website at issue contained "immediately visible notice of the existence of the license terms," as the link to the license terms was located directly next to the button pushed by user).

The EULA at issue in this case constitutes an enforceable contract with O'Neil. The homepages for each of the websites contain log-in and password boxes that Mitsubishi's authorized dealers use to access the website and the data contained therein. (Plaintiff's Trial Exs. 170 and 206). Just below the "ENTER" button, which grants users access to the website after entering their log-in and password information, is a statement which warns users that: "The use of and access to the information on this site is subject to the terms and conditions set out in our legal statement." (Plaintiff's Trial Exs. 170 and 206). Immediately following this text is a green box containing an arrow which users may click to read the EULA in its entirety, as shown below. (*Id.*)

© 2000-2009 Snap-on Business Solutions. All Rights Reserved. The use of and access to the information on this site is subject to the terms and conditions set out in our legal statement.

O'Neil is bound by the terms of the EULA because it clearly had at least constructive knowledge of the EULA each time it accessed one of Snap-on's websites to run the data scraping tool. The link to the EULA was located conspicuously near the point on the MCF website where O'Neil logged in to run the tool, and that link provided "immediately visible notice of the existence of the license terms." (Plaintiff's Trial Exs. 170 and 206). O'Neil made the decision to take the benefit of using the website with knowledge as to the existence and terms of the EULA. Therefore, the EULA constitutes a valid, enforceable contract against O'Neil.

Based on the general verdict in Snap-on's favor, the jury found that O'Neil breached the EULA, entitling Snap-on to "all reasonable costs and expenses, including reasonable legal fees, incurred to protect or enforce its rights" under the EULA. (Plaintiff's Trial Ex. 170, Section 8).

II. **THE AMOUNT OF ATTORNEYS' FEES THAT SNAP-ON SEEKS IS REASONABLE UNDER THE CIRCUMSTANCES**

In determining the amount of an attorney fee award, the Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983), held that "excellent results" warrant a "full[] compensatory fee," that "normally will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified". *See also Wayne v. Village of Sebring,* 36 F.3d 517, 532 (6th Cir. 1994). In this case, Snap-on prevailed on all five of its claims that were submitted to the jury. These claims included two violations of the Computer Fraud and Abuse Act, trespass to chattels, copyright infringement, and breach of the EULA. Snap-on also successfully defended against O'Neil's omnibus motion for summary judgment.

To determine the baseline amount of attorneys' fees, the Court will determine the Lodestar amount by multiplying the reasonable number of hours billed by the reasonable billing rate. *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983). The Supreme Court has emphasized that there is a "'strong presumption' that the Lodestar amount represents the 'reasonable' fee." *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992). The Court may then adjust the Lodestar amount according to the following factors: (1) time and labor required by the case; (2) novelty and difficulty of questions presented; (3) skill needed to perform the legal service properly; (4) preclusion of employment by attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitation imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) nature and length of the professional relationship with client; (12) awards in similar cases.

In conducting a lodestar analysis, courts analyze "hourly time records, full expense statements, documentation of attorney hourly billing rates in the community for the particular type of work involved, the attorney's particular skills and experience, and detailed billing records or client's actual bills showing tasks performed in connection with the litigation." *Adcock v. Secretary of Treasury U.S.*, 227 F.3d 343, 350 (6th Cir. 2000); *see also, Gobain Autover USA, Inc. v. Xinyi Glass North America,* 2010 U.S. Dist. LEXIS 36129, *49-50 (N.D. Ohio 2010).

### A.  The Requested Attorney Billing Rates Are Reasonable.

As a general matter, attorney billing rates that are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation" are reasonable. *Blum v. Stenson,* 465 U.S. 866, 896 at n. 11 (1984). Courts compare requested rates with the "prevailing market rates," because an attorneys' fee award "is to yield

the same level of compensation that would be available from the market." *Missouri v. Jenkins,* 491 U.S. 247, 286 (1989). The Sixth Circuit has defined the prevailing market rate as the rate that "lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004).

Moreover, many courts of appeals have held that the billing rates actually paid by clients are evidence of the prevailing rates. *Morrison v. Davis*, 88 F.Supp. 2d 799, 802 (S.D. Ohio 2000) ("the actual rate that applicant's counsel can command in the market is itself highly relevant proof of the prevailing community rate.") *See also Mathis v. Spears,* 857 F.2d 749, 756 (Fed. Cir. 1988) ("'Only if the evidence reveals that the rate actually charged is abnormally high or abnormally low will the Court base an attorney fee award on an hourly rate at variance with the bill for legal services that was actually rendered to the client'") (citing *Chromallyoy Am. Corp. v. Alloy Surfaces Co.,* 353 F. Supp. 429, 431 (D. Del. 1973).

Hahn Loeser's hourly rates in this matter ranged from $70 to $475, with most billing occurring in the range of $195 to $400 per hour. As set forth in the Declaration of R. Eric Gaum, Hahn Loeser's attorney billing rates in this matter are commensurate with the usual rates charged by attorneys at Hahn Loeser.

B. **Number of Hours Spent by Snap-on's Attorneys Was Reasonable.**

As a general matter, "[t]he number of hours actually expended by counsel may be accepted as reasonable, provided such expenditure of time is supported by the complexity and length of the litigation." *Mathis v. Hydro Air Indus. Inc.,* 1 U.S.P.Q. 2d 1513, 1531 (C.D. Cal. 1986), *aff'd Mathis v. Spears,* 857 F.2d 749 (Fed. Cir. 1988); *Gobain Autover USA, Inc.,* 2010 U.S. Dist. LEXIS 36129, at *49-50.

The present litigation involved complex subject matter, substantial electronic discovery, multiple depositions, including those of Mitsubishi personnel in Texas, opposing O'Neil's omnibus motion for summary judgment, and then the trial of claims based on the Computer Fraud and Abuse Act and trespass to chattels, copyright infringement, and breach of contract.

The number of hours actually expended by Hahn Loeser was reasonable considering the nature of the case.  As a result, Snap-on seeks reimbursement for a total of $634,310.50 in legal fees billed by Hahn Loeser in this matter.  (Gaum Dec., ¶ 11).

### III. SNAP-ON IS ALSO ENTITLED TO COSTS NOT ORDINARILY PROVIDED FOR 28 U.S.C. § 1924

Snap-on is also seeking recovery for costs incurred as part of the litigation against O'Neil not included in Snap-on's contemporaneously filed Bill of Costs.  Pursuant to Section 8 of the EULA, Snap-on is entitled to "all reasonable costs and expenses, including reasonable legal fees . . . ."  (Plaintiff's Trial Ex. 170, Section 8) (emphasis added).  While Snap-on is entitled to recover those costs provided for under 28 U.S.C. § 1924 as the prevailing party, Section 8 of the EULA provides for the recovery of all reasonable costs and expenses, without the limitations of Section 1924.

As such, Snap-on is also seeking recovery for all costs (except those provided for in its separate, contemporaneously filed Bill of Costs) under Section 8 of the EULA.  All are reasonable and were necessarily incurred to protect and enforce Snap-on's rights under the EULA against O'Neil.

Snap-on seeks reimbursement for $39,366.81 in expenses and costs related to this action (excluding costs sought separately as part of Snap-on's concurrently submitted Bill of Costs).

## **CONCLUSION**

For the foregoing reasons, Snap-on respectfully requests that the Court further award Snap-on all its reasonable costs and expenses, including reasonable legal fees, it incurred in protecting and enforcing its rights under the End User License Agreement against O'Neil, which in total comes to $673,677.31

                                                  Respectfully submitted,

Dated:  June 7, 2010                  HAHN LOESER & PARKS LLP

                                                  By:  /s/  Amanda H. Wilcox
                                                  Amanda H. Wilcox (Ohio Reg. No. 73,832)
                                                  ahwilcox@hahnlaw.com
                                                  R. Eric Gaum (Ohio Reg. No. 66,573)
                                                  regaum@hahnlaw.com
                                                  200 Public Square, Suite 2800
                                                  Cleveland, Ohio 44114
                                                  Phone:  (216) 621-0150
                                                  Fax:  (216) 241-2824

                                                  Phillip G. Eckenrode (Ohio Reg. No. 84,187)
                                                  pgeckenrode@hahnlaw.com
                                                  65 East State Street, Suite 1400
                                                  Columbus, Ohio 43215
                                                  Phone:  (614) 221-0240
                                                  Fax:  (614) 221-5909

                                                  Attorneys for Plaintiff
                                                  Snap-On Business Solutions, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2010, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Amanda H. Wilcox
One of the Attorneys for Plaintiff
Snap-on Business Solutions, Inc.